# Exhibit B

Execution version

## CONSTRUCTION TO PERMANENT
## LOAN AND SECURITY AGREEMENT

### KINGSTON WIND INDEPENDENCE, LLC
**as the Borrower**

### CATHAY BANK
**as Lender**

$5,068,000 Construction Loan converting to $3,568,000 Term Loan for the Acquisition, Development and Operation of 2,000 kW Wind Turbine located at 6-8 Cranberry Lane, Kingston, MA

November 30, 2011

Day Pitney 11/14/11 Revised Draft

## TABLE OF CONTENTS

**Page**

ARTICLE 1 -    DEFINITIONS AND REFERENCES ............................................................ 1

    Section 1.1        Defined Terms .................................................................... 1

    Section 1.2        Exhibits and Schedules; Additional Definitions ............................. 15

    Section 1.3        Amendment of Defined Instruments ............................................ 15

    Section 1.4        References and Titles ........................................................... 15

ARTICLE 2 -    THE LOANS ................................................................................ 16

    Section 2.1        Commitment to Lend; Note ..................................................... 16

    Section 2.3        Use of Proceeds................................................................. 18

    Section 2.4        Interest Rates and Fees; Payment Dates .................................... 18

    Section 2.5        Optional Prepayments .......................................................... 19

    Section 2.6        Mandatory Principal Payments; Prepayments ............................... 19

    Section 2.7        Guaranty......................................................................... 19

    Section 2.8        Conversion ...................................................................... 20

    Section 2.9        Conversion Conditions......................................................... 20

    Section 2.10       Prepayment Fee................................................................. 20

ARTICLE 3 -    PAYMENTS TO THE LENDER ........................................................... 21

    Section 3.1        General Procedures; Automatic Payment ................................... 21

    Section 3.2        Capital Reimbursement........................................................ 22

    Section 3.3        Funding Losses ................................................................. 22

    Section 3.4        Reimbursable Taxes............................................................ 23

ARTICLE 4 -    CONDITIONS PRECEDENT TO LENDING ............................................. 23

    Section 4.1        Items and Documents to be Delivered ...................................... 23

    Section 4.2        Conditions to Each Subsequent Advance ................................... 26

    Section 4.3        Additional Conditions Precedent ............................................ 26

ARTICLE 5 -    REPRESENTATIONS AND WARRANTIES............................................... 27

    Section 5.1        No Default....................................................................... 27

    Section 5.2        Organization and Good Standing............................................. 27

    Section 5.3        Authorization ................................................................... 28

    Section 5.4        No Conflicts or Consents...................................................... 28

# TABLE OF CONTENTS
### (continued)

Page

| | | |
|---|---|---|
| Section 5.5 | Enforceable Obligations | 28 |
| Section 5.6 | Financial Statements; Initial Projections | 28 |
| Section 5.7 | Other Obligations and Restrictions | 28 |
| Section 5.8 | Full Disclosure | 29 |
| Section 5.9 | Litigation | 29 |
| Section 5.10 | Labor Disputes and Acts of God | 29 |
| Section 5.11 | ERISA Plans and Liabilities | 30 |
| Section 5.12 | Environmental and Other Laws | 30 |
| Section 5.13 | Names and Places of Business | 30 |
| Section 5.14 | Subsidiaries | 30 |
| Section 5.15 | Investment Company Act; Federal Power Act | 31 |
| Section 5.16 | Solvency | 31 |
| Section 5.17 | Title to Properties; Licenses; Operation of the Project | 31 |
| Section 5.18 | Margin Regulations | 31 |
| Section 5.19 | Governmental Approvals and Permits | 31 |
| Section 5.20 | Security Document Representations and Warranties | 32 |
| Section 5.21 | Operation and Management of the Project | 32 |
| ARTICLE 6 - | AFFIRMATIVE COVENANTS OF THE BORROWER | 33 |
| Section 6.1 | Payment and Performance | 33 |
| Section 6.2 | Books, Financial Statements and Reports | 33 |
| Section 6.3 | Other Information and Inspections | 34 |
| Section 6.4 | Notice of Material Events | 35 |
| Section 6.5 | Maintenance of Properties | 35 |
| Section 6.6 | Maintenance of Existence, Qualifications and Permits | 36 |
| Section 6.7 | Payment of Trade Liabilities, Taxes, etc | 36 |
| Section 6.8 | Insurance | 36 |
| Section 6.9 | Performance on the Borrower's Behalf | 37 |
| Section 6.10 | Interest | 38 |
| Section 6.11 | Compliance with Agreements and Law | 38 |

**TABLE OF CONTENTS**
(continued)

Page

| | | |
|---|---|---|
| Section 6.12 | Environmental Matters; Environmental Reviews | 38 |
| Section 6.13 | Evidence of Compliance | 39 |
| Section 6.14 | Bank Accounts; Offset | 39 |
| Section 6.15 | Agreement to Deliver Security Documents | 39 |
| Section 6.16 | General Covenants Applicable to Collateral | 40 |
| Section 6.17 | Collateral | 42 |
| Section 6.18 | Financial Covenants | 42 |
| Section 6.19 | Loan in Balance | 42 |
| Section 6.20 | Borrower to Pay Expenses | 43 |
| Section 6.21 | Taking | 43 |
| ARTICLE 7 - | NEGATIVE COVENANTS OF THE BORROWER | 43 |
| Section 7.1 | Indebtedness | 43 |
| Section 7.2 | Limitation on Liens | 44 |
| Section 7.3 | Limitation on Mergers, Issuances of Securities | 44 |
| Section 7.4 | Limitation on Sales of Property | 44 |
| Section 7.5 | Limitation on Dividends, Redemptions and Payments on Permitted  Subordinated Debt | 44 |
| Section 7.6 | Limitation on Transfer of Membership Interests | 45 |
| Section 7.7 | Limitation on Investments and New Businesses | 45 |
| Section 7.8 | Limitation on Credit Extensions | 45 |
| Section 7.9 | Transactions with Affiliates | 45 |
| Section 7.10 | Prohibited Contracts | 45 |
| Section 7.11 | No Amendments | 45 |
| ARTICLE 8 - | COLLATERAL | 45 |
| Section 8.1 | Grant of Security Interest | 46 |
| Section 8.2 | Lien on Deposit Accounts; Cash Collateral | 46 |
| Section 8.3 | Other Collateral | 47 |
| Section 8.4 | No Assumption of Liability | 47 |
| Section 8.5 | Financing Statements; Power of Attorney | 47 |
| Section 8.6 | Further Assurances | 47 |

-iii-

## TABLE OF CONTENTS
(continued)

Page

ARTICLE 9 -     COLLATERAL ADMINISTRATION ................................................ 48
    Section 9.1     Administration of Accounts ................................................ 48
    Section 9.2     Administration of Equipment ................................................ 48
    Section 9.3     Administration of Deposit Accounts ................................ 48
    Section 9.4     General Provisions ................................................ 49
    Section 9.5     Power of Attorney ................................................ 49
ARTICLE 10 -     EVENTS OF DEFAULT AND REMEDIES ................................ 50
    Section 10.1     Events of Default ................................................ 50
    Section 10.2     Remedies ................................................ 52
    Section 10.3     Application of Proceeds after Acceleration ................ 52
    Section 10.4     UCC Remedies ................................................ 52
ARTICLE 11 -     MISCELLANEOUS ................................................ 53
    Section 11.1     Waivers and Amendments; Acknowledgments ................ 53
    Section 11.2     Survival of Agreements; Cumulative Nature ................ 54
    Section 11.3     Notices ................................................ 54
    Section 11.4     Payment of Expenses; Indemnity ................................ 55
    Section 11.5     Assignments ................................................ 56
    Section 11.6     Governing Law; Submission to Process ................ 57
    Section 11.7     Limitation on Interest ................................................ 58
    Section 11.8     Termination; Limited Survival ................................ 58
    Section 11.9     Severability ................................................ 58
    Section 11.10     Counterparts; Fax ................................................ 58
    Section 11.11     Waiver of Jury Trial, Punitive Damages, etc ................ 58
    Section 11.12     USA Patriot Act Notice ................................ 59
    Section 11.13     Lender's Consent ................................................ 59

### CONSTRUCTION TO PERMANENT LOAN
### AND SECURITY AGREEMENT

THIS CONSTRUCTION TO PERMANENT LOAN AND SECURITY AGREEMENT is made as of November 30 , 2011, by and among KINGSTON WIND INDEPENDENCE, LLC, a limited liability company formed under the laws of the Commonwealth of Massachusetts having a business address of 415 VFW Drive, Post Office Box 415, Rockland, MA 02370 (the "**Borrower**"), and CATHAY BANK a California banking corporation as lender having a business address of 621 Washington Street, Boston, MA 02111 (the "**Lender**").

WITNESSETH:

In consideration of the mutual covenants and agreements contained herein, the advances which may hereafter be made by the Lender to the Borrower and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto do hereby agree as follows:

### Article 1 - Definitions and References

Section 1.1    Defined Terms. As used in this Agreement, each of the following terms has the meaning given to such term in this Section 1.1 or in the sections and subsections referred to below:

"**Account**" means such term as defined in the UCC, including all rights to payment for goods sold or leased, or for services rendered.

"**Account Debtor**" means a Person who is obligated under an Account, Chattel Paper or General Intangible.

"**Act**" " has the meaning given to such term in Section 11.12.

"**Advance**" means any Borrowing requested by the Borrower in accordance with Section 2.2.

"**Adjusted EBITDA**" means, in respect of the Borrower, as of any date of determination, the difference of (a) EBITDA of the Borrower, minus (b) all taxes paid in cash during the applicable period, minus (c) all Distributions paid during the applicable period.

"**Affiliate**" means, as to any Person, each other Person that directly or indirectly (through one or more intermediaries or otherwise) controls, is controlled by, or is under common control with, such Person.  A Person shall be deemed to be "**controlled by**" any other Person if such other Person possesses, directly or indirectly, power

(a)    to vote 20% or more of the securities or other equity interests (on a fully diluted basis) having ordinary voting power for the election of directors, the managing general partner or partners or the managing member or members; or

(b)      to direct or cause the direction of the management and policies of such Person whether by contract or otherwise.

"**Aggregate Commitment**" means the lesser of (i) $5,068,000 and (ii) the product of 72.40% multiplied by the outstanding amounts expended by Borrower on the Project.

"**Agreement**" means this Construction to Permanent Loan and Security Agreement.

"**AIA**" "has the meaning given to such term in Section 2.2.

"**Approved Budget**" means the budget for the Project prepared by the Borrower and approved by the Lender prior to the closing of this Agreement.

"**Base Rate**" means the rate announced from time to time by Wall Street Journal as its Prime Rate.

"**Basis Point**" means one one-hundredth of one percent (0.01%).

"**Borrower**" means Kingston Wind Independence, LLC  a limited liability company organized under the laws of the State of The Commonwealth of Massachusetts.

"**Borrowing**" means a borrowing of a new Advance pursuant to Section 2.2.

"**Borrowing Notice**" means a written or telephonic request, or a written confirmation, made by the Borrower which meets the requirements of Section 2.2.

"**Business Day**" means a day, other than a Saturday or Sunday, on which commercial banks are open for business with the public in Boston, Massachusetts.

"**Cash Collateral**" means cash, and any interest or other income earned thereon, that is delivered to Lender to Cash Collateralize any Obligations.

"**Cash Collateral Account**" means a demand deposit, money market or other account established by Lender at such financial institution as Lender may select in its discretion, which account shall be subject to the Lien.

"**Cash Collateralize**" the delivery of cash to Lender, as security for the payment of any inchoate or contingent Obligations (including Obligations arising under Hedging Contracts), in an amount equal to Lender's good faith estimate of the amount due or to become due, including all fees and other amounts relating to such Obligations.  "**Cash Collateralization**" has a correlative meaning.

"**Cash Equivalents**" means Investments in:

(a)      marketable obligations, maturing within twelve months after acquisition thereof, issued or unconditionally guaranteed by the United States of America or an instrumentality or agency thereof and entitled to the full faith and credit of the United States of America;

2

(b)     demand deposits, and time deposits (including certificates of deposit) maturing within twelve months from the date of deposit thereof, with any office of the Lender;

(c)     repurchase obligations with a term of not more than seven days for underlying securities of the types described in <u>subsection (a)</u> above entered into with any commercial bank meeting the specifications of <u>subsection (b)</u> above;

(d)     open market commercial paper, maturing within 270 days after acquisition thereof, which are rated at least P-1 by Moody's or A-1 by S&P; and

(e)     money market or other mutual funds substantially all of whose assets comprise securities of the types described in <u>subsections (a) through (d)</u> above.

"**<u>Change of Control</u>**" means the occurrence of any of the following events: (a) Bradford S. Cleaves (or any trust or limited liability company the beneficiaries or owners of which are Bradford S. Cleaves and/or his lineal descendants) ceases to own 1/3 of Borrower or (b) Duncan S. Peterson (or any trust or limited liability company the beneficiaries or owners of which are Duncan S. Peterson and/or his lineal descendants) ceases to own 1/3 of Borrower or (c) Kially M. Ruiz (or any trust or limited liability company the beneficiaries or owners of which are Kially M. Ruiz and/or his lineal descendants) ceases to own 1/3 of Borrower; or (d) any of Kially M. Ruiz, Bradford S. Cleaves or Duncan S. Peterson ceases to be a Manager of the Borrower. Notwithstanding the foregoing, it shall not be an Event of Default hereunder, if each of the three individuals referred to in subparts (a)-(c) owns no less than 20% of the ownership interests in the Borrower (i.e., for a total of 60%), provided (i) the remaining ownership interests in the Borrower are owned by D&C Construction Company, a Massachusetts corporation, pursuant to its election to convert the debt owed to said corporation by the Borrower, as evidenced by that certain Convertible Promissory Note dated October 9, 2011 in the amount of $1,400,000, (ii) all of the shares of said D&C Construction Company continue to be held by Bradford S. Cleaves and Duncan S. Peterson and (iii) said D&C Construction Company executes a Guaranty of Payment in the same form as the Guaranty of Payment executed on the date hereof by Guarantors.

"**<u>Chattel Paper</u>**" means such term as defined in the UCC.

"**<u>Closing Date</u>**" means the date on which all of the conditions precedent set forth in Section 4.1 and Section 4.2 shall have been satisfied or waived.

"**<u>Collateral</u>**" means all property of any kind which is subject to a Lien in favor of the Lender, or which, under the terms of any Security Document, is purported to be subject to such a Lien, and shall include all property described in <u>Section 8.1</u>, or in any Security Documents as security for any Obligations.

"**<u>Commercial Operation Date</u>**" means the date of commencement of commercial operation of the Generating Unit, as confirmed by the Power Purchaser by letter as provided in each Power Purchase Agreement, but in no event shall the Commercial Operation Date be later than May 31, 2012.

"**<u>Commercial Tort Claim</u>**" means such term as defined as defined in the UCC.

"**Commitment**" means the obligation of the Lender to make Loans to the Borrower in an aggregate amount not exceeding the Aggregate Commitment.

"**Commitment Fee**" means $38,010 payable on or before the Closing Date.

"**Completion Guaranty**" means the guaranty dated as of the date of this Agreement entered into by the Guarantor in accordance with Section 2.7 of this Agreement.

"**Condemnation Proceeds**" has the meaning given to such term in Section 6.21.

"**Construction Deadline**" means March 31, 2012, provided however that such date may extended with the consent of the Lender due to construction delays as a result of events and circumstances outside of the Borrower's control as determined by the Lender, which consent shall not be unreasonably withheld or delayed.

"**Construction Loan Commitment Period**" means the period from and including the Closing Date until the last day of the Construction Period (or, if earlier, the day on which the obligation of the Lender to make Advances hereunder have been terminated or the Note first become due and payable in full).

"**Construction Period**" means the period beginning on the Closing Date and terminating on the Commercial Operation Date, but in no event later than the Construction Deadline.

"**Contractor**" means D&C Construction Company, a Massachusetts corporation.

"**Conversion Conditions**" has the meaning given to such term in Section 2.9

"**Debt Service**" means, in respect of the Loan, as of any date of determination, for any measurement period, the sum of (a) interest payments on the Loan during the applicable period after giving effect to all payments made or received by Borrower pursuant to any Hedging Contract entered into by the Borrower, plus (b) all scheduled principal payments on the Loan during such period.

"**Default**" means any Event of Default and any default, event or condition which would, with the giving of any requisite notices and the passage of any requisite periods of time, constitute an Event of Default.

"**Default Rate**" means, at the time in question the rate per annum equal to five percent (5.00%) above the Interest Rate then in effect provided in each case that no Default Rate charged by any Person shall ever exceed the Highest Lawful Rate.

"**Deposit Account**" means such term as defined in the UCC

"**Disclosure Report**" means either a notice given by the Borrower under Section 6.4 or a certificate given by the Borrower's chief financial officer under Section 6.2(b).

"**Disclosure Schedule**" means **Schedule 1** hereto.

"**Distribution**" means (a) any dividend or other distribution made by the Borrower to its members on or in respect of any equity interest in such member or any other member (including any option or warrant to buy any equity interest), or (b) any payment made by a member to purchase, redeem, acquire or retire any equity interest in such member or any other member (including any such option or warrant).

"**Distribution Conditions**" means, as of the end of each Fiscal Quarter following the Construction Period, satisfaction (or waiver by the Lender) of each of the following:

(a)     The Borrower shall have demonstrated compliance with the following covenant as of the end of such Fiscal Quarter on a quarterly basis commencing March 31, 2012, based on the Borrower's financial condition (I) on a cumulative basis until the Borrower has completed four-Fiscal Quarters of operations and (II) on a rolling four-Fiscal Quarter basis for the preceding four Fiscal Quarters, thereafter:

(i)     A ratio of Adjusted EBITDA to Debt Service on the Loan of not less than 1.25 to 1.00;

(b)     No Default or Event of Default shall have occurred and be continuing (or shall result from the payment of any such Distribution); and

(c)     No Material Adverse Effect shall have occurred and be continuing.

"**Documents**" means such term as defined in the UCC.

"**DSCR**" means the ratio of Adjusted EBITDA to Debt Service on the Loan.

"**EBITDA**" means, in respect of the Borrower, as of any date of determination, for any measurement period, the sum of (a) the Borrower's Net Income during the applicable period, plus (b) all interest paid or accrued on Indebtedness during the applicable period which was deducted in determining such Net Income, plus (c) all income taxes which were deducted in determining such Net Income, plus (d) all depreciation, amortization (including amortization of goodwill and debt issue costs) and other non-cash charges (including any provision for the reduction in the carrying value of assets recorded in accordance with GAAP) which were deducted in determining such Net Income.

"**Eligible Transferee**" means a Person which either (a) is the Lender or an Affiliate of the Lender, or (b) is consented to as an Eligible Transferee by the Lender and, so long as no Default or Event of Default is continuing, by the Borrower, which consents in each case will not be unreasonably withheld (provided that no Person organized outside the United States may be an Eligible Transferee if the Borrower would be required to pay withholding taxes on interest or principal owed to such Person).

"**Engineer**" means STV, Inc., or such other engineering company retained by the Lender from time to time.

"**Engineering Report**" means the initial engineering report and each engineering report delivered to the Borrower in connection with the development and operation of the Generating Unit in Kingston, Massachusetts for the production, generation and sale of energy.

"**Environmental Laws**" means any and all Laws relating to the environment or to emissions, discharges, releases or threatened releases of pollutants, contaminants, chemicals, or industrial, toxic or hazardous substances or wastes into the environment including ambient air, surface water, ground water, or land, or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport, or handling of pollutants, contaminants, chemicals, or industrial, toxic or hazardous substances or wastes.

"**Equipment**" means such term as defined in the UCC, including all machinery, apparatus, equipment, fittings, furniture, fixtures, motor vehicles and other tangible personal Property (other than Inventory), and all parts, accessories and special tools therefor, and accessions thereto.

"**Equity**" means membership or other equity interests in a limited liability company, shares of capital stock or a partnership interest, profits, capital, other equity interest, or options, warrants or any other rights to substitute for or otherwise acquire the membership interests capital stock or a partnership, profits, capital or other equity interest of any Person.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and any successor statutes or statute, together with all rules and regulations promulgated with respect thereto.

"**ERISA Affiliate**" means all members of a controlled group of corporations and all trades or businesses (whether or not incorporated) under common control that, together with the Borrower, are treated as a single employer under Section 414 of the Internal Revenue Code with respect to an ERISA Plan.

"**ERISA Plan**" means any employee pension benefit plan subject to Title IV of ERISA maintained by any ERISA Affiliate with respect to which the Borrower has a fixed or contingent liability.

"**Event of Default**" has the meaning given to such term in Section 10.1.

"**Event of Taking**" shall mean any taking, exercise of rights of eminent domain, public improvement, inverse condemnation, condemnation or similar action or proceeding by any Governmental Authority relating to any part of the Property or the Project.

"**Extended Maturity Date**" shall mean May 31, 2022.

"**Facility Usage**" means, at the time in question, the aggregate principal amount of outstanding Loan at such time.

"**Federal Incentive Grant**" has the meaning given to such term in Section 6.15.

"**FERC**" means the Federal Energy Regulatory Commission or its successor agency.

6

"**Fiscal Quarter**" means a three-month period ending on March 31, June 30, September 30 or December 31 of any year.

"**Fiscal Year**" means a twelve-month period ending on December 31 of any year.

"**5-year US Treasury Bill Rate**" means the average yield on United States Treasury obligations which mature in five (5) years from their issue date as published in the Bloomberg Financial Markets Service, and shall be determined by Lender based upon the applicable United States Treasury rate obtained by Lender from the Bloomberg Financial Markets Service (the "**Published Rate**") between 9:00 a.m. and 10:00 a.m., Massachusetts time, on the Publication Date immediately preceding the last day of fifth (5th) Term Year. "**Publication Date**" shall mean each Monday on which the Published Rate is published in the Bloomberg Financial Markets Service. If the Monday in question is a holiday or if the Bloomberg Financial Markets Service is not published on the day in question, the Publication Date shall be deemed to be the next Business Day on which the Bloomberg Financial Markets Service is published in that week.

"**GAAP**" means those generally accepted accounting principles and practices in the United States of America which are set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and the statements and pronouncements of the Financial Accounting Standards Board (or any generally recognized successor) and which, in the case of the Borrower and any consolidated subsidiaries, are applied for all periods after the date hereof in a manner consistent with the manner in which such principles and practices were applied to the Initial Financial Statements. Subject to Section 1.7, if any change in any accounting principle or practice is required by the Financial Accounting Standards Board (or any such successor) in order for such principle or practice to continue as a generally accepted accounting principle or practice, all reports and financial statements required hereunder with respect to the Borrower or with respect to the Borrower and its consolidated subsidiaries may be prepared in accordance with such change, but all calculations and determinations to be made hereunder may be made in accordance with such change only after notice of such change is given to the Lender, and the Lender agrees to such change insofar as it affects the accounting of the Borrower and its consolidated subsidiaries, such agreement not to be unreasonably withheld, delayed or conditioned.

"**General Intangibles**" means such term as defined in the UCC, including choses in action, causes of action, company or other business records, inventions, blueprints, designs, patents, patent applications, trademarks, trademark applications, trade names, trade secrets, service marks, goodwill, brand names, copyrights, registrations, licenses, franchises, customer lists, permits, tax refund claims, computer programs, operational manuals, internet addresses and domain names, insurance refunds and premium rebates, all rights to indemnification, and all other intangible property of any kind.

"**Generating Unit**" means a Hyundai wind-powered turbine with a name plate rating of 2,000 kW and all associated equipment.

"**Goods**" means such term as defined in the UCC.

"**Governmental Authority**" means any government, any arbitration panel, any court or any governmental department, commission, board, bureau, agency, authority, regulatory body or entity, or instrumentality of the United States of America or any state, province, commonwealth, nation, territory, possession, county, parish, town, township, village or municipality, whether now or hereafter constituted or existing.

"**Governmental Approvals**" means any authorization, approval, consent, waiver, exception, license, filing, registration, ruling, permit, tariff, certification, exemption and other action or requirement by or with any Governmental Authority.

"**Ground Lease**" means that certain Ground Lease (as contained within the Power Purchase Agreement) by and between Borrower as lessee and The Town of Kingston, Massachusetts as lessor/owner, dated March 18, 2011 and any amendment thereto, covering the entire area of the Property,

"**Guarantor**" means, collectively Bradford S. Cleaves, Duncan S. Peterson and Kially M. Ruiz.

"**Hazardous Materials**" means any substances regulated under any Environmental Law, whether as pollutants, contaminants, or chemicals, or as industrial, toxic or hazardous substances or wastes, or otherwise.

"**Hedging Contract**" means (a) any agreement providing for options, swaps, floors, caps, collars, forward sales or forward purchases involving interest rates, commodities or commodity prices, equities, currencies, bonds, or indexes based on any of the foregoing, (b) any option, futures or forward contract traded on an exchange, and (c) any other derivative agreement or other similar agreement or arrangement.

"**Highest Lawful Rate**" means, with respect to the Lender, the maximum nonusurious rate of interest that the Lender is permitted under applicable Law to contract for, take, charge, or receive with respect to such Obligations. All determinations herein of the Highest Lawful Rate, or of any interest rate determined by reference to the Highest Lawful Rate, shall be made by the Lender as appropriate to assure that the Loan Documents are not construed to obligate any Person to pay interest to the Lender at a rate in excess of the Highest Lawful Rate the Lender may charge.

"**Indebtedness**" of any Person means Liabilities in any of the following categories:

(a)     Liabilities for borrowed money,

(b)     Liabilities constituting an obligation to pay the deferred purchase price of property or services,

(c)     Liabilities evidenced by a bond, debenture, note or similar instrument,

(d)     Liabilities which (i) would under GAAP be shown on such Person's balance sheet as a liability, and (ii) are payable more than one year from the date of creation thereof (other than reserves for taxes and reserves for contingent obligations),

(e)     Liabilities arising under Hedging Contracts (on a net basis to the extent netting is provided for in the applicable Hedging Contract),

(f)     Liabilities constituting principal under Capital Leases,

(g)     Liabilities arising under conditional sales or other title retention agreements,

(h)     Liabilities owing under direct or indirect guaranties of Liabilities of any other Person or otherwise constituting obligations to purchase or acquire or to otherwise protect or insure a creditor against loss in respect of Liabilities of any other Person (such as obligations under working capital maintenance agreements, agreements to keep-well, or agreements to purchase Liabilities, assets, goods, securities or services), but excluding endorsements in the ordinary course of business of negotiable instruments in the course of collection,

(i)     Liabilities (for example, repurchase agreements, mandatorily redeemable preferred stock and sale/leaseback agreements) consisting of an obligation to purchase or redeem securities or other property, if such Liabilities arise out of or in connection with the sale or issuance of the same or similar securities or property,

(j)     Liabilities with respect to letters of credit or applications or reimbursement agreements therefor,

(k)     Liabilities with respect to banker's acceptances,

(l)     Liabilities with respect to payments received in consideration of oil, gas, or other minerals yet to be acquired or produced at the time of payment (including obligations under "take-or-pay" contracts to deliver gas in return for payments already received and the undischarged balance of any production payment created by such Person or for the creation of which such Person directly or indirectly received payment), or

(m)     Liabilities with respect to other obligations to deliver goods or services in consideration of advance payments therefor; provided, however, that the "Indebtedness" of any Person shall not include Liabilities that were incurred by such Person on ordinary trade terms to vendors, suppliers, or other Persons providing goods and services for use by such Person in the ordinary course of its business, unless and until such Liabilities are outstanding more than 90 days past the original invoice or billing date therefor.

"**Initial Financial Statements**" means the initial financial statements for the Borrower and the Project, for the Fiscal Year ending December 31, 2011, including a balance sheet and related statements of income as of the end of such Fiscal Quarter and for such Fiscal Quarter, which shall be prepared and reported in accordance with GAAP and shall fairly present the financial condition of the Borrower and the Project as at the end of such Fiscal Quarter, prepared by the Borrower and approved by the Lender prior to the Closing Date.

"**Initial Maturity Date**" shall mean June 30, 2012.

"**Initial Projections**" means the financial projections dated May 10, 2011 provided to Lender.

"**Instrument**" means such term  as defined in the UCC.

"**Insurance Schedule**" means Schedule 3 attached hereto.

"**Intellectual Property**" means all intellectual and similar property of any Person, including inventions, designs, patents, patent applications, copyrights, trademarks, service marks, trade names, trade secrets, confidential or proprietary information, customer lists, know-how, software and databases; all embodiments or fixations thereof and all related documentation, registrations and franchises; all books and records describing or used in connection with the foregoing; and all licenses or other rights to use any of the foregoing.

"**Interest Period**" means the period beginning on and including the date specified in a Borrowing Notice (which must be a Business Day), and ending, at the Borrower's option, 30, 60 or 90 days thereafter; provided that: (a) any Interest Period which would otherwise end on a day which is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Interest Period shall end on the next preceding Business Day; (b) any Interest Period which begins on the last Business Day in a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day in a calendar month; and (c) notwithstanding the foregoing, any Interest Period which would otherwise end after the last day of the Commitment Period shall end on the last day of the Commitment Period (or, if the last day of the Commitment Period is not a Business Day, on the next preceding Business Day).

"**Interest Rate**" has the meaning given to such term in Section 2.4

"**Interest Reserve**" means a reserve in the amount of $160,000 funded from the initial advance under the Loan and held by Lender in the Interest Reserve Account, the proceeds of which shall, provided no Default exists, be used to pay for any interest due under the Loan.

"**Interest Reserve Account**" has the meaning given to such term in Section 3.1

"**Internal Revenue Code**" means the United States Internal Revenue Code of 1986, as amended from time to time and any successor statute or statutes, together with all rules and regulations promulgated with respect thereto.

"**Inventory**" means such term as defined in the UCC.

"**Investment**" means any investment, made directly or indirectly, in any Person, whether by purchase, acquisition of equity interests, indebtedness or other obligations or securities or by extension of credit, loan, advance, capital contribution or otherwise and whether made in cash, by the transfer of property, or by any other means.

"**Landlord's Disclaimer and Consent**" means that Consent to Assignment and Agreement dated November____, 2011, executed by The Town of Kingston, as landlord of the Property and as the Power Purchaser.

10

"**Laws**" or "**Law**" means any statute, law, regulation, ordinance, rule, treaty, judgment, order, decree, permit or permit conditions, concession, franchise, license, license condition, agreement, authorization or other restriction of the United States or any state or political subdivision thereof or of any Governmental Authority or of any foreign country or any department, province or other political subdivision thereof. Any reference to a Law includes any amendment or modification to such Law, and all regulations, rulings, and other Laws promulgated under such Law.

"**Leasehold Mortgage**" means that certain Construction Leasehold Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing with respect to the Property, executed by Borrower in favor of Lender, to be duly recorded in the land records of Plymouth County , Massachusetts.

"**Lender**" means Cathy Bank a California banking corporation in its capacity as a Lender hereunder and its successors hereunder pursuant to Section 11.5.

"**Liabilities**" means, as to any Person, all indebtedness, liabilities and obligations of such Person, whether matured or unmatured, liquidated or unliquidated, primary or secondary, direct or indirect, absolute, fixed or contingent, and required to be considered pursuant to GAAP.

"**Lien**" means, with respect to any property or assets, any right or interest therein of a creditor to secure Liabilities owed to it or any other arrangement with such creditor which provides for the payment of such Liabilities out of such property or assets or which allows such creditor to have such Liabilities satisfied out of such property or assets prior to the general creditors of any owner thereof, including any lien, mortgage, security interest, pledge, deposit, production payment, rights of a vendor under any title retention or conditional sale agreement or lease substantially equivalent thereto, tax lien, mechanic's or materialman's lien, or any other charge or encumbrance for security purposes, whether arising by Law or agreement or otherwise, but excluding any right of offset which arises without agreement in the ordinary course of business. "Lien" also means any filed financing statement, any registration of a pledge (such as with an issuer of uncertificated securities), or any other arrangement or action which would serve to perfect a Lien described in the preceding sentence, regardless of whether such financing statement is filed, such registration is made, or such arrangement or action is undertaken before or after such Lien exists.

"**Loan Documents**" mean this Agreement, the Notes, the Security Documents, and all other agreements, certificates, documents, instruments and writings at any time delivered in connection herewith or therewith (exclusive of term sheets and commitment letters).

"**Loan**" has the meaning given to such term in Section 2.1.

"**Manager**" shall mean Bradford S. Cleaves, Duncan S. Peterson, Kially M. Ruiz

"**Material Adverse Change**" means a material and adverse change, from the state of affairs presented in the Initial Financial Statements or as represented or warranted in any Loan Document, to (a) the Borrower's financial condition, (b) the Borrower's business, assets, operations, properties or prospects, considered as a whole, (c) the Borrower's ability to timely pay the Obligations, or (d) the enforceability of the material terms of any Loan Documents.

Notwithstanding anything to the contrary contained herein, if at any time the Power Purchaser responsible for purchasing at least 90% of the projected output of the Facility have long term unsecured debt ratings of less than BBB-by S&P and/or Baa3 by Moody's, it shall constitute a Material Adverse Change.  A list of the Power Purchaser and the percentage output of the Facility each Power Purchaser is responsible for purchasing is attached hereto as Exhibit H.

"**Maturity Date**" means the earlier of:

        (a)     the Initial Maturity Date, unless extended to the Extended Maturity Date; and

        (b)     the date on which the repayment of the Obligations is accelerated after the occurrence of an Event of Default.

"**Maximum Permitted Balance**"  shall mean the total permitted balance of the Loan which results in a ratio of Adjusted EBITDA to Debt Service on the Loan of at least 1.25:1.  The determination of Maximum Permitted Balance is subject to annual review of Borrower's income tax returns.

"**Member**" means any member of the Borrower pursuant to its Operating Agreement.

"**Net Income**" means, for any period, the Borrower's gross revenues for such period minus the Borrower's expenses and other proper charges against income (including taxes on income, to the extent imposed), each determined in accordance with GAAP.

"**Note**" has the meaning given to such term in Section 2.1.

"**Obligations**" means all Liabilities from time to time owing by the Borrower to the Lender under or pursuant to any of the Loan Documents.

"**Obligation**" means any part of the Obligations.

"**Operating Agreement**" means the Operating Agreement of the Borrower, dated February 15, 2011 executed by Bradford S. Cleaves, Duncan S. Peterson and Kially M. Ruiz.

"**Payment Date**" means the first Business Day of each month.

"**Payment Intangible**" means such term as defined in the UCC.

"**Payment Item**" means each check, draft or other item of payment payable to Borrower, including those constituting proceeds of any Collateral.

"**Permitted Investments**" means

        (a)     Cash Equivalent;

        (b)     existing Investments described in the Disclosure Schedule; and

(c)      normal and prudent extensions of credit by the Borrower to its customers for buying goods and services in the ordinary course of business, which extensions shall not be for longer periods than those extended by similar businesses operated in a normal and prudent manner.

"**Permitted Liens**" means:

(a)      statutory Liens for taxes, assessments or other governmental charges or levies which are not yet delinquent or which are being contested in good faith by appropriate action and for which adequate reserves have been maintained in accordance with GAAP;

(b)      landlords', operators', carriers', warehousemen's, repairmen's, mechanics', materialmen's, or other like Liens which do not secure Indebtedness, in each case only to the extent arising in the ordinary course of business and only to the extent securing obligations which are not delinquent or which are being contested in good faith by appropriate proceedings and for which adequate reserves have been maintained in accordance with GAAP;

(c)      minor defects and irregularities in title to any property, so long as such defects and irregularities neither secure Indebtedness nor materially impair the value of such property or the use of such property for the purposes for which such property is held;

(d)      deposits of cash or securities to secure the performance of bids, trade contracts, leases, statutory obligations and other obligations of a like nature (excluding appeal bonds) incurred in the ordinary course of business;

(e)      Liens of the Lender under the Security Documents; and

(f)      with respect only to property subject to any particular Security Document, Liens burdening such property which are expressly allowed by such Security Document.

"**Permitted Subordinated Debt**" has the meaning set forth in Section 7.1.

"**Person**" means an individual, corporation, general partnership, limited partnership, limited liability company, association, joint stock company, trust or trustee thereof, estate or executor thereof, any Governmental Authority, or any other legally recognizable entity.

"**Personal Guaranty**" means the guaranty dated as of the date of this Agreement entered into by each Guarantor jointly and severally in accordance with Section 2.7 of this Agreement.

"**Plans**" means the plans and specifications for the construction of the Project, approved by the Lender and the Engineer.

"**Power Purchase Agreement**" means, collectively, that certain Net Metering Power Sales Agreement between the Borrower and Power Purchaser, with an effective date of March 18, 2011, as amended, modified, supplemented or restated from time to time on terms reasonably acceptable to the Lender.

"**Power Purchaser**" means Town of Kingston, Massachusetts.

"**Premises**" means all locations in which Borrower owns, leases or operates any sales office, executive or administrative offices, warehouse or other facility or maintains any tangible personal property, including without limitation, any tangible personal property related to the Project.

"**Prepayment Fee**" has the meaning given to such term in Section 2.10.

"**Prevailing Floor**" shall mean the minimum interest rate established from time to time by Lender based upon prevailing interest rates.

"**Project**" means the development, construction and operation of one Generating Unit on the Property at 6-8 Cranberry Lane, Kingston, Massachusetts.

"**Project Documents**" means the agreements, permits, contracts and other documents necessary for the development, construction and operation of the Project.

"**Property**" means the real property where the Project is located, in which the Borrower shall own a leasehold estate.

"**RECs**" has the meaning given to such term in Section 6.15.

"**Register**" has the meaning given to such term in Section 11.5(e).

"**Regulation D**" means Regulation D of the Board of Governors of the Federal Reserve System as from time to time in effect.

"**Security Documents**" means the instruments listed in the Security Schedule and all other security agreements, deeds of trust, mortgages, chattel mortgages, pledges, guaranties, financing statements, continuation statements, extension agreements and other agreements or instruments now, heretofore, or hereafter delivered by the Borrower to the Lender in connection with this Agreement or any transaction contemplated hereby to secure or guarantee the payment of any part of the Obligations or the performance of the Borrower's other duties and obligations under the Loan Documents.

"**Security Schedule**" means Schedule 2 hereto.

"**Software**" means such term as defined in the UCC.

"**Special Damages**" has the meaning given to such term in Section 11.11.

"**Subsidiary**" means, with respect to any Person, any corporation, association, partnership, limited liability company, joint venture, or other business or corporate entity, enterprise or organization which is directly or indirectly (through one or more intermediaries) controlled by or owned fifty percent or more by such Person.

"**Tangible Net Worth**" means , in respect of the Borrower, the amount calculated in accordance with GAAP as (i) the sum of (a) net worth of the Borrower, plus, without duplication

(b) debt of the Borrower to any of its Members; minus (ii) the intangibles of the Borrower, including, without limitation, all items treated as intangibles in accordance with GAAP.

"**Term Year**" shall mean each twelve (12) month period following the Initial Maturity Date, the first of which shall start on the date immediately following the Initial Maturity Date and end on the last day of the twelfth month thereafter, and each successive twelve month period thereafter.

"**UCC**" the Uniform Commercial Code as in effect in the Commonwealth of Massachusetts or, when the laws of any other jurisdiction govern the method or manner of the perfection or enforcement of any Lien, the Uniform Commercial Code of such jurisdiction. Any term used in this Agreement and in any financing statement filed in connection herewith which is defined in the UCC and not otherwise defined in this Agreement or in any other Loan Document has the meaning given to the term in the UCC.

"**Wind Study Review**" means the comprehensive wind study commissioned by the Borrower, in form and substance acceptable to the Lender and the Engineer.

Section 1.2     Exhibits and Schedules; Additional Definitions. Schedules attached to this Agreement are a part hereof for all purposes. Reference is hereby made to the Security Schedule for the meaning of certain terms defined therein and used but not defined herein, which definitions are incorporated herein by reference.

Section 1.3     Amendment of Defined Instruments. Unless the context otherwise requires or unless otherwise provided herein the terms defined in this Agreement which refer to a particular agreement, instrument or document also refer to and include all renewals, extensions, modifications, amendments and restatements of such agreement, instrument or document, provided that nothing contained in this Section shall be construed to authorize any such renewal, extension, modification, amendment or restatement.

Section 1.4     References and Titles. All references in this Agreement to Exhibits, Schedules, articles, sections, subsections and other subdivisions refer to the Exhibits, Schedules, articles, sections, subsections and other subdivisions of this Agreement unless expressly provided otherwise. Exhibits and Schedules to any Loan Document shall be deemed incorporated by reference in such Loan Document. References to any document, instrument, or agreement (a) shall include all exhibits, schedules, and other attachments thereto, and (b) shall include all documents, instruments, or agreements issued or executed in replacement thereof. Titles appearing at the beginning of any subdivisions are for convenience only and do not constitute any part of such subdivisions and shall be disregarded in construing the language contained in such subdivisions. The words "this Agreement", "this instrument", "herein", "hereof", "hereby", "hereunder" and words of similar import refer to this Agreement as a whole and not to any particular subdivision unless expressly so limited. The phrases "this section" and "this subsection" and similar phrases refer only to the sections or subsections hereof in which such phrases occur. The word "or" is not exclusive, and the word "including" (in its various forms) means "including without limitation". Pronouns in masculine, feminine and neuter genders shall be construed to include any other gender, and words in the singular form shall be construed to include the plural and vice versa, unless the context otherwise requires. Accounting

terms have the meanings assigned to them by GAAP, as applied the accounting entity to which they refer. References to "days" shall mean calendar days, unless the term "Business Day" is used. Unless otherwise specified, references herein to any particular Person also refer to its successors and permitted assigns.

Section 1.5    Calculations and Determinations. All calculations under the Loan Documents of interest chargeable and of fees shall be made on the basis of actual days elapsed (including the first day but excluding the last) and a year of 360 days. Each determination by the Lender of amounts to be paid under Article III or any other matters which are to be determined hereunder by the Lender shall, in the absence of manifest error, be conclusive and binding. Unless otherwise expressly provided herein or unless the Lender otherwise consents all financial statements and reports furnished to the Lender hereunder shall be prepared and all financial computations and determinations pursuant hereto shall be made in accordance with GAAP.

Section 1.6    Joint Preparation; Construction of Indemnities and Releases. This Agreement and the other Loan Documents have been reviewed and negotiated by sophisticated parties with access to legal counsel and no rule of construction shall apply hereto or thereto which would require or allow any Loan Document to be construed against any party because of its role in drafting such Loan Document. All indemnification and release provisions of this Agreement shall be construed broadly (and not narrowly) in favor of the Persons receiving indemnification or being released.

Section 1.7    Changes in GAAP. If at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in any Loan Document, and either the Borrower or Lender shall request, the Borrower and Lender shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP; provided that, until so amended (i) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein and (ii) the Borrower shall provide to the Lender financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP.

## Article 2 - The Loans

Section 2.1    Commitment to Lend; Note. Subject to the terms and conditions hereof, the Lender agrees to make advances to the Borrower (herein called the "**Advances**") to be advanced upon the Borrower's request during the Commitment Period, provided that after giving effect to such Advances, the Facility Usage does not exceed the Aggregate Commitment. Advances on the Loan shall be made in accordance with the Borrower's approved construction budget and schedule, upon the Borrower's submission of a Borrowing Notice and subject to the submission of invoices in accordance with the provisions of Section 2.2 of this Agreement. The amount of each Advance must be greater than or equal to $100,000. The obligation of the Borrower to repay to the Lender the aggregate amount of all Advances the Lender has made, together with interest accruing in connection therewith, shall be evidenced by a single promissory note (herein called the "**Note**") made by the Borrower payable to the order of the Lender in the form of Exhibit A with appropriate insertions. The amount of principal owing on the Note at any given time shall be the aggregate amount of all Advances theretofore made

minus all payments of principal theretofore received on the Note. Interest on the Note shall accrue and be due and payable as provided herein. The Note shall be due and payable as provided herein, and shall be due and payable in full on the Maturity Date.

Section 2.2    Requests for Advances. The Borrower must give to the Lender written or electronic notice (or telephonic notice promptly confirmed in writing) of any requested Borrowing to be advanced by the Lender. Each such notice constitutes a "**Borrowing Notice**" hereunder and must specify the aggregate amount of any such Borrowing, which for the avoidance of doubt, shall by equal to amount shown on the American Institute of Architects ("**AIA**") form G-702 providing a summary of the requested draw, less a 5% retainage with respect to any contractor payments, which retainage will be released upon receipt of evidence that the Commercial Operation Date has occurred and an interconnection permit has been issued;

(a)    be received by the Lender at least seven (7) Business Days preceding the day on which any such Advance is to be made, except, that with respect to the final Advance, such Borrowing Notice must be received at least ten (10) Business Days preceding the day on which such Advance is to be made; and

(b)    be accompanied by:

(i)    the AIA form G-702 and AIA form G-703 providing detail that supports the summary billing statements, and such vouchers, invoices, and other written evidence substantiating amounts requested for payments to the Contractor, subcontractors, material suppliers and other direct or indirect recipients of requested funds;

(ii)    such receipts, canceled checks, releases, certificates of payment or other written evidence as may be required by the Lender from time to time to substantiate that (x) amounts required to be funded by the Borrower (not from advances of the Loan) have in fact been paid in accordance with the Approved Budget; and (y) all advances of the Loan previously made to the Borrower have, in fact, been paid to the Contractor or other direct or indirect recipients of funds requested in any previous Borrowing Notice;

(iii)    a certification of the Engineer confirming that the work for which payment is requested in the Borrowing Notice has been completed in accordance with the Plans;

(iv)    Lien waivers signed by the Contractor;

(v)    Satisfactory review and update of title and other legal matters by bank's legal counsel, including, without limitation, review of all contracts, including construction contract with Contractor, Ground Lease, Power Purchase Agreement, the contract with Hyundai for the purchase of the Generating Unit, including the component parts thereof, and the Renewable Energy Certificates purchase agreement;

(vi)    Satisfactory review of Borrower's insurance coverage, providing, *inter alia*, that Lender is named as first loss payee;

Each such written request or confirmation must be made in the form and substance of the "**Borrowing Notice**" attached hereto as Exhibit B, duly completed. Each such telephonic

including interest during construction and transactional fees and expenses. In no event shall the funds from the Loan be used directly or indirectly by any Person for personal, family, household or agricultural purposes or for the purpose, whether immediate, incidental or ultimate, of purchasing, acquiring or carrying any "margin stock" (as such term is defined in Regulation U promulgated by the Board of Governors of the Federal Reserve System) or to extend credit to others directly or indirectly for the purpose of purchasing or carrying any such margin stock. The Borrower represents and warrants that the Borrower is not engaged principally, or as one of the Borrower's important activities, in the business of extending credit to others for the purpose of purchasing or carrying such margin stock. Notwithstanding any other provisions in this Agreement to the contrary, Lender shall be permitted to withhold from the initial Advance, $160,000, to be placed in the Interest Reserve to be applied as provided in <u>Section 3.1</u> hereof.

Section 2.4    <u>Interest Rates and Fees; Payment Dates</u>.

(a)    <u>Interest Rates</u>.

(i)    During the Construction Loan Commitment Period, the Borrower shall pay interest on all Advances of the Loan at a floating Interest Rate equal to the greater of (A) the Base Rate plus 1.00% per-annum, calculated on a 360-day year and actual days elapsed basis and (B) five and three quarters (5.75%) percent per annum.

(ii)    During the Term Years 1-5, the Borrower shall pay interest on all Advances of the Loan at a fixed rate of five and three quarters (5.75%) percent per annum, and shall be payable as part of the Periodic Amortization Amount.

(iii)    During Term Years 6-10, the Borrower shall pay interest on all Advances of the Loan at the Prevailing Floor plus either of the following, as selected by Borrower: (A) a fixed rate equal to the 5-year US Treasury Bill Rate plus three percent (3.00%) per annum or (B) a floating rate equal to the Base Rate plus one percent (1.00%) per annum.

(b)    <u>Late Fees</u>. If any installment of principal or interest or any other payment is not paid within ten (10) days after the date when due, then there shall also be immediately due and payable a late charge at the rate of five cents ($.05) for each dollar of such delinquent payment to cover the costs of handling such delinquent payment.

(c)    <u>Default Rate</u>. If an Event of Default shall have occurred and be continuing, the Lender may, by notice to the Borrower, elect to have the outstanding Loan bear interest at the Default Rate, whereupon the Loan shall bear interest at the applicable Default Rate until the earlier of (i) the first date thereafter upon which there shall be no Default continuing and (ii) the date upon which the Lender shall have rescinded such notice.

(d)    <u>Payment Dates</u>. On each Payment Date occurring during the Construction Loan Commitment Period, the Borrower shall pay to the Lender all unpaid interest which has accrued on the Loan to but not including such Payment Date.

Section 2.5    <u>Optional Prepayments</u>. The Borrower may, upon three Business Days' notice to the Lender, from time to time and without premium or penalty, except as provided in <u>Section 2.10</u> hereof, prepay the Note in whole or in part. Each prepayment under this Section

(d)　　Payment Dates.  On each Payment Date occurring during the Construction Loan Commitment Period, the Borrower shall pay to the Lender all unpaid interest which has accrued on the Loan to but not including such Payment Date.

Section 2.5　　Optional Prepayments. The Borrower may, upon three Business Days' notice to the Lender, from time to time and without premium or penalty, except as provided in Section 2.10 hereof, prepay the Note in whole or in part.  Each prepayment under this Section shall be applied in accordance with Section 3.1 hereof.  Any principal or interest prepaid pursuant to this Section shall be in addition to, and not in lieu of, all payments otherwise required to be paid under the Loan Documents at the time of such prepayment.

Section 2.6　　Mandatory Principal Payments; Mandatory Prepayments.

(a)　　If the Conversion Conditions are satisfied and the Initial Maturity Date shall have been extended to the Extended Maturity Date in accordance with the terms of this Agreement, then, on each Payment Date beginning on June 1, 2012, the Borrower shall pay to the Lender monthly installments of principal plus interest on the outstanding Loan balance in accordance with the amortization schedule attached hereto as Schedule 2.6(a).  Notwithstanding that the amounts of the monthly installments of principal are computed on the basis of a term of twelve (12) years, the entire unpaid balance of the Note and all interest accrued thereon, and all other sums due under the Loan Documents, shall be due and payable in full on the Extended Maturity Date.

(b)　　If, at any time during the Construction Loan Commitment Period the Facility Usage exceeds the Aggregate Commitment, the Borrower shall immediately upon demand prepay a portion of the principal amount of the Loan in an amount at least equal to such excess.

(c)　　If, following the Initial Maturity Date, Operating Income is insufficient to service the Loan at a minimum DSCR of 1.25:1, then Borrower shall immediately upon demand pay down the outstanding Principal balance in the amount sufficient for the DSCR to meet a minimum requirement of 1.25:1.

(d)　　Any sums received by Borrower as part of a Federal Incentive Grant shall be immediately paid to Lender to be applied by Lender toward all amounts then due and owning under the Loan.  To the extent such sums are paid directly to Lender, Lender shall apply such sums toward all amounts then due and owning under the Loan.

(e)　　Each prepayment of principal under this Section shall be accompanied by all interest then accrued and unpaid on the principal so prepaid. Any principal or interest prepaid pursuant to this Section shall be in addition to, and not in lieu of, all payments otherwise required to be paid under the Loan Documents at the time of such prepayment.

Section 2.7　　Guaranty. As inducement for the Lender to enter into this Agreement and make the Loan, each Guarantor shall execute and deliver that certain (a) Guaranty of Completion in the form attached as Exhibit F hereto and (b) Personal Guaranty in the form attached as Exhibit G hereto.

Section 2.8    Conversion.  Prior to the satisfaction of the Conversion Conditions and the extension of the Initial Maturity Date to the Extended Maturity Date, the entire unpaid principal amount of the Loan and all accrued and unpaid interest thereon shall be due and payable on the Initial Maturity Date.  If the Conversion Conditions are satisfied and the Initial Maturity Date shall have been extended to the Extended Maturity Date in accordance with the terms of this Agreement, Borrower shall make monthly payments each in the amounts described in Section 2.6(a) above.  In any event, a balloon payment equal to the entire unpaid principal amount of the Loan and all accrued and unpaid interest shall be due and payable on the Extended Maturity Date.

Section 2.9    Conversion Conditions.  The entire Loan balance outstanding on the Initial Maturity Date and all other amounts due and owning by Borrower under this Agreement shall be due an owing on the Initial Maturity Date, unless all of the following conditions are met:

(a)    The Generating Unit is completed, as confirmed in writing to Lender by the Engineer;

(b)    Borrower provides Lender with evidence, including, without limitation, lien waivers, that all contractors and subcontractors have been paid in full and have waived any and all rights to place any liens against the Premises or the Project;

(c)    Borrower has paid Lender a sufficient amount to reduce the outstanding principal balance of the Loan to an amount not to exceed $3,568,000.

(d)    Borrower has provided evidence satisfactory to Lender that the Commercial Operation Date has occurred and that the Power Purchaser has commenced making payments under the Power Purchase Agreement; and

(e)    There are no existing Defaults.

Section 2.10    Prepayment Fee.

(a)    During the Construction Loan Commitment Period, there shall be no Prepayment Fee due for any prepayment of any outstanding principal amount of the Loan outstanding.

(b)    If, on the Initial Maturity Date, Borrower elects to repay the entire outstanding principal amount of the Loan, such repayment shall include a fee equal to twenty five hundredths (.25%) percent multiplied by the entire outstanding principal amount of the Loan.

(c)    If, by the Initial Maturity Date all of the Conversion Conditions are satisfied and the Initial Maturity Date is extended to the Extended Maturity Date, then the following Prepayment Fee shall be due and payable;

(i)    during the first Term Year, a fee equal to five (5.0%) percent multiplied by the entire outstanding principal amount of the Loan;

20

(ii)   during the second Term Year, a fee equal to four (4.0%) percent multiplied by the entire outstanding principal amount of the Loan;

(iii)   during the third Term Year, a fee equal to three (3.0%) percent multiplied by the entire outstanding principal amount of the Loan;

(iv)   during the fourth Term Year, a fee equal to two (2.0%) percent multiplied by the entire outstanding principal amount of the Loan;

(v)   during the fifth Term Year (except the last 60-days thereof), a fee equal to one (1.0%) percent multiplied by the entire outstanding principal amount of the Loan;

(vi)   during the sixth Term Year, a fee equal to five (5.0%) percent multiplied by the entire outstanding principal amount of the Loan, unless the Interest Rate then in effect is a variable rate;

(vii)   during the seventh Term Year, a fee equal to four (4.0%) percent multiplied by the entire outstanding principal amount of the Loan, unless the Interest Rate then in effect is a variable rate;

(viii)   during the eighth Term Year, a fee equal to three (3.0%) percent multiplied by the entire outstanding principal amount of the Loan, unless the Interest Rate then in effect is a variable rate;

(ix)   during the ninth Term Year, a fee equal to two (2.0%) percent multiplied by the entire outstanding principal amount of the Loan; and

(x)   during the tenth Term Year (except the last 60-days thereof, a fee equal to one (1.0%) percent multiplied by the entire outstanding principal amount of the Loan;

Notwithstanding the foregoing, no Prepayment Fee shall be required in connection with the prepayment of the Loan if, during Term Years 6-10, the Interest Rate in effect is a floating rate established pursuant to Section 2.4 (a)(iii)(B) above.

## Article 3 - Payments to the Lender

Section 3.1   General Procedures; Automatic Payment. The Borrower will make each payment which it owes under the Loan Documents to the Lender in lawful money of the United States of America, without set-off deduction or counterclaim, and in immediately available funds. Each such payment must be received by the Lender not later than 11:00 a.m., Eastern time, on the date such payment becomes due and payable. Any payment received by the Lender after such time will be deemed to have been made on the next following Business Day. Should any such payment become due and payable on a day other than a Business Day, the maturity of such payment shall be extended to the next succeeding Business Day, and, in the case of a payment of principal or past due interest, interest shall accrue and be payable thereon for the period of such extension as provided in the Loan Document under which such payment is due. Each payment under a Loan Document shall be due and payable at the Lender's office in Boston, Massachusetts. The Borrower hereby authorizes the Bank to automatically deduct from the

Borrower's operating account number _____ maintained with the Lender any amount due under the Loan Documents.  In addition, Borrower shall establish an Interest Reserve with Lender, the proceeds of which shall be used solely for the purpose of paying any interest due on the Loan.  The "**Interest Reserve Account**" shall a non-interest bearing account maintained with Lender, or such other depository institution as Lender directs, which shall be used to hold the Interest Reserve.  If the funds in either the Interest Reserve Account or the operating account are insufficient to advance funds to cover any payment due under this Agreement, the Lender shall not be obligated to advance funds to cover the payment. At any time and for any reason, the Borrower or the Lender may voluntarily terminate the automatic payments referred to in this Section.

The Lender shall apply all payments received from the Borrower as follows:

(a)    first, to payment of all Obligations which are then due (and if such money is insufficient to pay all such Obligations, first to any reimbursements due the Lender under Section 6.9 or 9.4);

(b)    then to the prepayment of amounts owing under the Loan Documents (other than principal and interest of the Loans);

(c)    then to the prepayment of installments of principal and interest of the Loans in inverse order of their becoming due; and last, to the payment or prepayment of any other Obligations.

All payments applied to principal or interest on any Note shall be applied first to any interest then due and payable, then to principal then due and payable, and last to any prepayment of principal and interest in compliance with Sections 2.5 and 2. and in accordance with subsection (c) above. Notwithstanding the foregoing, Lender will allow for alternative approaches in its reasonable discretion with respect to the application of any prepayment in order to reduce Borrower's settlement costs associated with any Hedging Contract.

Section 3.2    Capital Reimbursement. If either (a) the introduction or implementation after the date hereof of or the compliance with or any change after the date hereof in or in the interpretation of any Law regarding capital adequacy, or (b) the introduction or implementation after the date hereof of or the compliance with any request, directive or guideline issued after the date hereof from any central bank or other governmental authority (whether or not having the force of Law) regarding capital requirements has or would have the effect of reducing the rate of return on the Lender's capital, or on the capital of any corporation controlling the Lender, as a consequence of the Advances made by the Lender, to a level below that which the Lender or such corporation could have achieved but for such change (taking into consideration such Lender's policies and the policies of any such corporation with respect to capital adequacy), then from time to time the Borrower will pay to the Lender, within 3 Business Days of demand therefore, such additional amount or amounts the Lender shall determine to be appropriate to compensate the Lender for such reduction.

Section 3.3    Funding Losses. In addition to its other obligations hereunder, the Borrower will indemnify the Lender against, and reimburse the Lender on demand for, any loss

or expense incurred or sustained by the Lender, as a result of any payment or prepayment (whether authorized or required hereunder or otherwise) of all or a portion of the Loan on a day other than the day on which the Interest Period ends. Such indemnification shall be on an after-tax basis.

Section 3.4    Reimbursable Taxes. The Borrower covenants and agrees that:

(a)    The Borrower will indemnify the Lender against and reimburse the Lender for all present and future income, stamp and other taxes, levies, costs and charges whatsoever imposed, assessed, levied or collected on or in respect of this Agreement (whether or not legally or correctly imposed, assessed, levied or collected), excluding, however, (i) taxes imposed on or measured by its overall net income, and franchise taxes imposed on it (in lieu of net income taxes), by the jurisdiction (or any political subdivision thereof) under the Laws of which it is organized or otherwise resides for tax purposes; (ii) taxes imposed by reason of any present or former connection between the Lender and the jurisdiction imposing such taxes, other than solely as a result of this Agreement or the Note or any transaction contemplated hereby; and (iii) any United States withholding tax imposed on any payment by the Borrower pursuant to this Agreement, but not excluding any portion of such tax that exceeds the United States withholding tax which would have been imposed on such a payment to the Lender under the laws and treaties in effect when the Lender first becomes a party to this Agreement (all such non-excluded taxes, levies, costs and charges being collectively called "Reimbursable Taxes"). Such indemnification shall be on an after-tax basis and, except as otherwise provided in Section 3.4(b), paid within 3 Business Days after the Lender makes demand therefor.

(b)    All payments on account of the principal of, and interest on, the Note, and all other amounts payable by the Borrower to the Lender hereunder, shall be made in full without set-off or counterclaim and shall be made free and clear of and without deductions or withholdings of any nature by reason of any Reimbursable Taxes, all of which will be for the account of the Borrower. In the event of the Borrower being compelled by Law to make any such deduction or withholding from any payment to the Lender, the Borrower shall pay on the due date of such payment, by way of additional interest, such additional amounts as are needed to cause the amount receivable by the Lender after such deduction or withholding to equal the amount which would have been receivable in the absence of such deduction or withholding. If the Borrower should make any deduction or withholding as aforesaid, the Borrower shall within 60 days thereafter forward to the Lender an official receipt or other official document evidencing payment of such deduction or withholding.

## Article 4 - Conditions Precedent to Lending

Section 4.1    Items and Documents to be Delivered. The Lender has no obligation to make its first Advance, unless it has received all of the following, duly executed and delivered and in form, substance and date satisfactory to the Lender:

(a)    This Agreement, the Completion Guaranty, the Personal Guaranty, and any other documents that Lender or the Borrower are to execute in connection herewith;

(b)    The Note;

(c)     Each Security Document listed in the Security Schedule;

(d)     Executed copies of all Project Documents;.

(e)     An originally executed counterpart of the fixed price contract for the construction of the Project, accompanied by Contractor's written (A) consent to the assignment to the Lender of the Borrower's rights under such contract and (B) agreement to continue performance of its obligations under such contract for the benefit of the Lender;

(f)     Certificates or binders evidencing the insurance coverages required under this Agreement, each in effect on the date hereof and with such endorsements as re required pursuant to Section 6.8;

(g)     A Borrowing Notice for the amount of the initial Advance;

(h)     Certain certificates of the Borrower including:

(i)     An "**Omnibus Certificate**" of the Manager of the Borrower, which shall contain the names and signatures of the officer(s) of the Borrower authorized to execute Loan Documents and which shall certify to the truth, correctness and completeness of the following exhibits attached thereto: (1) a copy of resolutions duly adopted by the Manager or, if required by the Operating Agreement of the Borrower, by the Members of the Borrower, and in full force and effect at the time this Agreement is entered into, authorizing the execution of this Agreement and the other Loan Documents delivered or to be delivered in connection herewith and the consummation of the transactions contemplated herein and therein, (2) a copy of the charter documents of the Borrower and all amendments thereto, certified by the appropriate official of the Borrower's state of organization, and (3) a copy of the Operating Agreement and any management agreements of the Borrower;

(ii)     A "**Closing Certificate**" of the Manager of the Borrower, of even date with such Loan, in which such officer certifies to the satisfaction of the conditions set out in subsections (a), (b), (c) and (d) of Section 4.2; and

(iii)     A certificate signed by the Manager or chief financial officer of the Borrower in form and detail acceptable to the Lender confirming the insurance that is in effect as of the date hereof and certifying that such insurance is customary for the businesses conducted by the Borrower and is in compliance with the requirements of this Agreement.

(i)     Certificate (or certificates) of the due formation, valid existence and good standing of the Borrower in its state of organization, issued by the appropriate authorities of such jurisdiction, and certificates of the Borrower's good standing and due qualification to do business, issued by appropriate officials in any states in which the Borrower owns property subject to Security Documents;

(j)     A favorable opinion of Adler Pollock & Sheehan P.C., counsel for the Borrower, in form and substance satisfactory to the Lender;

(k)     Favorable opinions of Adler Pollock & Sheehan P.C., counsel for the Borrower in form and substance satisfactory to the Lender relating to permits and regulatory compliance and real estate matters;

(l)     The Initial Projections for Project;

(m)     A certificate by the chief financial officer of the Borrower, certifying the Initial Financial Statements and Initial Projections of the Borrower delivered pursuant to clause (1) above;

(n)     Approved Budget;

(o)     Evidence of minimum cash investment by the Borrower  in the Project of the sum of (A) 20% of the total Project cost plus (ii) $665,000;

(p)     Landlord's Disclaimer and Consent;

(q)     Engineering Report;

(r)     Wind Study Review;

(s)     Payment of all fees and expenses required to be paid to the Lender pursuant to any Loan Documents or any commitment agreement heretofore entered into the Commitment Fee;

(t)     The Borrower shall have paid in full all costs and expenses of the Lender in the making of the Loan as required by Section 6.20 of this Agreement;

(u)     Satisfactory completion of due diligence by the Lender in connection with the Project and the Borrower, including but not limited to, satisfactory review of the Power Purchase Agreements by Lender;

(v)     Satisfactory review of the Project by Engineer in Lender's sole discretion;

(w)     Evidence that each Power Purchaser has a credit rating of at least ("A-") by S&P and/or ("A3") by Moody's;

(x)     A lender's leasehold title insurance policy at closing in such form and with such coverages and endorsements as shall be acceptable to the Lender and its counsel and a current UCC, judgment, pending litigation and lien search with respect to Borrower and its business assets including, but not limited to the Project, Generating Unit and all related equipment;

(y)     Evidence of the compliance of the Project with applicable Law and assembly/operating permits;

(z)     Assignment of all Plans, contracts, and agreements involving the Project; and

(aa)     All other documents and instruments which the Lender has then reasonably requested, in addition to those described in this Section 4.1.  All such additional documents and instruments shall be reasonably satisfactory to the Lender in form, substance and date.

Section 4.2     Conditions to Each Subsequent Advance. The Lender's obligation to make any Advance of proceeds of the Loan to the Borrower after the initial Advance shall be subject to the satisfaction of the requirements of Section 2.2 hereof and of, or written waiver by the Lender, in its sole reasonable judgment, of each of the following conditions precedent:

(a)     All work on the construction of the Project through the date of the requested Advance shall have been performed (A) in conformity with the Plans and with all applicable Laws and (B) to the reasonable satisfaction of the Lender;

(b)     The Project shall not have suffered any material damage due to fire or other casualty, unless the Lender is satisfied, in its sole discretion, that such fire or other casualty is adequately covered by insurance and that the amount and the timing of receipt of insurance proceeds will be adequate to permit the total reconstruction and substantial completion of the Project, all within the Approved Budget and prior to the expiration of the Construction Period;

(c)     All permits, approvals and licenses required to be obtained under applicable Law for the level of construction then being performed shall have been validly issued, without any conditions unacceptable to the Lender, and all appeal periods with respect thereto shall have expired. None of such permits, licenses, approvals or certificates or any others previously issued shall be the subject of any revocation, suspension or termination, or shall any litigation, arbitration, investigation, administrative action or any proceedings be pending or threatened affecting the Project, the Property or the Borrower which might materially adversely affect the development of the Project as required under this Agreement;

(d)     An updated title report showing no new matters of record since the date of Closing, and an updated UCC, judgment, pending litigation and lien search with respect to Borrower and its business assets including, but not limited to the Project, Generating Unit and all related equipment; and

(e)     All costs remaining to be incurred in order to effect the completion of construction of the Project (including, without limitation, interest expenses payable under the Loan and all other soft costs) do not exceed, in the aggregate, the amounts remaining for disbursement under the Loan and the amounts available for such purposes under the Completion Guarantee (unless, if there is such an imbalance, the Borrower shall have deposited with the Lender in cash or otherwise invested in the Project such sums as shall be necessary, in the Lender's sole discretion, to offset any such imbalance).

Section 4.3     Additional Conditions Precedent. The Lender has no obligation to make any Loan unless the following additional conditions precedent have been satisfied (or waived):

(a)     All representations and warranties made by the Borrower in any Loan Document shall be true in all material respects on and as of the date of such Advance as if such representations and warranties had been made as of the date of such Advance, except to the

extent that such representation or warranty was made as of a specific date or updated, modified or supplemented as of a subsequent date with the consent of the Lender;

(b)     No Default or event the existence and continuation of which would be a Default shall exist at the date of such Loan;No Material Adverse Change shall have occurred to, and no event or circumstance shall have occurred that could reasonably be expected to cause a Material Adverse Change to, the Borrower's financial condition or businesses since the date of the Initial Financial Statements;

(c)     The Borrower shall have performed and complied in all material respects with all agreements and conditions required in the Loan Documents to be performed or complied with by it on or prior to the date of such Loan;

(d)     The making of such Loan shall not be prohibited by any Law and shall not subject the Lender to any penalty or other onerous condition under or pursuant to any such Law;

(e)     The Lender shall have received all documents and instruments which it

(f)     has then requested, in addition to those described in <u>Section 4.1</u> (including opinions of legal counsel; corporate documents and records; documents evidencing governmental authorizations, consents, approvals, licenses and exemptions; and certificates of public officials and of officers and representatives of the Borrower), as to (i) the accuracy and validity of or compliance with all representations, warranties and covenants made by the Borrowers in this Agreement and the other Loan Documents, (ii) the satisfaction of all conditions contained herein or therein, and (iii) all other matters pertaining hereto and thereto. All such additional documents and instruments shall be reasonably satisfactory to the Lender in form, substance and date; and

(g)     All other documents and instruments which the Lender has then reasonably requested in addition to those described in this <u>Section 4.3</u>.

## **Article 5 - Representations and Warranties**

To confirm the Lender's understanding concerning the Borrower and its businesses, properties and obligations and to induce the Lender to enter into this Agreement and to extend credit hereunder, the Borrower represents and warrants to the Lender that:

Section 5.1     <u>No Default</u>. The Borrower is not in default in the performance of any of the material covenants and agreements contained in any Loan Document or Project Document. No event has occurred and is continuing which constitutes a Default.

Section 5.2     <u>Organization and Good Standing</u>. The Borrower is duly organized, validly existing and in good standing under the Laws of the Commonwealth of Massachusetts, having all powers required to carry on its business and enter into and carry out the transactions contemplated hereby.  The Borrower is duly qualified, in good standing, and authorized to do business in all other jurisdictions within the United States wherein the character of the properties owned or held by it or the nature of the business transacted by it makes such qualification necessary, except where the failure to so qualify could not reasonably be expected to cause a

Material Adverse Change.  The Borrower has no business assets nor properties outside the United States. The Borrower has not transacted any business outside the Untied States.

Section 5.3    Authorization. The Borrower has duly taken all action necessary to authorize the execution and delivery by it of the Loan Documents to which it is a party and to authorize the consummation of the transactions contemplated thereby and the performance of its obligations thereunder. The Borrower is duly authorized to borrow funds hereunder.

Section 5.4    No Conflicts or Consents. The execution and delivery by the Borrower of the Loan Documents to which each is a party, the performance by each of its obligations under such Loan Documents, and the consummation of the transactions contemplated by the various Loan Documents, do not and will not (a) conflict with any provision of (i) any Law, (ii) the organizational documents of the Borrower, or (iii) any material agreement, judgment, license, order or permit applicable to or binding upon the Borrower, (b) result in the acceleration of any Indebtedness owed by the Borrower, or (c) result in or require the creation of any Lien upon any assets or properties of the Borrower except as expressly contemplated or permitted in the Loan Documents. Except as expressly contemplated in the Loan Documents or Project Documents, no permit, consent, approval, authorization or order of, and no notice to or filing with, any Governmental Authority or third party is required in connection with the execution, delivery or performance by the Borrower of any Loan Document or to consummate any transactions contemplated by the Loan Documents, except for any such third party consents, approvals, authorizations or notices, which the failure to provide or obtain could not reasonably be expected to cause, individually or in the aggregate, a Material Adverse Change.

Section 5.5    Enforceable Obligations. This Agreement is, and the other Loan Documents when duly executed and delivered will be, legal, valid and binding obligations of the Borrower, enforceable in accordance with their terms except as such enforcement may be limited by bankruptcy, insolvency or similar Laws of general application relating to the enforcement of creditors rights.

Section 5.6    Financial Statements; Initial Projections. All financial statements of the Borrower and of each Guarantor heretofore and hereafter delivered to Lender are complete and accurate, fairly presenting the financial conditions of the Borrower and of each Guarantor, as the case may be as of the date thereof and for the periods covered hereby, all such statements of Borrower being prepared in accordance with GAAP consistently applied through the relevant periods.  Neither the Borrower nor any Guarantor has no liability, contingent or otherwise, not disclosed in the aforesaid financial statements or in any notes thereto which could result in a Material Adverse Change.  The Initial Projections represent the Borrower's good faith assumptions contained therein.  The Borrower has delivered to the Lender true, correct and complete copies of the Initial Projections which include projections for the establishment of the Borrower, the acquisition of the Generating Unit, the installation of the Generating Unit, its operation and maintenance for the term of the Loan.  Since the date of the Initial Projections, no Material Adverse Change has occurred, except as reflected in Section 5.6 of the Disclosure Schedule.

Section 5.7    Other Obligations and Restrictions. The Borrower has no outstanding Liabilities of any kind (including contingent obligations, tax assessments, and unusual forward or

long-term commitments) which are, in the aggregate, material to the Borrower that are not disclosed in Section 5.7 of the Disclosure Schedule or a Disclosure Report otherwise permitted under Section 7.1. Except as shown or disclosed in Section 5.7 of the Disclosure Schedule or a Disclosure Report, the Borrower is not subject to or restricted by any franchise, contract, deed, organizational document or charter restriction, or other instrument or restriction which limits or restricts the Borrower's right to engage in the type of business activity currently conducted or proposed to be conducted by Borrower, which grants to any Person other than Borrower and Lender any rights in any Collateral, or which could reasonably be expected to cause a Material Adverse Change.  The Borrower will make only sales of the output of the Project at wholesale, pursuant to the authorization on file with the FERC, which wholesale sales shall be regulated by the FERC and the Borrower will not change such regulatory status so as to subject the Project to regulation as to power sales rates, charges or services under state utility laws.

Section 5.8   Full Disclosure. Neither this Agreement, nor any certificate, statement (including any financial statements referred to in this Agreement) or other information delivered herewith or heretofore by the Borrower to the Lender in connection with the negotiation of this Agreement or in connection with any transaction contemplated hereby contains any untrue statement of a material fact or omits to state any material fact (other than industry-wide risks normally associated with the types of businesses conducted by the Borrower) necessary to make the statements contained herein or therein not misleading as of the date made or deemed made. There is no fact (other than industry-wide risks normally associated with the types of businesses conducted by the Borrower) that has not been disclosed to the Lender in writing which could cause a Material Adverse Change.  There are no statements or conclusions in any Engineering Report which are based upon or include misleading information or fail to take into account material information regarding the matters reported therein, it being understood that each Engineering Report is necessarily based upon professional opinions, estimates and projections and that the Borrower does not warrant that such opinions, estimates and projections will ultimately prove to have been accurate.  The Borrower has heretofore delivered to the Lender true, correct and complete copies of the Engineering Report.

Section 5.9   Litigation. Except as disclosed in Section 5.9 of the Disclosure Schedule: (a) there are no actions, suits or legal, equitable, arbitrative or administrative proceedings pending, or to the knowledge of the Borrower threatened, against the Borrower or affecting any Member (including any which challenge or otherwise pertain to any the Borrower's title to any Member's interest in or title to membership interests in the Borrower) before any Governmental Authority which could cause a Material Adverse Change, and (b) there are no outstanding judgments, injunctions, writs, rulings or orders by any such Governmental Authority against the Borrower or the Borrower's members, directors or officers or affecting any of its material assets or property or concerning any Governmental Approval or permit which could cause a Material Adverse Change.

Section 5.10   Labor Disputes and Acts of God. Except as disclosed in Section 5.10 of the Disclosure Schedule or a Disclosure Report, neither the business of the Borrower nor the properties owned or occupied by the Borrower (i) has been affected by, nor does the Borrower know or have any reasonable grounds to expect, any fire, explosion, accident, strike, lockout or other labor dispute, drought, storm, hail, earthquake, embargo, act of God or of the public enemy or other casualty (whether or not covered by insurance) or (ii) is in violation of any federal or

state so-called "OSHA" law, except, in each case, which could cause a Material Adverse Change.

Section 5.11   ERISA Plans and Liabilities. The Borrower is not part of any ERISA Plan, and is not required to contribute to, and has no contingent liability in respect of, any "multi-employer plan".

Section 5.12   Environmental and Other Laws. Except as disclosed in Section 5.12 of the Disclosure Schedule or a Disclosure Report: (a) the Borrower is conducting its business in material compliance with all applicable Laws, including Environmental Laws, and have and are in compliance with all licenses and permits required under any such Laws; (b) none of the operations or properties of the Borrower is the subject of federal, state or local investigation evaluating whether any material remedial action is needed to respond to a release of any Hazardous Materials into the environment or to the improper storage or disposal (including storage or disposal at offsite locations) of any Hazardous Materials; (c) neither the Borrower (and to the best actual knowledge of the Borrower) nor any other Person has filed any notice under any Law indicating that the Borrower is responsible for the improper release into the environment, or the improper storage or disposal, of any material amount of any Hazardous Materials or that any Hazardous Materials have been improperly released, or are improperly stored or disposed of, upon any property of the Borrower; (d) the Borrower has not transported or arranged for the transportation of any Hazardous Material to any location which is (i) listed on the National Priorities List under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, listed for possible inclusion on such National Priorities List by the Environmental Protection Agency in its Comprehensive Environmental Response, Compensation and Liability Information System List, or listed on any similar state list or (ii) the subject of federal, state or local enforcement actions or other investigations which may lead to claims against the Borrower for clean-up costs, remedial work, damages to natural resources or for personal injury claims (whether under Environmental Laws or otherwise); and (e) the Borrower otherwise does not have any known material contingent liability under any Environmental Laws or in connection with the release into the environment, or the storage or disposal, of any Hazardous Materials. The Borrower (or its ultimate parent or Affiliates) undertook, at the time of the acquisition of each of the material properties to be used in connection with the Project, all appropriate inquiry into the previous ownership and uses of the Property and any potential environmental liabilities associated therewith.

Section 5.13   Names and Places of Business. The Borrower has not, during the preceding five years, had, been known by, or used any other trade or fictitious name, except as disclosed in Section 5.13 of the Disclosure Schedule. Except as otherwise indicated in Section 5.13 of the Disclosure Schedule, the chief executive office and principal place of business of the Borrower are (and for the preceding five years have been) located at the address of the Borrower set out on the signature pages hereto. Except as indicated in Section 5.13 of the Disclosure Schedule or otherwise disclosed in writing to the Lender, the Borrower has not had any other office or place of business.

Section 5.14   Subsidiaries. The Borrower does not presently have any Subsidiary except those listed in Section 5.14 of the Disclosure Schedule or disclosed to the Lender in writing. The Borrower does not have any equity investments in any other Person except those listed in Section

5.14 of the Disclosure Schedule.  The Borrower owns, directly or indirectly, the equity interests in each of its Subsidiaries which is indicated in Section 5.14 of the Disclosure Schedule.

Section 5.15   Investment Company Act; Federal Power Act. The Borrower is not (a) an "investment company" or a company "controlled" by an "investment company" within the meaning of the Investment Company Act of 1940, as amended, or (b) subject to regulation under the Federal Power Act, as amended, or any other Law which regulates the incurring by such Person of Indebtedness, including Laws relating to common contract carriers or the sale of electricity, gas, steam, water or other public utility services.

Section 5.16   Solvency. Upon giving effect to the execution of the Loan Documents by the Borrower and the consummation of the transactions contemplated hereby, the Borrower will be solvent (as such term is used in applicable bankruptcy, liquidation, receivership, insolvency or similar Laws), and the sum of the Borrower's absolute and contingent liabilities, including the Obligations or guarantees thereof, shall not exceed the fair market value of the Borrower's assets, and (ii) the Borrower's capital should be adequate for the businesses in which Borrower is engaged and intends to be engaged. The Borrower has not incurred (whether under the Loan Documents or otherwise), and does not intend to incur or believe that it will incur, debts which will be beyond its ability to pay as such debts mature.

Section 5.17   Title to Properties; Licenses; Operation of the Project. The Borrower has good and defensible title to all of its material properties and assets, including but not limited to the Collateral, free and clear of all Liens, encumbrances, or adverse claims other than Permitted Liens and free and clear of all impediments to the use of such properties and assets in its business.  The Borrower enjoys peaceful and undisturbed possession under all leases under which it operates and all said leases are valid and subsisting and in full force and effect.  The Borrower possesses all licenses, permits, franchises, patents, copyrights, trademarks and trade names, and other intellectual property (or otherwise possesses the right to use such intellectual property without violation of the rights of any other Person) which are necessary to construct, own and operate the Project and to carry out its business as presently conducted and as presently proposed to be conducted hereafter, and the Borrower is not in violation in any material respect of the terms of any license or permit or the terms under which it possesses such intellectual property or the right to use such intellectual property.  There are no Liabilities secured by Permitted Liens encumbering the Borrower's property on the date hereof (excluding only inchoate Liens for taxes not yet due and payable).  The Project when completed, will comply in all material respects with all applicable design, systems and equipment approvals.  The generating facility and all interconnection facilities will be constructed in accordance with all applicable manufacturer's recommendations and schedules and in accordance with the Project Documents.

Section 5.18   Margin Regulations. None of the Borrower or its Subsidiaries are engaged in the business of extending credit for the purpose of purchasing or carrying Margin Stock, and no proceeds of any Loans will be used for a purpose which violates or would be inconsistent with Regulations T, U and X promulgated by the Federal Reserve Board from time to time.

Section 5.19   Governmental Approvals and Permits. Section 5.19 of the Disclosure Schedule contains a complete and accurate list of all material Governmental Approvals and

permits relating to the Borrower, the Project, the Property or the transactions contemplated by the Loan Documents or the Project Documents, as well as the expiration or renewal date for each such Governmental Approval and permit. Except as provided in Section 5.19 of the Disclosure Schedule or in a Disclosure Report, all Governmental Approvals have been duly obtained, are in full force and effect, are final and non-appealable and constitute all Governmental Approvals that are necessary for the operation of the Project or are otherwise required to be obtained as of the Closing Date or in connection with the transactions contemplated by the Project Documents or the Loan Documents. All conditions contained in such Governmental Approvals required to have been satisfied by the Closing Date have been satisfied except to the extent that failure to satisfy such a condition could not reasonably be expected to cause a Material Adverse Change. The Borrower is in compliance in all respects with the terms and conditions of such Governmental Approvals, except to the extent that non-compliance could not reasonably be expected to cause a Material Adverse Change.

Section 5.20    Security Document Representations and Warranties. Capitalized terms used in this Section, not otherwise defined in this Agreement, and defined in the Security Agreements shall when used in this Section have the meanings given them in the Security Agreements.

(a)    Ownership Free of Liens. No effective financing statement or other registration or instrument similar in effect covering all or any part of the Collateral or any Member's interest in the Borrower is on file in any recording office except any which have been filed in favor of the Lender relating to the Security Documents.

(b)    Perfection Certificate. The Borrower has previously completed and delivered a perfection certificate to the Lender in the form attached hereto as Exhibit E, and each such certificate is true, correct and complete.

(c)    General Intangibles. Each General Intangible included within the Collateral which is material to the Borrower's business represents the valid and legally binding obligation of each other Person who is a party thereto or who is otherwise stated to be obligated thereunder, subject to no contra- accounts, setoffs, defenses, counterclaims, discounts, allowances, rebates, credits or adjustments by or available to account debtors obligated thereon (in this subsection collectively called "**adjustments**"), except (i) in the case of General Intangibles under which money is owing to the Borrower, for those adjustments for which adequate reserves have been taken in substantially the same amount as is shown on the financial statements of the Borrower most recently delivered to the Lender, and (ii) in the case of other General Intangibles, for those adjustments which do not materially impair the value to the Borrower or the enforcement by the Borrower of such General Intangibles.

(d)    Documents and Instruments. All Documents and Instruments included within the Collateral are valid and genuine. Any such Document or Instrument has only one original counterpart which constitutes collateral within the meaning of the Massachusetts Uniform Commercial Code or the law of any applicable jurisdiction, and all such original counterparts (other than checks delivered in payment of receivables in the ordinary course of business) have been delivered into the possession of the Lender.

(e)     Address. The chief executive office and principal place of business and the office where all records are kept at the Borrower's address set forth on its signature page hereto.

(f)     Fixtures. As to any items of Collateral which are or are to become

fixtures, the Premises constitutes the real estate upon which such fixtures are or will be affixed. Section 5.20 of the Disclosure Schedule sets forth all holders of real estate interests in the Premises.

Section 5.21   Operation and Management of the Project.   At all times prior to the payment in full of the Indebtedness, the Project shall be managed by an operator/management company satisfactory to Lender, pursuant to an operation, service and management agreement reasonably satisfactory to Lender. Such operation, service and management agreement shall be subordinate to the Mortgage and all of the Loan Documents.  As of the date hereof, Lender acknowledges   that   D&C   Construction,   Inc.   is   presently   serving   as   temporary operator/management company for the Project.  Borrower hereby covenants and agrees that said D&C Construction, Inc. shall, by the earlier to occur of (1) the Commercial Operation Date or (ii) May 31, 2012, be replaced by an operator/management company satisfactory to Lender, and pursuant to an operation, service and management agreement reasonably satisfactory to Lender, and such substitute operator/management company shall execute such documents as requested by Lender.  Notwithstanding the foregoing, Lender reserves the right, at any time to revoke its approval of any operator/management company and/or such company's operation, service and management agreement.   Borrower further covenants and agrees that it shall not without Lender's prior written consent, (A) terminate or replace any operator/management company previously approved by Lender nor (B) amend, terminate or permit the termination of any such operation, service and management agreement previously approved by Lender.

## Article 6 - Affirmative Covenants of the Borrower

To conform with the terms and conditions under which the Lender is willing to have credit outstanding to the Borrower, and to induce the Lender to enter into this Agreement and extend credit hereunder, the Borrower warrants, covenants and agrees that until the full and final payment of the Obligations and the termination of this Agreement, unless the Lender has previously agreed in writing otherwise:

Section 6.1   Payment and Performance. The Borrower will pay all amounts due under the Loan Documents, to which it is a party, in accordance with the terms thereof, including but not limited to all amounts owing to Lender thereunder on account of fees or otherwise, and will observe, perform and comply with every covenant, term and condition expressed or implied in the Loan Documents to which it is a party.

Section 6.2   Books, Financial Statements and Reports. The Borrower will at all times maintain full and accurate books of account and records.  The Borrower will maintain and will cause its Subsidiaries to maintain a standard system of accounting, will maintain its Fiscal Year, and will furnish the following statements and reports to the Lender at the Borrower's expense:

(a)     As soon as available and in any event within sixty (60) days after the close of each Fiscal Quarter of each Fiscal Year of the Borrower, unaudited financial statements for the Borrower and the Project, including a balance sheet and related statement of income as of the end of such fiscal quarter and for such Fiscal Quarter and the current Fiscal Year to the end of such Fiscal Quarter, which shall be internally prepared and presented on a consistent basis, as certified by the chief financial officer of the Borrower in a Compliance Certificate in the form of Exhibit C;

(b)     As soon as available and in any event within one-hundred twenty (120) days after the close of each Fiscal Year of the Borrower, audited financial statements for the Borrower and the Project, including a balance sheet and related statements of income and changes in financial position as of the end of such Fiscal Year and for such Fiscal Year, which shall be prepared and reported on without qualification by the accountant in accordance with GAAP, and shall fairly present the financial condition of the Borrower and the Project as at the end of such Fiscal Year, as certified by the chief financial officer of the Borrower in the form of Exhibit C;

(c)     Upon receipt thereof by the Borrower, copies of any letter or report with respect to the management, operations or properties of the Borrower submitted to the Borrower by the accountant in connection with any annual or interim audit of the Borrower's accounts, and a copy of any written response of the Borrower to any such letter or report;

(d)     Upon receipt thereof by the Borrower, notice of the cancellation or expiration (without renewal or replacement) of any insurance required to be maintained by this Agreement;

(e)     Copies of Borrower's and each Guarantor's Federal Income tax returns and/or extension within 30-days of filing;

(f)     Personal financial statements of each Guarantor annually by March 31 of every year, in such form and content reasonably satisfactory to Lender;.

(g)     Annual Operating Statement and revenue analysis of the Project by March 31st of each calendar year; and

(h)     Commencing with the delivery of the financial statements under clause (a) above for the Fiscal Quarter ending March 31, 2012, calculations demonstrating compliance with the financial covenants in Section 6.18, certified by the chief financial officer of the Borrower.

Section 6.3     Other Information and Inspections.

(a)     The Borrower will furnish to the Lender any information which the Lender may from time to time request concerning any provision of the Loan Documents or any matter in connection with the Borrower's businesses, properties, prospects, financial condition and operations, including all evidence which the Lender from time to time reasonably requests in writing as to the accuracy and validity of or compliance with all representations, warranties and covenants made by the Borrower in the Loan Documents, the satisfaction of all conditions contained therein, and all other matters pertaining thereto.  The Borrower will permit

representatives appointed by the Lender (including independent accountants, auditors, agents, attorneys, appraisers and any other Persons) to visit and inspect during normal business hours any of the Borrower's property, including its books of account, other books and records, and any facilities or other business assets, and to make extra copies therefrom and photocopies and photographs thereof, and to write down and record any information such representatives obtain, and the Borrower shall permit the Lender or its representatives to investigate and verify the accuracy of the information furnished to the Lender in connection with the Loan Documents and to discuss all such matters with its officers, employees and representatives. In the event the Borrower fails to comply with these reporting requirements, the Lender may audit the Borrower at the Borrower's expense.

(b)     Any inspection or approval performed by the Lender (i) is strictly for the Lender's own information and own business purposes; (ii) is not for the benefit of the Borrower or any other person; (iii) is not for the purpose of supervising or superintending the work; and (iv) does not constitute an approval or acceptance of the quality or quantity of any work or materials, the rate of progress of the work, or any deviation from the or the Approved Budget.

Section 6.4     Notice of Material Events. The Borrower will promptly notify the Lender in writing, stating that such notice is being given pursuant to this Agreement, of:

(a)     occurrence of any Material Adverse Change;

(b)     the occurrence of any Default;

(c)     the acceleration of the maturity of any Indebtedness owed by the Borrower or of any default by the Borrower under any indenture, mortgage, agreement, contract or other instrument to which any of them is a party or by which any of them or any of their properties is bound, if such acceleration or default could cause a Material Adverse Change;

(d)     any claim of $100,000 or more, any notice of potential liability under any Environmental Laws which might exceed such amount, or any other material adverse claim asserted against the Borrower or its properties; and

(e)     the filing of any suit or proceeding against the Borrower in which an adverse decision could cause a Material Adverse Change.  Upon the occurrence of any of the foregoing the Borrower will take all necessary or appropriate steps to remedy promptly any such Material Adverse Change, Default, acceleration, or default, to protect against any such adverse claim, to defend any such suit or proceeding, and to resolve all controversies on account of any of the foregoing.

Section 6.5     Maintenance of Properties.  The Borrower will maintain, preserve, protect, and keep all Collateral and all other property used or useful in the conduct of its business in good condition (ordinary wear and tear excepted) in accordance with prudent industry standards, and in material compliance with all applicable Laws, in conformity with all applicable contracts, servitudes, leases and agreements, and will from time to time make all repairs, renewals and replacements needed to enable the business and operations carried on in connection therewith to be promptly and advantageously conducted at all times.

Section 6.6    Maintenance of Existence, Qualifications and Permits. The Borrower will maintain and preserve its existence and its rights and franchises and its permits in full force and effect and will qualify to do business in all states or jurisdictions where required by applicable Law, except where the failure so to qualify would not cause a Material Adverse Change.

Section 6.7    Payment of Trade Liabilities, Taxes, etc. The Borrower will (a) timely file all required tax returns including any extensions; (b) timely pay all taxes, assessments, and other governmental charges or levies imposed upon it or upon its income, profits or property before the same become delinquent; (c) within ninety (90) days past the original invoice billing date therefore same becomes due pay all Liabilities owed by it on ordinary trade terms to vendors, suppliers and other Persons providing goods and services used by it in the ordinary course of its business; (d) pay and discharge when due all other Liabilities now or hereafter owed by it, other than royalty payments suspended in the ordinary course of business; and (e) maintain appropriate accruals and reserves for all of the foregoing in accordance with GAAP.

Section 6.8    Insurance.

(a)    The Borrower shall at all times maintain (at its own expense) insurance for its property in accordance with the Insurance Schedule and insurance with respect to all Collateral. The Borrower will at all times maintain, with financially sound and reputable insurance companies, insurance in at least such amounts, with at least such limitations on deductibles, and against such risks, in such form and with such financially sound and reputable insurers as shall be satisfactory to the Lender from time to time, as to such casualties, liabilities and other risks as are usually insured against in the same general area by prudent companies of similar size engaged in the same or a similar business, and will furnish to each Lender, upon written request, full information as to the insurance carried. All insurance policies covering Collateral shall be endorsed (b) to provide for payment of losses to the Lender as its interests may appear, (c) to provide that such policies may not be canceled or reduced or affected in any material manner for any reason without ten (10) days prior notice to the Lender, (d) to provide for any other matters specified in any applicable Security Document or which the Lender may reasonably require; and (e) to provide for insurance against fire, casualty and any other hazards normally insured against, in the amount of the full value (less a reasonable deductible not to exceed amounts customary in the industry for similarly situated businesses and properties) of the property insured. The Borrower shall at all times maintain insurance against its liability for injury to persons or property in accordance with the Insurance Schedule, which insurance shall be by financially sound and reputable insurers. Without limiting the foregoing, the Borrower shall at all time maintain liability insurance in accordance with Insurance Schedule.

(b)    Each policy for liability insurance shall provide for all losses to be paid on behalf of the Lender and the Borrower as their respective interests may appear, and each policy insuring loss or damage to Collateral shall provide for all losses in excess of $500,000 or as otherwise provided in subsection (d) of this Section to be paid directly to the Lender. Each such policy shall in addition (A) name the Borrower and the Lender as insured parties thereunder (without any representation or warranty by or obligation upon the Lender) as their interests may appear, (B) contain the agreement by the insurer that any loss thereunder shall be payable to the Lender notwithstanding any action, inaction or breach of representation or warranty by the Borrower, (C) provide that there shall be no recourse against the Lender for payment of

36

premiums or other amounts with respect thereto and (D) provide that at least thirty (30) days' prior written notice of cancellation or of lapse shall be given to the Lender by the insurer. The Borrower will, if so requested by the Lender, deliver to the Lender original or duplicate policies of such insurance and, as often as the Lender may reasonably request, a report of a reputable insurance broker with respect to such insurance. The Borrower will also, at the request of the Lender, duly execute and deliver instruments of assignment of such insurance policies consistent with the provisions of this subsection (b) and cause the respective insurers to acknowledge notice of such assignment. The Lender is hereby authorized to enforce payment under all such insurance policies and to compromise and settle any claims in excess of $500,000 thereunder, in its own name or in the name of the Borrower.

(c)     Reimbursement under any liability insurance maintained by the Borrower pursuant to this Section may be paid directly to the Person who has incurred the liability covered by such insurance. With respect to any loss involving damage to Collateral as to which subsection (d) of this Section is not applicable, the Borrower will make or cause to be made the necessary repairs to or replacements of such Collateral, and any proceeds of insurance maintained by the Borrower pursuant to this Section shall be paid to the Borrower by the Lender as reimbursement for the costs of such repairs or replacements as such repairs or replacements are made or acquired.

(d)     Upon the occurrence and during the continuance of an Event of Default or upon the occurrence of a loss in excess of $500,000 per occurrence, all insurance payments in respect of such loss shall be paid to the Lender. The Lender shall apply all loss proceeds remaining after deduction of all expenses of collection and settlement thereof, including reasonable attorneys' and adjustor's fees and expenses, to the restoration of the Project, but only so as long as (i) no Event of Default then exists and is continuing, (ii) such loss proceeds shall be in an amount sufficient to complete the restoration of the Project and pay, during the period of reconstruction, all operating expenses of the Project and all debt service on the Loan, or, if such loss proceeds are insufficient, the Borrower shall have deposited with the Lender an amount equal to any deficiency within ten (10) business days of the determination of such deficiency and in any event prior to application of any loss proceeds to restoration of the Project, (iii) the plans, specifications, construction contracts, and all other material agreements relating to the restoration shall be approved by the Lender in writing; (iv) the Lender determines, in its sole discretion, that the Project is capable of being fully restored by the earlier of (A) the date which is 12 months from the occurrence of the loss or damage and (B) the Maturity Date. If the foregoing conditions are met, the Lender shall disburse the loss proceeds in accordance with customary construction loan practices and only as repairs or replacements are effected and continuing and expenses become due and payable. If any one or more of the above conditions are not met, the Lender shall have the right to declare all Obligations immediately due and payable, and to apply all of the loss proceeds, after deductions as herein provided, to the payment of the Obligations.

Section 6.9   Performance on the Borrower's Behalf. If the Borrower fails to pay any taxes, insurance premiums, expenses, attorneys' fees or other amounts it is required to pay under any Loan Document, the Lender may pay the same. The Borrower shall immediately reimburse the Lender for any such payments and each amount paid by the Lender shall constitute an Obligation owed hereunder which is due and payable on the date such amount is paid by the Lender.

Section 6.10   Interest. The Borrower hereby promises to the Lender to pay interest at the Default Rate on all Obligations, including Obligations to pay fees or to reimburse or indemnify the Lender but excluding principal of, and interest on, any Loan which the Borrower has in this Agreement promised to pay to the Lender and which are not paid when due.  Such interest shall accrue from the date such Obligations become due until they are paid.

Section 6.11   Compliance with Agreements and Law. The Borrower will perform all material obligations it is required to perform under the terms of each indenture, mortgage, deed of trust, security agreement, lease, franchise, agreement, contract or other instrument or obligation to which it is a party or by which it or any of its properties is bound. The Borrower will conduct its business and affairs in compliance with all Laws and Governmental Approvals and permits applicable thereto.  The Borrower will cause all licenses and permits necessary or appropriate for the conduct of its business and the ownership and operation of its property used and useful in the conduct of its business to be at all times maintained in good standing and in full force and effect.  The Borrower will operate all equipment in accordance with good industry practice and all applicable manufacturer's recommendations and schedules.

Section 6.12   Environmental Matters; Environmental Reviews.

(a)    The Borrower will comply in all material respects with all Environmental Laws now or hereafter applicable to the Borrower, as well as all contractual obligations and agreements with respect to environmental remediation or other environmental matters, and shall obtain, at or prior to the time required by applicable Environmental Laws, all environmental, health and safety permits, licenses and other authorizations necessary for its operations and will maintain such authorizations in full force and effect.  The Borrower will not do anything or permit anything to be done which will subject any of its properties to any remedial obligations under, or result in noncompliance with applicable permits and licenses issued under, any applicable Environmental Laws, assuming disclosure to the applicable governmental authorities of all relevant facts, conditions and circumstances.  Upon the Lender's reasonable request, at any time and from time to time, the Borrower will provide at its own expense an environmental inspection of any of the Borrower's material real properties and audit of their environmental compliance procedures and practices, in each case from an engineering or consulting firm approved by the Lender.

(b)    The Borrower will promptly furnish to the Lender all written notices of violation, orders, claims, citations, complaints, penalty assessments, suits or other proceedings received by the Borrower, or of which the Borrower otherwise has notice, pending or threatened against the Borrower by any governmental authority with respect to any alleged violation of or non-compliance with any Environmental Laws or any permits, licenses or authorizations in connection with the Borrower's ownership or use of its properties or the operation of its business.

(c)    The Borrower will promptly furnish to the Lender all requests for information, notices of claim, demand letters, and other notifications, received by the Borrower in connection with the Borrower's ownership or use of its properties or the conduct of its business, relating to potential responsibility with respect to any investigation or clean-up of Hazardous Material at any location.

(d)    Promptly after the last day of each Fiscal Year, and in any case no more than 30 days after the last day of each Fiscal Year, the Borrower will send the Lender an Environmental Compliance Certificate, executed by a responsible officer of the Borrower, in the form of <u>Exhibit D</u>.

Section 6.13    <u>Evidence of Compliance</u>. The Borrower will furnish to the Lender at the Borrower's expense all evidence which the Lender from time to time reasonably requests in writing as to the accuracy and validity of or compliance with all representations, warranties and covenants made by the Borrower in the Loan Documents, the satisfaction of all conditions contained therein, and all other matters pertaining thereto.

Section 6.14    <u>Bank Accounts; Offset</u>. The Borrower shall at all times maintain its primary operating accounts with the Lender, and ensure that all other depository accounts of Borrower with any other financial institution are subject to control agreements in favor of the Lender.  To secure the repayment of the Obligations the Borrower hereby grants to the Lender a security interest, a lien, and a right of offset, each of which shall be in addition to all other interests, liens, and rights of the Lender at common Law, under the Loan Documents, or otherwise, and each of which shall be upon and against (a) any and all moneys, securities or other property (and the proceeds therefrom) of the Borrower now or hereafter held or received by or in transit to the Lender from or for the account of the Borrower, whether for safekeeping, custody, pledge, transmission, collection or otherwise, (b) any and all deposits (general or special, time or demand, provisional or final) of the Borrower with the Lender or any other financial institution, and (c) any other credits and claims of the Borrower at any time existing against the Lender, including claims under certificates of deposit.  At any time and from time to time after the occurrence of any Default, the Lender is hereby authorized to foreclose upon, or to offset against the Obligations then due and payable (in either case without notice to the Borrower), any and all items hereinabove referred to. The remedies of foreclosure and offset are separate and cumulative, and either may be exercised independently of the other without regard to procedures or restrictions applicable to the other.  ANY AND ALL RIGHTS TO REQUIRE THE LENDER TO EXERCISE ITS RIGHTS OR REMEDIES WITH RESPECT TO ANY OTHER COLLATERAL WHICH SECURES THE LOAN, PRIOR TO EXERCISING ITS OFFSET RIGHTS WITH RESPECT TO SUCH DEPOSITS, SECURITIES OR OTHER PROPERTY OF THE BORROWER ARE HEREBY KNOWINGLY, VOLUNTARILY AND IRREVOCABLY WAIVED.

Section 6.15    <u>Agreement to Deliver Security Documents</u>.  The Borrower agrees to deliver to further secure the Obligations whenever requested by the Lender in its sole and absolute discretion, deeds of trust, mortgages, chattel mortgages, security agreements, financing statements, financing statement continuation statements, assignments of leases and rents, collateral assignment of the Power Purchase Agreement, pledge of any credit, benefit, reduction, offset, financial incentive, tax credit, payment, and other beneficial allowance arising as a result of the ownership and operation of the Project, including, without limitation, a) the grant to be applied for and made available to the Borrower by the United States Department of Treasury (the "**Federal Incentive Grant**"), b) the Renewable Energy Certificates or any similar credits under the laws of the Commonwealth of Massachusetts (the "**RECs**"), c) tax credits, incentives or depreciation allowances established under any federal or state law, and d)other allowances howsoever named or referred to, with respect to any and all fuel, emissions, air quality, or other

environmental characteristics, resulting from the use of wind electricity generation or the avoidance of the emission of any gas, chemical, or other substance into the air, soil, or water attributable to the sale of electricity generated by the wind facility, collateral assignment of all licenses, permits, and agreements relating to the construction and installation of the Project, including, without limitation, all contracts and subcontracts, collateral assignment of all building permits, governmental permits, licenses, consents, approvals, and authorizations now or hereafter granted or issued, and all intellectual property rights including but not limited to trade names and trademarks in connection with the construction, development or operation of the Project, a collateral assignment of all Plans, drawings surveys, renderings prepared for the construction of the Project and a collateral assignment of any reserves, escrows or contingency accounts, extension agreements, acknowledgments, and other Security Documents in form and substance satisfactory to the Lender for the purpose of granting, confirming, protecting and perfecting Liens or security interests in any real or personal property now owned or hereafter acquired by the Borrower.

Section 6.16    General Covenants Applicable to Collateral. Capitalized terms used in this Section and not otherwise defined herein and which are defined in the Security Agreements shall have the meanings given them in the Security Agreements.

(a)    Change of Name, Location, or Structure; Additional Filings. The Borrower recognizes that financing statements pertaining to the collateral have been or may be filed where the Borrower maintains any Collateral, has its records concerning any Collateral or has its chief executive office or chief place of business. Without limitation of any other covenant herein, the Borrower will not cause or permit any change to be made in its name, identity or limited liability company structure, or any change to be made to a jurisdiction other than as represented in Section 5.20 hereof in (i) the location of any collateral, (ii) the location of any records concerning any collateral or (iii) in the location of the Borrower's chief executive office or principal place of business, in each case, unless the Borrower shall have first notified the Lender of such change at least forty-five (45) days prior to the effective date of such change, taken all action requested by the Lender (under the following subsection (b) or otherwise) for the purpose of further confirming and protecting the Lender's security interests and rights under the Loan Documents and the perfection and priority thereof, and if reasonably requested by the Lender, provided to the Lender a legal opinion to its satisfaction confirming that such change will not adversely affect in any way the Lender's security interests and rights under this Agreement or the perfection or priority thereof In any notice furnished pursuant to this subsection, the Borrower will expressly state that the notice is required by this Agreement and contains facts that may require additional filings of financing statements or other notices for the purposes of continuing perfection of the Lender's security interest in the Collateral.

(b)    Ownership and Liens. The Borrower will maintain good and marketable title to all Collateral free and clear of all Liens, encumbrances or adverse claims, except for Permitted Liens. The Borrower will not permit any dispute, right of setoff, counterclaim or defense to exist with respect to all or any part of the Collateral. The Borrower will cause to be terminated any financing statement or other registration or instrument similar in effect covering all or any part of the Collateral, except any which have been filed in favor of the Lender relating to any Security Document or any Permitted Liens.

(c)     Further Assurances. The Borrower will defend the Lender's right, title and special property and security interest in and to the Collateral against the claims of any Person. The Borrower will not take or fail to take any action which would in any manner impair the value or enforceability of the Lender's security interest in any Collateral.  The Borrower will, at its expense as from time to time requested by the Lender, promptly execute and deliver all further instruments, agreements, filings and registrations, and take all further action, in order: (i) to confirm and validate this Agreement and Lender's rights and remedies hereunder, (ii) to correct any errors or omissions in the descriptions herein of the Obligations or the Collateral or in any other provisions hereof, (iii) to perfect, register and protect the security interests and rights created or purported to be created hereby or to maintain or upgrade in rank the priority of such security interests and rights, (iv) to enable the Lender to exercise and enforce its rights and remedies hereunder in respect of the Collateral, or (v) to otherwise give the Lender the full benefits of the rights and remedies described in or granted under this Agreement. As part of the foregoing the Borrower will, whenever requested by the Lender (i) execute and file any financing statements, continuation statements, and other filings or registrations relating to the Lender's security interests and rights hereunder, and any amendments thereto, and (ii) mark its books and records relating to any Collateral to reflect that such Collateral is subject to this Agreement and the security interests hereunder.  To the extent requested by the Lender from time to time, the Borrower will obtain from any material account debtor or other obligor on the Collateral the acknowledgment of such account debtor or obligor that such Collateral is subject to this Agreement.

(d)     Ownership, Liens, Possession and Transfers. The Borrower will maintain good and marketable title to all Collateral, free and clear of all Liens, encumbrances or adverse claims except for the security interests created by the Security Documents and Permitted Liens, and the Borrower will not grant or allow any such Liens, encumbrances or adverse claims to exist. The Borrower will not grant or allow to remain in effect any financing statement or other registration or instrument similar in effect covering all or any part of the Collateral, except any which have been filed in favor of the Lender relating to this Agreement, or other Permitted Liens. The Borrower (i) will insure that all of the Collateral - whether goods, Documents, Instruments, or otherwise - is and remains in the possession of the Borrower or the Lender (or a bailee selected by the Lender who is holding such Collateral for the benefit of the Lender), except for goods being transported in the ordinary course of business, and (ii) will not sell, assign (by operation of law or otherwise), transfer, exchange, lease or otherwise dispose of any of the Collateral.

(e)     Impairment of Security Interest. The Borrower will not take or fail to take any action which would in any manner impair the value or enforceability of the Lender's first priority security interest in any Collateral.

(f)     Compromise of Collateral. The Borrower will not adjust, settle, compromise, amend or modify any of its rights in the Collateral.

(g)     Receivables & General Intangibles. The Borrower will, except as otherwise expressly provided herein, collect at its own expense all amounts due or to become due under each Receivable and General Intangible which is included within the Collateral.  In connection with such collections, the Borrower may (and, at the Lender's direction, will) take

such action (not otherwise forbidden hereunder) as the Borrower or the Lender may deem necessary or advisable to enforce collection or performance of each such Receivable or General Intangible.  Except for actions and omissions in the ordinary course of business which do not in the aggregate cause material losses or reductions, the Borrower (i) will duly perform and cause to be performed all of its obligations with respect to the goods or services, the sale or lease or rendering of which gave rise or will give rise to each such Receivable or General Intangible, and (ii) will not (whether through failure to duly perform its obligations under any contracts, instruments, and agreements which are related to any such Receivable or General Intangible, or by any written instrument, or otherwise) take or allow any action or omission which causes any such Receivable or General Intangible to become subject to any contra-accounts, setoffs, defenses, counterclaims, discounts, allowances, rebates, credits or adjustments by or available to account debtors obligated on such Receivable or General Intangible.

(h)      Documents and Instruments.  The Borrower will at all times cause any Documents or Instruments which are included within the Collateral to be valid and genuine.  The Borrower will cause all Instruments included within the Collateral to have only one original counterpart.  The Borrower will promptly deliver to the Lender all originals of Documents or Instruments which are included within the Collateral.  The Borrower will not (whether through failure to duly perform its obligations under any contracts, instruments, and agreements which are related to any Documents or Instruments which are included within the Collateral, or by any written instrument, or otherwise) take or allow any action or omission which causes any Documents or Instruments which are included within the Collateral to become subject to any contra-accounts, setoffs, defenses, counterclaims, discounts, allowances, rebates, credits or adjustments by or available to the Persons obligated thereon.

Section 6.17   Collateral. At all times the Obligations shall be secured by first and prior Liens (subject only to Permitted Liens) covering and encumbering all of the Borrower's assets.

Section 6.18   Financial Covenants. The Borrower shall demonstrate compliance with the following covenant as of the end of each Fiscal Quarter commencing July 1, 2012, based on the Borrower's financial condition (i) on a cumulative basis until the Borrower has completed four-Fiscal Quarters of operations and (ii) on a rolling four-Fiscal Quarter basis for the preceding four Fiscal Quarters, thereafter:

(a)      A DSCR of not less than 1.25 to 1.00.

For the avoidance of doubt, any calculation for determining compliance with the financial covenants pursuant to this Section 6.18 or in connection with determining satisfaction of the Distribution Conditions shall exclude Permitted Subordinated Debt so long as such Indebtedness was incurred in accordance with Section 7.1(iii).

Section 6.19   Loan in Balance. The aggregate outstanding amount of the Obligations, together with committed investment of the Borrower in the Project, will at all times be sufficient to fund all hard and soft construction costs of the Project in accordance with the Approved Budget.

Section 6.20   Borrower to Pay Expenses. At the closing of the Loan, the Borrower will pay all of the Lender's out-of-pocket expenses in connection with the Loan.  Such expenses include, but are not limited to, the Lender's legal fees and expenses and all costs of the Engineering Report commissioned by the Lender and any third party due diligence. In addition, the Borrower shall pay all closing costs customary to transactions of this nature, including but not limited to recording and filing fees, title search charges and insurance premiums and any other reasonable costs of the Lender incurred in connection with or otherwise incidental to closing the Loan.

Section 6.21   Taking.

(a)   If an Event of Taking shall be threatened or occurs, the Borrower (i) promptly upon any such threat of which it is aware or upon any such occurrence, shall provide written notice thereof to the Lender, (ii) shall diligently pursue all its rights to compensation against the condemning authority in respect of such an Event of Taking, and (iii) so long as no Event of Default shall have occurred and be continuing, may, with the written consent of the Lender, compromise or settle any claim against the condemning authority.  The right to compromise or settle any claim against the condemning authority (if an Event of Default shall have occurred and be continuing) is hereby assigned to the Lender, and the right to collect all amounts and proceeds (including instruments) payable in respect of an Event of Taking ("**Condemnation Proceeds**") is hereby assigned to the Lender.  All Condemnation Proceeds will be paid to the Lender and the Lender, after deducting all reasonable expenses incurred by the Lender and the Borrower in litigating, arbitrating, compromising or settling any claims against the condemning authority, will hold such Condemnation Proceeds as security for the Obligations and apply the same in accordance with the provisions of this Section.  The Lender may participate in any proceedings relating to an Event of Taking, and the Borrower will from time to time deliver to the Lender all instruments requested by either of them to permit such participation.

(b)   In the case of an Event of Taking, all Condemnation Proceeds will be applied by the Lender either to prepay the Obligations or to pay or reimburse the Borrower for the cost of restoration in accordance with the same procedures as provided in Section 6.8 with respect to insurance proceeds.

## Article 7 - Negative Covenants of the Borrower

To conform with the terms and conditions under which the Lender is willing to have credit outstanding to the Borrower, and to induce the Lender to enter into this Agreement and make the Loans, the Borrower warrants, covenants and agrees that until the full and final payment of the Obligations and the termination of this Agreement, unless the Lender has previously agreed in writing otherwise:

Section 7.1   Indebtedness. The Borrower will not in any manner owe or be liable for Indebtedness, either on a secured or unsecured basis, without the consent of the Lender, other than:

(i)   the Obligations;

       (ii)     as set forth on <u>Section 7.1</u> of the Disclosure Schedule; and

       (iii)    debt owing to the Borrower's Members or their Affiliates, provided that payments on account of such debt shall be subordinated to payment of the Obligations on terms reasonably acceptable to the Lender (the "**Permitted Subordinated Debt**").

Borrower will not engage in any restructure or default or otherwise act or failure to act which would result in the acceleration of payment of any existing debt.

      Section 7.2    <u>Limitation on Liens</u>. Except for Permitted Liens, the Borrower will not create, assume or permit to exist any Lien upon any of the properties or assets which it now owns or hereafter acquires. No Member of the Borrower shall create, assume or permit to exist any Liens, other than the Lien in favor of the Lender pursuant to the Security Documents of the Borrower.

      Section 7.3    <u>Limitation on Mergers, Issuances of Securities</u>. The Borrower will not merge or consolidate with or into any other Person.

      Section 7.4    <u>Limitation on Sales of Property</u>. The Borrower will not sell, transfer, lease, exchange, alienate or dispose of any of its material assets including but not limited to the Generating Unit, or properties, including, without limitation its interest in the Ground Lease, or any material interest therein, or discount, sell, pledge or assign any notes payable to it, accounts receivable or future income.

      Section 7.5    <u>Limitation on Dividends, Redemptions and Payments on Permitted Subordinated Debt</u>. The Borrower will not declare or make any Distributions or payments on any Permitted Subordinated Debt without the prior written consent of the Lender; provided, that upon Borrower providing a certification to the Lender as to its satisfaction with all Distribution Conditions as of the end of any Fiscal Quarter after the expiration of the Construction Period, the Borrower may make (x) quarterly Distributions following such Fiscal Quarter and (y) regularly scheduled interest payments with respect to any Permitted Subordinated Debt, and (ii) notwithstanding Borrower's inability to satisfy the Distribution Conditions, Borrower may make Distributions in an aggregate amount necessary for the Members of Borrower (or the individual members of Members that are limited liability companies), to pay federal and state income taxes upon Borrower's undistributed income for such year, in each case, so long as there is not an uncured Default at the time of such Distribution or regularly scheduled interest payment with respect any Permitted Subordinated Debt and further that immediately after giving effect to such contemplated Distribution or regularly scheduled interest payment with respect any Permitted Subordinated Debt, Borrower is in compliance with the covenants set forth in <u>Section 6.18</u>. Notwithstanding anything to the contrary contained herein and so long as no Event of Default shall have occurred and be continuing (or shall result from the payment of such Distribution), the Borrower may declare or make a Distributions without the prior written consent of the Lender in an amount not to exceed any cash received by Borrower from the United States Treasury in connection with any grant issued to Borrower pursuant to and in accordance with Section 1603 of The American Recovery and Reinvestment Act.

Section 7.6    Limitation on Transfer of Membership Interests. Any transfer of any beneficial interests in the Borrower will be subject to the Lender's prior written approval.

Section 7.7    Limitation on Investments and New Businesses. The Borrower will not (a) make any expenditure or commitment or incur any obligation or enter into or engage in any transaction except in the ordinary course of business, (b) engage directly or indirectly in any business or conduct any operations except in connection with or incidental to its present businesses and operations, or (c) make any acquisitions of or capital contributions to or other Investments in any Person or property, other than Permitted Investments.

Section 7.8    Limitation on Credit Extensions. Except for Permitted Investments, the Borrower will not extend credit, enter into any guaranty, make advances or make loans.

Section 7.9    Transactions with Affiliates. Except for (i) any unpaid development fee owing to any Affiliate of the Borrower and (ii) that certain Engineering, Procurement and Construction Services Contract with Contractor dated April 20, 2011, the Borrower will not engage in any material transaction with any of its Affiliates on terms which are less favorable to it than those which would have been obtainable at the time in arm's-length dealing with Persons other than such Affiliates.

Section 7.10    Prohibited Contracts. The Borrower will not enter into, amend or permit any amendment to any contract or lease which releases, qualifies, limits, makes contingent or otherwise detrimentally affects the rights and benefits of the Lender under or acquired pursuant to any Security Documents.  No ERISA Affiliate will incur any obligation to contribute to any "multiemployer plan" as defined in Section 4001 of ERISA.

Section 7.11    No Amendments. The Borrower will not (i) amend the Ground Lease or any Project Documents (other than the Approved Budget and the Borrower's Operating Agreement which are specifically addressed in clause (ii) of this Section 7.11) without the prior written consent of the Lender nor (ii) materially amend the Approved Budget or its Operating Agreement without the prior written consent of the Lender, which consent shall not be unreasonably withheld, conditioned or delayed.  For the avoidance of doubt, a 10% aggregate increase in the amount of the Approved Budget shall constitute a material amendment to the Approved Budget for the purposes of clause (ii) of this Section 7.11.

## Article 8 - Collateral

Section 8.1    Grant of Security Interest.  To secure the prompt payment and performance of all Obligations, Borrower hereby grants (and hereby reaffirms it prior grant pursuant to each Advance) to Lender a continuing security interest in and Lien upon all personal property of Borrower, including all of the following property, whether now owned or hereafter acquired, and wherever located:

(a)    all Accounts;

(b)    all Chattel Paper, including electronic chattel paper;

(c)    all Commercial Tort Claims;

(d)     all Deposit Accounts;

(e)     all Documents;

(f)     all General Intangibles, including Payment Intangibles, Software and Intellectual Property;

(g)     all Goods, including Inventory, Equipment and fixtures;

(h)     all Instruments;

(i)     all monies, whether or not in the possession or under the control of Lender or any Lender or a bailee or Affiliate of Lender or any Lender, including any Cash Collateral;

(j)     all accessions to, substitutions for, and all replacements, products, and cash and non-cash proceeds of the foregoing, including proceeds of and unearned premiums with respect to insurance policies, and claims against any Person for loss, damage or destruction of any Collateral; and

(k)     all books and records (including customer lists, files, correspondence, tapes, computer programs, print-outs and computer records) pertaining to the foregoing.

Section 8.2     Lien on Deposit Accounts; Cash Collateral.

(a)     Deposit Accounts.  To further secure the prompt payment and performance of all Obligations, Borrower hereby grants to Lender a continuing security interest in and Lien upon all of Borrower's right, title and interest in and to each Deposit Account of Borrower and any deposits or other sums at any time credited to any such Deposit Account, including any sums in any blocked or lockbox accounts or in any accounts into which such sums are swept.  Borrower authorizes and directs each bank or other depository to deliver to Lender, on a daily basis, all balances in each Deposit Account maintained by Borrower with such depository for application to the Obligations then outstanding.  Borrower irrevocably appoints Lender as Borrower's attorney-in-fact to collect such balances to the extent any such delivery is not so made.

(b)     Cash Collateral.  Any Cash Collateral may be invested, in Lender's discretion, in Cash Equivalents, but Lender shall have no duty to do so, regardless of any agreement, understanding or course of dealing with Borrower, and shall have no responsibility for any investment or loss.  Borrower hereby grants to Lender a security interest in all Cash Collateral held from time to time and all proceeds thereof, as security for the Obligations, whether such Cash Collateral is held in the Cash Collateral Account or elsewhere.  Lender may apply Cash Collateral to the payment of any Obligations, in such order as the Lender may elect, as they become due and payable.  The Cash Collateral Account and all Cash Collateral shall be under the sole dominion and control of Lender.  Neither Borrower nor any Person claiming through or on behalf of Borrower shall have any right to any Cash Collateral, until full payment of all Obligations.

Section 8.3     Other Collateral.

(a)     <u>Commercial Tort Claims</u>.  Borrower shall promptly notify Lender in writing if Borrower has a Commercial Tort Claim (other than, as long as no Default or Event of Default exists, a Commercial Tort Claim for less than $100,000) and, upon Lender's request, shall promptly execute such documents and take such actions as Lender deems appropriate to confer upon Lender a duly perfected, first priority Lien upon such claim.

(b)     <u>Certain After-Acquired Collateral</u>.  Borrower shall promptly notify Lender in writing if, after the date of this Agreement, Borrower obtains any interest in any Collateral consisting of Deposit Accounts, Chattel Paper, Documents, Instruments or Intellectual Property, and, upon Lender's reasonable request, shall promptly execute such documents and take such actions as Lender deems appropriate to effect Lender's duly perfected, first priority Lien upon such Collateral, including obtaining any appropriate possession, control agreement or Lien waiver.  If any Collateral is in the possession of a third party, at Lender's request, Borrower shall use commercially reasonably efforts to obtain an acknowledgment that such third party holds the Collateral for the benefit of Lender.

Section 8.4     <u>No Assumption of Liability</u>.  The Lien on Collateral granted hereunder is given as security only and shall not subject Lender, or in any way modify, any obligation or liability of Borrower or any Guarantor relating to any Collateral.

Section 8.5     <u>Financing Statements; Power of Attorney</u>.  Borrower authorizes Lender at Borrower's expense to file any financing statements and/or amendments thereto relating to the Collateral (without Borrower's signature thereon) which Lender deems appropriate that (a) indicate the Collateral (i) as "all assets" of Borrower or words of similar effect, if appropriate, regardless of whether any particular asset comprised in the Collateral falls within the scope of Article 9 of the UCC, or (ii) by specific Collateral category, and (b) provide any other information required by part 5 of Article 9 of the UCC for the sufficiency or filing office acceptance of any financing statement or amendment. Borrower irrevocably appoints Lender as its attorney in fact to execute any such financing statements and/or control agreements in Borrower's name and to perform all other acts, at Borrower's expense, which Lender deems appropriate to perfect and to continue perfection of the security interest of Lender.  Borrower hereby appoints Lender as Borrower's attorney in fact to endorse, present and collect on behalf of Borrower and in Borrower's name any Payment Items or other documents necessary or desirable to collect any amounts which Borrower may be owed.  Lender is hereby granted a license or other right to use, without charge, Borrower's labels, patents, copyrights, rights of use of any name, trade secrets, trade names, trademarks and advertising matter, or any property of a similar nature, as it pertains to the Collateral, in advertising for sale and selling any Collateral, and Borrower's rights under all licenses and all franchise agreements shall inure to Lender.  If any deficiency shall arise, Borrower and each other Guarantor shall remain jointly and severally liable to Lender therefor.

Section 8.6     <u>Further Assurances</u>.  Promptly upon request, Borrower shall deliver such instruments, assignments, title certificates, or other documents or agreements, and shall take such actions, as Lender deems appropriate under applicable Law to evidence or perfect its Lien on any Collateral, or otherwise to give effect to the intent of this Agreement.

**Article 9 - Collateral Administration**

Section 9.1     Administration of Accounts.

(a)     Records and Schedules of Accounts. Borrower shall keep accurate and complete records of its Accounts, including all payments and collections thereon, and Borrower shall submit to Lender on a weekly or such other periodic basis as Lender may request, sales and collections reports for Borrower in form satisfactory to Lender.

(b)     Taxes. If an Account of Borrower includes a charge for any taxes, Lender and each Lender is authorized, in its discretion, to pay the amount thereof to the proper taxing authority for the account of Borrower and to charge Borrower therefor; provided, however, that neither Lender nor any Lender shall be liable for any taxes that may be due from Borrower or with respect to any Collateral.

(c)     Account Verification. Whether or not a Default or Event of Default exists, Lender shall have the right at any time, in the name of Lender, any designee of Lender or Borrower, as the case may be, to verify the validity, amount or any other matter relating to any Accounts of Borrower by mail, telephone or otherwise. Borrower shall cooperate fully with Lender in an effort to facilitate and promptly conclude any such verification process.

Section 9.2     Administration of Equipment.

(a)     Records and Schedules of Equipment. Borrower shall keep accurate and complete records of its Equipment, including kind, quality, quantity, cost, acquisitions and dispositions thereof, and shall submit to Lender on such periodic basis as Lender may request, a current schedule thereof, in form satisfactory to Lender. Promptly upon request, Borrower shall deliver to Lender evidence of its ownership or interests in any Equipment.

(b)     Dispositions of Equipment. Borrower shall not sell, lease or otherwise dispose of any Equipment, without the prior written consent of Lender and Lenders, other than (a) a Permitted Asset Disposition; and (b) replacement of Equipment that is worn, damaged or obsolete (as determined by Borrower) with Equipment of like function, if the replacement Equipment is acquired substantially contemporaneously with such disposition and is free of Liens other than the Lien securing the Subordinated Term A Note Obligations.

(c)     Condition of Equipment. The Equipment of Borrower is in good operating condition and repair, and all necessary replacements and repairs have been made so that the value and operating efficiency of the Equipment is preserved at all times, reasonable wear and tear excepted. Borrower shall ensure that the Equipment is mechanically and structurally sound, and capable of performing the functions for which it was designed, in accordance with the manufacturer's published and recommended specifications. Borrower shall not permit any Equipment to become affixed to Real Estate unless any landlord or mortgagee delivers a Lien Waiver or similar instrument.

Section 9.3     Administration of Deposit Accounts. Borrower shall take all actions as necessary to establish Lender's control of each the Deposit Account (other than an account exclusively used for payroll, payroll taxes or employee benefits, or an account containing not

more that $10,000 at any time).  Borrower, as the case may be, shall be the sole account holder of each Deposit Account and shall not allow any other Person (other than Lender) to have control over a Deposit Account or any property deposited therein.  Borrower shall promptly notify Lender of any opening or closing of a Deposit Account.

Section 9.4    General Provisions.

(a)    Location of Collateral.  All tangible items of Collateral shall at all times be kept by Borrower at the Project.

(b)    Protection of Collateral.  All expenses of protecting, storing, warehousing, insuring, handling, maintaining and shipping any Collateral, all taxes payable with respect to any Collateral (including any sale thereof), and all other payments required to be made by Lender to any Person to realize upon any Collateral, shall be borne and paid by Borrower.  Neither Lender shall be liable or responsible in any way for the safekeeping of any Collateral, for any loss or damage thereto (except for reasonable care in its custody while Collateral is in Lender's or any Lender's actual possession), for any diminution in the value thereof, or for any act or default of any warehouseman, carrier, forwarding agency or other Person whatsoever, but the same shall be at Borrower's sole risk.

(c)    Defense of Title to Collateral.  Borrower shall at all times defend its title to Collateral and Lender's Liens therein against all Persons, claims and demands whatsoever, except Permitted Liens.

Section 9.5    Power of Attorney.  Borrower hereby irrevocably constitutes and appoints Lender (and all Persons designated by Lender) as Borrower's true and lawful attorney (and Lender-in-fact) for the purposes provided in this Section.  Lender, or Lender's designee, may, without notice and in either its or Borrower's name, but at the cost and expense of Borrower:

(i)    Endorse Borrower's name on any Payment Item or other proceeds of Collateral (including proceeds of insurance) that come into Lender's possession or control; and

(ii)    During an Event of Default, (i) take control, in any manner, of any proceeds of Collateral; (ii) prepare, file and sign Borrower's name to a proof of claim or other document in a bankruptcy of an Account Debtor, or to any notice, assignment or satisfaction of Lien or similar document; (iii) receive, open and dispose of mail addressed to Borrower, and notify postal authorities to change the address for delivery thereof to such address as Lender may designate; (iv) endorse any Chattel Paper, Document, Instrument, invoice, freight bill, bill of lading, or similar document or agreement relating to any Accounts, Inventory or other Collateral; (v) use such Borrower's stationery and sign its name to verifications of Accounts and notices to Account Debtors; (vi) use the information recorded on or contained in any data processing equipment and computer hardware and software relating to any Collateral; (vii) make and adjust claims under policies of insurance; (viii) take any action as may be necessary or appropriate to obtain payment under any letter of credit or banker's acceptance for which Borrower is a beneficiary; and (ix) take all other actions as Lender deems appropriate to fulfill Borrower's obligations under the Loan Documents.

## Article 10 - Events of Default and Remedies

Section 10.1   Events of Default. Each of the following events constitutes an Event of Default under this Agreement:

(a)      The Borrower fails to pay any component of any Obligation when due and payable, whether at a date for the payment of a fixed installment or as a contingent or other payment becomes due and payable or as a result of acceleration or otherwise;

(b)      Any "default" or "event of default" occurs under any Loan Document which defines either such term, and the same is not remedied within the applicable period of grace (if any) provided in such Loan Document;

(c)      The Borrower fails (other than as referred to in subsections (a) and (b) above or (d) below) to duly observe, perform or comply with any covenant, agreement, condition or provision of any Loan Document to which it is a party, and such failure remains unremedied for a period of thirty (30) days after notice of such failure is given by the Lender to the Borrower;

(d)      Any representation or warranty previously, presently or hereafter made in writing by or on behalf of the Borrower in connection with any Loan Document shall prove to have been false or incorrect in any material respect on any date on or as of which made, or any Loan Document at any time ceases to be valid, binding and enforceable as warranted in Section 5.5 for any reason other than its release or subordination by the Lender;

(e)      The Borrower fails to duly observe, perform or comply with any agreement with any Person or any term or condition of any instrument, if such agreement or instrument is materially significant to the Borrower, and such failure is not remedied within the applicable period of grace (if any) provided in such agreement or instrument;

(f)      Without limited the generality of the foregoing, the Commercial Operation Date does not occur within 30 days following the Construction Deadline, or Borrower otherwise defaults in its obligations under any Power Purchase Agreement or the Ground Lease or any other lease with respect to the Premises and such default is not cured to the Lender's reasonable satisfaction within thirty (30) days from the date of the default;

(g)      The Borrower (i) fails to pay any portion, when such portion is due, of any of its Indebtedness in excess of $50,000, or (ii) breaches or defaults in the performance of any agreement or instrument by which any such Indebtedness is issued, evidenced, governed, or secured, and any such failure, breach or default continues beyond any applicable period of grace provided therefor;

(h)      The Borrower becomes or obtains an ERISA Affiliate;

(i)      The Borrower:

(i)      suffers the entry against it of a judgment, decree or order for relief by a Governmental Authority of competent jurisdiction in an involuntary proceeding commenced under any applicable bankruptcy, insolvency or other similar Law of any jurisdiction now or hereafter in effect, including the United States Bankruptcy Code, as from time to time amended, or has any such proceeding commenced against it which remains undismissed for a period of sixty days; or

(ii)     commences a voluntary case under any applicable bankruptcy, insolvency or similar Law now or hereafter in effect, including the United States Bankruptcy Code, as from time to time amended; or applies for or consents to the entry of an order for relief in an involuntary case under any such Law; or makes a general assignment for the benefit of creditors; or is generally unable to pay (or admits in writing its inability to pay) its debts as such debts become due; or takes corporate or other action to authorize any of the foregoing; or

(iii)    suffers the appointment of or taking possession by a receiver, liquidator, assignee, custodian, trustee, sequestrator or similar official of all or a substantial part of its assets or of any part of the Collateral in a proceeding brought against or initiated by it, and such appointment or taking possession is neither made ineffective nor discharged within thirty days after the making thereof, or such appointment or taking possession is at any time consented to, requested by, or acquiesced to by it; or

(iv)     suffers the entry against it of a final judgment for the payment of money in excess of $50,000 (not covered by insurance satisfactory to the Lender in its reasonable discretion), unless the same is discharged within thirty days after the date of entry thereof or an appeal or appropriate proceeding for review thereof is taken within such period and a stay of execution pending such appeal is obtained; or

(v)      suffers a writ or warrant of attachment or any similar process to be issued by any Governmental Authority against all or any substantial part of its assets or any part of the Collateral, and such writ or warrant of attachment or any similar process is not stayed or released within thirty days after the entry or levy thereof or after any stay is vacated or set aside;

(j)      Any Change of Control occurs; or

(k)      Any Material Adverse Change occurs.

Upon the occurrence of an Event of Default described in this section with respect to the Borrower, all of the Obligations shall thereupon be immediately due and payable, without demand, presentment, notice of demand or of dishonor and nonpayment, protest, notice of protest, notice of intention to accelerate, declaration or notice of acceleration, or any other notice or declaration of any kind, all of which are hereby expressly waived by the Borrower who at any time ratifies or approves this Agreement. Upon any such acceleration, any obligation of the Lender hereunder or to make any further Loans shall be permanently terminated. During the continuance of any other Event of Default, the Lender at any time and from time to time may, without notice to the Borrower, do either or both of the following: (1) terminate any obligation to make Loans hereunder and (2) declare any or all of the Obligations immediately due and payable, and all such Obligations shall thereupon be immediately due and payable, without

demand, presentment, notice of demand or of dishonor and nonpayment, protest, notice of protest, notice of intention to accelerate, declaration or notice of acceleration, or any other notice or declaration of any kind, all of which are hereby expressly waived by the Borrower who at any time ratifies or approves this Agreement, provided, however, that upon the occurrence of an Event of Default described in clause (i) of this section, the Aggregate Commitment hereunder shall forthwith terminate and be reduced to $0, and the unpaid principal and accrued interest on the Loan and all other amounts owing hereunder, shall automatically become due and payable without any further notice or actions by or on behalf of Lender or any other Person, all of which are hereby expressly waived by the Borrower.

Section 10.2    Remedies. If any Default shall occur and be continuing, the Lender may protect and enforce its rights under the Loan Documents by any appropriate proceedings, including proceedings for specific performance of any covenant or agreement contained in any Loan Document, and the Lender may enforce the payment of any Obligations due it or enforce any other legal or equitable right which it may have. All rights, remedies and powers conferred upon the Lender under the Loan Documents shall be deemed cumulative and not exclusive of any other rights, remedies or powers available under the Loan Documents or at Law or in equity.

Section 10.3    Application of Proceeds after Acceleration. Except as otherwise provided in the Security Documents with respect to application of proceeds to any reimbursements due the Lender thereunder, if the Lender collects or receives money on account of the Obligations after the acceleration of the Obligations as provided in Section 10.1, the Lender shall distribute all money so collected or received:

      (a)    first to any reimbursements due the Lender hereunder; and

      (b)    then ratably to the payment of the Obligations (and among the outstanding Obligations in the manner provided in Section 3.1.

Section 10.4    UCC Remedies. Upon the occurrence of an Event of Default, Lender shall have the right to exercise any and all other rights or remedies afforded under any agreement, by Law, at equity or otherwise, including the rights and remedies of a secured party under the UCC. Such rights and remedies include the rights to (i) take possession of any Collateral; and (ii) sell or otherwise dispose of any Collateral in its then condition, or after any further manufacturing or processing thereof, at public or private sale, with such notice as may be required by Applicable Law, in lots or in bulk, at such locations. Borrower agrees that 10 days notice of any proposed sale or other disposition of Collateral by Lender shall be reasonable. Lender shall have the right to conduct such sales on any Borrower's premises, without charge, and such sales may be adjourned from time to time in accordance with applicable Law. Lender shall have the right to sell, lease or otherwise dispose of any Collateral for cash, credit or any combination thereof, and Lender may purchase any Collateral at public or, if permitted by law, private sale and, in lieu of actual payment of the purchase price, may set off the amount of such price against the Obligations. Lender is hereby granted an irrevocable, non-exclusive license or other right to use, license or sub-license (without payment of royalty or other compensation to any Person) the Generating Unit, any or all Intellectual Property of Borrower, computer hardware and software, trade secrets, brochures, customer lists, promotional and advertising materials, labels, packaging materials and other property, in advertising for sale, marketing, selling, collecting, completing

manufacture of, or otherwise exercising any rights or remedies with respect to, any Collateral. Borrower's rights and interests under Intellectual Property shall inure to Lender's benefit.

### Article 11 - Miscellaneous

Section 11.1    Waivers and Amendments; Acknowledgments.

(a)    Waivers and Amendments. No failure or delay (whether by course of conduct or otherwise) by the Lender in exercising any right, power or remedy which the Lender may have under any of the Loan Documents shall operate as a waiver thereof or of any other right, power or remedy, nor shall any single or partial exercise by the Lender of any such right, power or remedy preclude any other or further exercise thereof or of any other right, power or remedy. No waiver of any provision of any Loan Document and no consent to any departure therefrom shall ever be effective unless it is in writing and signed as provided below in this Section, and then such waiver or consent shall be effective only in the specific instances and for the purposes for which given and to the extent specified in such writing. No notice to or demand on the Borrower shall in any case of itself entitle the Borrower to any other or further notice or demand in similar or other circumstances. This Agreement and the other Loan Documents set forth the entire understanding between the parties hereto with respect to the transactions contemplated herein and therein and supersede all prior discussions and understandings with respect to the subject matter hereof and thereof, and no waiver, consent, release, modification or amendment of or supplement to this Agreement or the other Loan Documents shall be valid or effective against any party hereto unless the same is in writing and signed by the parties.

(b)    Acknowledgments and Admissions. The Borrower hereby represents, warrants, acknowledges and admits that (i) it has been advised by counsel in the negotiation, execution and delivery of the Loan Documents to which it is a party, (ii) it has made an independent decision to enter into this Agreement and the other Loan Documents to which it is a party, without reliance on any representation, warranty, covenant or undertaking by the Lender, whether written, oral or implicit, other than as expressly set out in this Agreement or in another Loan Document delivered on or after the date hereof, (iii) there are no representations, warranties, covenants, undertakings or agreements by the Lender as to the Loan Documents except as expressly set out in this Agreement or in another Loan Document delivered on or after the date hereof, (iv) the Lender has no fiduciary obligation toward the Borrower with respect to any Loan Document or the transactions contemplated thereby, (v) the relationship pursuant to the Loan Documents between the Borrower, on one hand, and the Lender, on the other hand, is and shall be solely that of debtor and creditor, respectively, provided that, solely for purposes of Section 11.5(e) the Lender shall act as agent of the Borrower in maintaining the Register as set forth therein (vi) no partnership or joint venture exists with respect to the Loan Documents between the Borrower and the Lender, (vii) the Lender is not the Borrower's agent, provided that, solely for purposes of Section 11.5(e) the Lender shall act as agent of the Borrower in maintaining the Register as set forth therein, (viii) should an Event of Default or Default occur or exist, the Lender will determine in its sole discretion and for its own reasons what remedies and actions it will or will not exercise or take at that time, (ix) without limiting any of the foregoing, the Borrower is not relying upon any representation or covenant by the Lender, or any representative thereof, and no such representation or covenant has been made, that the Lender will, at the time of an Event of Default or Default, or at any other time, waive, negotiate, discuss,

or take or refrain from taking any action permitted under the Loan Documents with respect to any such Event of Default or Default or any other provision of the Loan Documents, and (x) the Lender has relied upon the truthfulness of the acknowledgments in this Section in deciding to execute and deliver this Agreement and to become obligated hereunder.

      (c)    <u>Joint Acknowledgment</u>. **THIS WRITTEN AGREEMENT AND THE OTHER LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

      Section 11.2   <u>Survival of Agreements; Cumulative Nature</u>. All of the Borrower's various representations, warranties, covenants and agreements in the Loan Documents shall survive the execution and delivery of this Agreement and the other Loan Documents and the performance hereof and thereof, including the making or granting of the Loans and the delivery of the Note and the other Loan Documents, and shall further survive until all of the Obligations are paid in full to the Lender and all of the Lender's obligations to the Borrower are terminated. All statements and agreements contained in any certificate or other instrument delivered by the Borrower to the Lender under any Loan Document shall be deemed representations and warranties by the Borrower or agreements and covenants of the Borrower under this Agreement. The Borrower's representations, warranties, indemnities, and covenants in the Loan Documents, and the rights, powers, and privileges granted to the Lender in the Loan Documents, are cumulative, and, except for expressly specified waivers and consents, no Loan Document shall be construed in the context of another to diminish, nullify, or otherwise reduce the benefit to the Lender of any such representation, warranty, indemnity, covenant, right, power or privilege. In particular and without limitation, no exception set out in this Agreement (including in any Schedule hereto) to any representation, warranty, indemnity, or covenant herein contained shall apply to any similar representation, warranty, indemnity, or covenant contained in any other Loan Document, and each such similar representation, warranty, indemnity, or covenant shall be subject only to those exceptions which are expressly made applicable to it by the terms of the various Loan Documents.

      Section 11.3   <u>Notices</u>. All notices, requests, consents, demands and other communications required or permitted under any Loan Document shall be in writing, unless otherwise specifically provided in such Loan Document, and shall be deemed sufficiently given or furnished if delivered by personal delivery, by facsimile or other electronic transmission, by delivery service with proof of delivery, or by registered or certified United States mail, postage prepaid, to the Borrower at the address of the Borrower specified on the signature pages hereto and to the Lender at its address specified on the signature page of this Agreement (unless changed by similar notice in writing given by the particular Person whose address is to be changed). Any such notice or communication shall be deemed to have been given (a) in the case of personal delivery or delivery service, as of the date of first attempted delivery during normal business hours at the address provided herein, (b) in the case of facsimile or other electronic transmission, upon receipt, or (c) in the case of registered or certified United States mail, three days after deposit in the mail; provided, however, that no Borrowing Notice shall become effective until actually received by the Lender.

Section 11.4   <u>Payment of Expenses; Indemnity</u>.

(a)   <u>Payment of Expenses</u>. Whether or not the transactions contemplated by this Agreement are consummated, the Borrower will promptly (and in any event, within 10 days after any invoice or other statement or notice) pay: (i) all transfer, stamp, mortgage, documentary or other similar taxes, assessments or charges levied by any governmental or revenue authority in respect of this Agreement or any of the other Loan Documents or any other document or transaction referred to herein or therein, (ii) all reasonable costs and expenses incurred by or on behalf of the Lender (including attorneys' fees, consultants' fees and engineering fees, travel costs and miscellaneous expenses) in connection with (1) the negotiation, preparation, execution and delivery of the Loan Documents, and any and all consents, waivers or other documents or instruments relating thereto,(2) the filing, recording, refiling and re-recording of any Loan Documents and any other documents or instruments or further assurances required to be filed or recorded or refiled or re-recorded by the terms of any Loan Document, (3) the borrowings hereunder and other action reasonably required in the course of administration hereof, (4) monitoring or confirming (or preparation or negotiation of any document related to) the Borrower's compliance with any covenants or conditions contained in this Agreement or in any Loan Document, and (iii) all reasonable costs and expenses incurred by or on behalf of the Lender (including without limitation attorneys' fees, consultants' fees and accounting fees) in connection with the preservation of any rights under the Loan Documents or the defense or enforcement of any of the Loan Documents (including this Section), any attempt to cure any breach thereunder by the Borrower, or the defense of the Lender's exercise of its rights thereunder. In addition to the foregoing, until all Obligations have been paid in full, the Borrower will also pay or reimburse the Lender for all reasonable out-of-pocket costs and expenses of the Lender or its agents or employees in connection with the continuing administration of the Loans and the related due diligence of the Lender, including travel and miscellaneous expenses and fees and expenses of the Lender's outside counsel, reserve engineers and consultants engaged in connection with the Loan Documents.

(b)   <u>Indemnity.</u> The Borrower agrees to indemnify the Lender, upon demand, from and against any and all liabilities, obligations, broker's fees, claims, losses, damages, penalties, fines, actions, judgments, suits, settlements, costs, expenses or disbursements (including reasonable fees of attorneys, accountants, experts and advisors) of any kind or nature whatsoever (in this Section collectively called "<u>liabilities and costs</u>") which to any extent (in whole or in part) may be imposed on, incurred by, or asserted against the Lender growing out of, resulting from or in any other way associated with any of the Collateral, the Loan Documents and the transactions and events (including the enforcement or defense thereof) at any time associated therewith or contemplated therein (whether arising in contract or in tort or otherwise). Among other things, the foregoing indemnification covers all liabilities and costs incurred by the Lender related to any breach of a Loan Document by the Borrower, any bodily injury to any Person or damage to any Person's property, or any violation or noncompliance with any Environmental Laws by the Lender or any other Person or any liabilities or duties of the Lender or any other Person with respect to Hazardous Materials found in or released into the environment.

**THE FOREGOING INDEMNIFICATION SHALL APPLY WHETHER OR NOT SUCH LIABILITIES AND COSTS ARE IN ANY WAY OR TO ANY EXTENT OWED,**

**IN WHOLE OR IN PART, UNDER ANY CLAIM OR THEORY OF STRICT LIABILITY OR CAUSED, IN WHOLE OR IN PART BY ANY NEGLIGENT ACT OR OMISSION OF ANY KIND BY THE LENDER,**

provided only that the Lender shall not be entitled under this Section to receive indemnification for that portion, if any, of any liabilities and costs which is proximately caused by its own individual gross negligence or willful misconduct, as determined in a final judgment. If any Person (including the Borrower or any of its Affiliates) ever alleges such gross negligence or willful misconduct by the Lender, the indemnification provided for in this Section shall nonetheless be paid upon demand, subject to later adjustment or reimbursement, until such time as a court of competent jurisdiction enters a final judgment as to the extent and effect of the alleged gross negligence or willful misconduct. As used in this Section the term "Lender" shall also to each director, officer, agent, trustee, attorney, employee, representative and Affiliate of or for such Person.

Section 11.5    Assignments.

(a)    All grants, covenants and agreements contained in the Loan Documents shall bind and inure to the benefit of the parties thereto and their respective successors and assigns; provided, however, that the Borrower may not assign or transfer any of its rights or delegate any of its duties or obligations under any Loan Document without the prior consent of all of the Lender. If the Borrower or any Affiliate of the Borrower at any time purchases some but less than all of the Obligations owed to the Lender, such purchaser shall not be entitled to any rights of the Lender under the Loan Documents unless and until the Borrower or its Affiliates have purchased all of the Obligations.

(b)    The Lender shall not make any assignment or transfer of any kind of its commitments or any of its rights under the Loan or under the Loan Documents, except for assignments to an Eligible Transferee, and then only if such assignment is made in accordance with the following requirements:

(i)    Each such assignment shall apply to all Obligations owing to the assignor Lender hereunder and to the unused portion of the assignor Lender's commitments, so that after such assignment is made the assignor Lender shall have a fixed (and not a varying) percentage share in the Loan and Note and be committed to make that percentage share of all future Advancess, the assignee shall have a fixed percentage share in the Loan and Note and be committed to make that percentage share of all future Advances.

(ii)    The parties to each such assignment shall execute and deliver to the Lender, for its acceptance and recording in the Register (as defined below in this Section), an assignment and acceptance, appropriately completed, together with the Note subject to such assignment. Upon such execution, delivery, and payment and upon the satisfaction of the conditions set out in such Assignment and Acceptance, then (1) the Borrower shall issue new Notes to such assignor and assignee upon return of the old Note to the Borrower, and (2) as of the "Settlement Date" specified in such Assignment and Acceptance the assignee thereunder shall be a party hereto and the Lender hereunder and the Lender shall thereupon deliver to the

Borrower and the Lender a schedule showing the revised percentage shares of such assignor Lender and such assignee Lender.

(iii)    Each assignee Lender which is not a United States person (as such term is defined in Section 7701(a)(30) of the Internal Revenue Code) for Federal income tax purposes, shall (to the extent it has not already done so) provide the Borrower with the necessary forms with respect to withholding.

(iv)    Unless the assignee is an Affiliate of the assignor, such assignment shall be consented to in writing by the Lender and, unless an Event of Default shall have occurred and be continuing, the Borrower (such consent not to be unreasonably withheld or delayed).

(c)    Nothing contained in this Section shall prevent or prohibit the Lender from assigning or pledging all or any portion of the Loan and Note to any Federal Reserve Bank as collateral security pursuant to Regulation A of the Board of Governors of the Federal Reserve System and any Operating Circular issued by such Federal Reserve Bank; provided that no such assignment or pledge shall relieve such Lender from its obligations hereunder.

(d)    By executing and delivering an Assignment and Acceptance, each assignee Lender thereunder will be confirming to and agreeing with the Borrower that such assignee understands and agrees to the terms hereof

(e)    The Lender shall maintain a copy of each Assignment and Acceptance and a register for the recordation of the names and addresses of Lenders and their percentage shares of, and principal amount of the Loan owing to, each Lender from time to time (in this Section called the "**Register**").  The entries in the Register shall be conclusive, in the absence of manifest error, and the Borrower and the Lender may treat each Person whose name is recorded in the Register as a Lender hereunder for all purposes. The Register shall be available for inspection by the Borrower or the Lender at any reasonable time and from time to time upon reasonable prior notice. The Lender shall act as the agent of the Borrower solely for purposes of maintaining the Register as set forth in this <u>Section 11.5(e).</u>

Section 11.6    <u>Governing Law; Submission to Process</u>. Except to the extent that the Law of another jurisdiction is expressly elected in a Loan Document, the Loan Documents shall be deemed contracts and instruments made under the Laws of The Commonwealth of Massachusetts and shall be construed and enforced in accordance with and governed by the Laws of The Commonwealth of Massachusetts and the Laws of the United States of America, without regard to principles of conflicts of law. The Borrower hereby agrees that any legal action or proceeding against the Borrower with respect to this Agreement, the Note or any of the Loan Documents may be brought in the courts of the state of Massachusetts or in the United States of America U.S. District Court for the District of Massachusetts as Lender Parties may elect, and, by execution and delivery hereof, the Borrower accepts and consents for itself and in respect to its property, generally and unconditionally, the jurisdiction of the aforesaid courts, and further agrees to a transfer of any such proceeding to a federal court sitting in The Commonwealth of Massachusetts to the extent that it has subject matter jurisdiction, and otherwise to a Commonwealth court in Boston, Massachusetts, and agrees that such jurisdiction shall be

exclusive, unless waived by the Lender in writing, with respect to any action or proceeding brought by it against Lender Parties and any questions relating to usury. The Borrower waives any right to stay or to dismiss any action or proceeding brought before said courts on the basis of *forum non conveniens.* Nothing herein shall affect the right of the Lender to serve process in any manner permitted by Law or shall limit the right of the Lender to bring proceedings against the Borrower in the courts of any other jurisdiction.

Section 11.7    Limitation on Interest. The Lender and the Borrower intend to contract in strict compliance with applicable usury Law from time to time in effect. In furtherance thereof such persons stipulate and agree that none of the terms and provisions contained in the Loan Documents shall ever be construed to provide for interest in excess of the maximum amount of interest permitted to be contracted for, charged, or received by applicable Law from time to time in effect. None of the Borrower or any present or future guarantors, endorsers, or other Persons hereafter becoming liable for payment of any Obligation shall ever be liable for unearned interest thereon or shall ever be required to pay interest thereon in excess of the maximum amount that may be lawfully contracted for, charged, or received under applicable Law from time to time in effect, and the provisions of this Section shall control over all other provisions of the Loan Documents which may be in conflict or apparent conflict herewith.

Section 11.8    Termination; Limited Survival. In its sole and absolute discretion the Borrower may at any time that no Obligations are owing (other than indemnity obligations and similar obligations that survive the termination of this Agreement for which no notice of a claim has been received by the Borrower) elect in a written notice delivered to the Lender to terminate this Agreement. Upon receipt by the Lender of such a notice, if no Obligations are then owing this Agreement and all other Loan Documents shall thereupon be terminated and the parties thereto released from all prospective obligations thereunder. Notwithstanding the foregoing or anything herein to the contrary, any waivers or admissions made by the Borrower in any Loan Document, any Obligations under Sections 3.2 through Section 3.4, and any obligations which any Person may have to indemnify or compensate the Lender shall survive any termination of this Agreement or any other Loan Document. At the request and expense of the Borrower, the Lender shall prepare and execute all necessary instruments to reflect and effect such termination of the Loan Documents. The Lender is hereby authorized to execute all such instruments on behalf of all Lenders, without the joinder of or further action by the Lender.

Section 11.9    Severability. If any term or provision of this Agreement or of any Loan Document shall be determined to be illegal or unenforceable all other terms and provisions of this Agreement and the other Loan Document shall nevertheless remain effective and shall be enforced to the fullest extent permitted by applicable Law.

Section 11.10    Counterparts; Fax. This Agreement may be separately executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to constitute one and the same Agreement. This Agreement and the Loan Documents may be validly executed and delivered by facsimile or other electronic transmission.

Section 11.11    Waiver of Jury Trial, Punitive Damages, etc. The Borrower and the Lender each hereby knowingly, voluntarily, intentionally, and irrevocably (a) waives, to the

maximum extent not prohibited by Law, any right it may have to a trial by jury in respect of any litigation based hereon, or directly or indirectly at any time arising out of, under or in connection with the Loan Documents or any transaction contemplated thereby or associated therewith, before or after maturity; (b) waives, to the maximum extent not prohibited by Law, any right it may have to claim or recover in any such litigation any "**Special Damages**", as defined below, (c) certifies that no party hereto nor any representative or agent or counsel for any party hereto has represented, expressly or otherwise, or implied that such party would not, in the event of litigation, seek to enforce the foregoing waivers, and (d) acknowledges that it has been induced to enter into this Agreement, the other Loan Documents and the transactions contemplated hereby and thereby by, among other things, the mutual waivers and certifications contained in this Section.  As used in this section, "**Special Damages**" includes all special, consequential, exemplary, or punitive damages (regardless of how named), but does not include any payments or funds which any party hereto has expressly promised to pay or deliver to any other party hereto.

Section 11.12   USA Patriot Act Notice. Lender hereby notifies the Borrower that pursuant to the requirements of the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "**Act**"), it is required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow the Lender to identify the Borrower in accordance with the Act.

Section 11.13   Lender's Consent. Whenever pursuant to this Agreement (a) the Lender exercises any right given to it to approve or disapprove, (b) any arrangement or term is to be satisfactory to the Lender, or (c) any other decision or determination is to be made by the Lender, the decision of the Lender to approve or disapprove, all requirements that any arrangements or terms are satisfactory or not satisfactory and all other decisions and determinations made by the Lender shall be in the sole and absolute discretion of the Lender and shall be final and conclusive, except as may be otherwise expressly and specifically provided herein.  All approvals of or waivers by the Lender in respect of any of the terms, conditions or requirements of this Agreement must be in writing.

*[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]*

IN WITNESS HEREOF, the Borrower and Lender have executed this Agreement under seal by its duly authorized signing officer as of date first written above.

BORROWER:

KINGSTON WIND INDEPENDENCE, LLC, a Massachusetts limited liability company

By: _____
Name: Bradford S. Cleaves
Title: Manager

Address:
415 VFW Drive, Post Office Box 415
Rockland, MA  02370

LENDER:

CATHAY BANK, a California banking corporation

By: _____
Name:   GRANT A. PATTISON
Title:   VP & Man - BOSTON

Address:
621 Washington Street
Boston, MA 02111

'Signature Pate to Credit Agreement]

SCHEDULE 1

<u>DISCLOSURE SCHEDULE</u>

*[To be Completed by Borrower]*

 To supplement the following sections of the Agreement of which this Schedule is a part, the Borrower hereby makes the following disclosures:

Section 5.6.  <u>Initial Projections:</u>

None.

Section 5.7.  <u>Other Obligations and Restrictions:</u>

None.

Section 5.9.  <u>Litigation:</u>

None.

Section 5.10.  <u>Labor Disputes and Acts of God:</u>

None.

Section 5.12.  <u>Environmental and Other Laws:</u>

None.

Section 5.13.  <u>Names and Places of Business:</u>

None.

Section 5.14.  <u>The Borrower's Subsidiaries:</u>

None.

Section 5.19.   <u>Governmental Approvals and Permits:</u>

Federal Aviation Administration
Determination of No Hazard
Issued:  July 5, 2011
Expires: January 5, 2013

MA Department of Environmental Protection
Post Closure Use of Kingston Sanitary Landfill Transmittal #231941
Issued: May 27, 2011
Expires: N/A

Board of Environmental Protection
Order affirming Maine Department of Environmental Protection permit issued on
Expires: N/A

Town of Kingston, Massachusetts
Site Plan Review Approval pursuant to Section 4.16 of the Town of Kingston Zoning By-Laws
Issued: July 7, 2010
Expires:  N/A

Town of Town of Kingston, Massachusetts
Building Permit Number 4070
Issued: October 20,2011
Expires:  N/A

Massachusetts Department of Highways
Wide Load Permit
Issued:
Expires:
(Unless construction has commenced)

Section 5.20    <u>Holders of Real Estate Interests in the Premises</u>:

1.    Town of Kingston, Massachusetts: Lessor under lease to Kingston Wind Independence, LLC, as contained in Net Metering Power Sales Agreement dated March 18th, 2011, by and between Town of Kingston, Massachusetts and Kingston Wind Independence, LLC

2.    Various other easements and interests affect the Premises as listed and identified in title and survey materials to be furnished to lender, to which further reference is made for a complete description of the title to the Premises.

Section 7.1    <u>Existing Indebtedness</u>:

None.