# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| CATHAY BANK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. 1:20-cv-11396-FDS |
| v. | ) | |
| | ) | |
| KINGSTON WIND INDEPENDENCE, | ) | |
| LLC, BRADFORD CLEAVES, | ) | |
| KIALLY RUIZ, and DUNCAN PETERSON, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DEFENDANT PETERSON'S MEMORANDUM IN SUPPORT OF MOTION TO VACATE EX PARTE ATTACHMENT AGAINST HIM

1.  <u>Mr. Peterson's 1993 Tenancy by the Entirety</u>. Mr. Peterson and his wife, Ms. Rita Berkeley, purchased by Quitclaim Deed on March 1, 1992 a property located 12 Cousens Circle, Newton, Massachusetts (the "Newton Property"). Peterson Aff., ¶ 2, and Ex. "1" thereto . The Quitclaim Deed specified, at the bottom of the first paragraph, that Mr. Peterson and Ms. Berkeley were purchasing the Newton Property as "Husband and Wife as tenants by the entirety." *Id.* Mr. Peterson Ms. Berkeley were married in 1988. *Id.* Mr. Peterson remains married to Ms. Berkeley and they both reside at the Newton Property. *Id.* Mr. Peterson knew the Newton Property was protected by a tenancy by the entirety. Id., ¶ 3.

2.  <u>Writ of Attachment Recorded against Mr. Peterson</u>. The Writ of Attachment recorded by the Bank was for $1.8 million and specifically references the book and page of the Deed to the Newton Property. Peterson Aff., ¶ 4, and Ex. "2".

3. <u>Formation of KWI.</u> In 2011, Mr. Peterson, a construction company manager, Bradford Cleaves ("Mr. Cleaves), also a construction company manager, and Kially Ruiz ("Mr. Ruiz"), a consultant in the industrial wind turbine industry, formed a Massachusetts limited liability company called Kingston Wind Independence, LLC ("KWI"). Ruiz Aff., ¶ 2. They formed KWI for the purpose of purchasing, installing, and operating an industrial wind turbine in the Town of Kingston, Massachusetts. *Id.*

4. <u>KWI's 2001 Contract with the Town of Kingston.</u> In 2011 KWI entered into a contract with the Town of Kingston pursuant to which KWI would sell electrical power to Kingston, to be generated by KWI's acquisition and installation in Kingston of a large industrial grade 2 MW wind turbine to be situated on Town-owned land (the "Kingston Contract" and the "KWI Turbine"). Ruiz Aff., ¶ 3. KWI would also pay the Town: (1) personal property taxes; and (2) rent for running the KWI Turbine on the site of a former Town land fill, a site not usable for any other significant economic purpose. *Id.* At the time of this 2011 Kingston Contract no regulation of the Town, or any other regulation, restricted the KWI Turbine from operating 24 hours per day, 365 days per year. *Id.*

5. <u>KWI's Contract with the Massachusetts Clean Energy Center</u> ("CEC"). In 2011 KWI entered into a contract with the CEC pursuant to which the CEC would purchase up to 71,443 Renewable Energy Credits ("RECs") over 15 years with a value of between $2.1-$2.6 million (the "CEC Contract"). Ruiz Aff., ¶ 4. The RECS were essentially a subsidy being offered to increase production of alternative energy such as wind energy. *Id.*

6. <u>KWI's 2011 Contract with Hyundai.</u> In 2011 KWI also entered into a contract with Hyundai Heavy Industries ("Hyundai") to purchase what is referred to here as the KWI Turbine or the Turbine (the "Hyundai Contract"). Ruiz Aff., ¶ 5. The Hyundai Contract

applied Massachusetts law but provided that disputes were subject to international arbitration. *Id.*

7.  The Bank's 2011 Loan. In 2011, the Bank made a $5,068,000 loan to KWI to finance its purchase, installation, and operation of the KWI Turbine (the "Loan"). This Loan was evidenced by a Promissory Note and was governed by a Construction to Permanent Loan and Security Agreement (the "Loan Agreement"). Ruiz Aff., ¶ 6. Also, as part of its loan arrangement with the Bank, KWI granted the Bank a customary all-assets first-position UCC security interest or lien on all of KWI's assets (the "Bank's 1st Lien"), a copy of which, as recorded in the Massachusetts UCC Lien Registry, Ruiz Aff., ¶ 6, Ex. "2", which Bank's 1st Lien included, at section (j), the KWI Turbine, and at section (l), the Kingston Contract.

8.  The Guaranty. Defendants Mr. Cleaves, Mr. Peterson, and Mr. Ruiz executed a Guaranty of Payment of the Loan (the "Guaranty"). Ruiz Aff., Ex. "3". In the Guaranty, at section 4(c), each Guarantor purported to "waive[] any defense to the enforcement of the Guaranty, including ... any manner in which Lender has exercised its rights and remedies under the Loan Documents..."[1]

9.  Investment-backed Expectations. KWI entered into the Kingston Contract, the Hyundai Contract, and the Loan based on the following investments: (1) the Guarantors invested over $2.0 million, which was ultimately the property of Mr. Cleaves, Mr. Peterson, and Mr. Ruiz; (2) the CEC made a grant to KWI of $2.4 million; and (3) the U.S Treasury made a grant to KWI of $1.9 million, Ruiz Aff., ¶ 8, Ex. "4", all of which are referred to here as the "Investment-backed Expectations".

---

[1] As shown below, this waiver clause violated the applicable provisions of the Massachusetts Uniform Commercial Code, G.L. c. 106.

10.     A Related Wind Turbine Purchase to be Located in Ipswich.  A separate company, Ipswich Wind Independence, LLC ("IWI"), but with the same three managing members, also entered into a contract with Hyundai to buy a 2 MW industrial wind turbine to be installed at a location in the Town of Ipswich. Ruiz Aff., ¶ 9.  That purchase was financed with a loan from Seminole Bank located in Florida. *Id.*

11.     KWI Begins to Repay the Loan.  KWI proceeded to pay back the Loan over time from revenues generated from operating the KWI Turbine.  Ruiz Aff., ¶ 10.  Such revenues derived from the Turbine's production of electrical power and KWI's sale of that power to the Town and from its sales of the RECs to the CEC. *Id.*

12.     Dispute with Hyundai.  Problems with the both turbines began as early as 2013. Ruiz Aff., ¶ 11.  In late 2013 Hyundai and KWI/IWI entered into a Memorandum of Understanding ("MOU") providing KWI  and IWI with certain remedies. *Id.*

13.     Dispute with the Town of Kingston.  A dispute between KWI and the Town of Kingston began when some residents of the Town complained about night-time noise from the KWI Turbine.  Ruiz Aff., ¶ 12.  In 2015 of the Town's Board of Health ("BOH") issued an abatement order against the KWI Turbine (the "Noise Order"). *Id.* The Noise Order forced KWI to shut down operation of the KWI Turbine 5 hours per day, resulting in a loss of electricity production and corresponding revenue of about 22%. *Id.* The BOH could have resorted to less onerous means of dealing with the noise issue than complete shut-down of the KWI Turbine of five hours per day such as by permitting the KWI Turbine to run during those hours when wind speeds reached a certain level. *Id.* Only operating at higher wind speeds, as shown by expert studies, would mask the noise of the Turbine itself. *Id.*, ¶ 12, Ex. "5". Out of gross annual revenue of approximately $803,000, this 22% drop in gross revenue (about

$175,000), given KWI's annual operating expenses of approximately $620,000, meant that the Noise Order rendered the KWI Turbine essentially unprofitable and economically unviable. *Id.* As a result, KWI was increasingly unable to pay the taxes and rent it owed to the Town. And the Town exacerbated this problem by increasing the personal property taxes on KWI, and refusing abatements, even while the KWI Turbine had no economic value. *Id.*

14.     The Bank's Actions Seeking To Enforce Its Collateral. The Bank was at all times kept aware of the BOH's Noise Order and its attorney William Pezzoni ("Attorney Pezzoni") made substantial efforts to lift or reduce the Noise Order and reduce KWI's taxes because the Bank recognized that Kingston's actions jeopardized the Bank's ability to enforce its collateral and KWI's ability to repay the Loan. Ruiz Aff., ¶ 13. In the Fall of 2018 Attorney Pezzoni undertook a substantial effort to bring aby contacting and/or meeting with Kingston's BOH, Kingston's Selectmen, and the Massachusetts CEC. *Id.* Attorney Pezzoni sent a letter dated October 2, 2018, to Jay Talerman, counsel for the Town of Kingston, together with a chart summarizing such studies, indicating that the Town had no right to set-off funds in payment of electricity KWI provided to the Town against taxes the Town claimed KWI owed to the Town. *Id.* at Ex. "6". On November 21, 2018, Attorney Pezzoni sent an email to Attorney Talerman, *id.* at Ex. "7", asking for the total of KWI's funds the Town was withholding and the balance of taxes the Town claimed KWI owed, and further indicating that Attorney Pezzoni was "assisting in bringing this matter to an amicable resolution." Attorney Pezzoni sent a further email to the Guarantors and Grant Pattison ("Mr. Pattison"), the Bank's First Vice President & Manager of Commercial Lending, dated December 11, 2018, *id.* at Ex. "8", detailing some of his efforts to bring about a resolution of the Town of Kingston's ongoing actions to shut down the Turbine and overtax KWI.

15.    <u>Ongoing Dispute with Hyundai.</u> In 2017, KWI's and IWI's problems with Hyundai's wind turbines remained. Ruiz Aff., ¶ 14.

16.    <u>Filing of International Arbitration against Hyundai.</u>  On April 10, 2017, KWI and IWI, through the Houston, Texas law firm of Yetter Coleman and its partner, Collin Cox ("Attorney Cox"), filed an international arbitration against Hyundai with the International Center for Dispute Resolution (the "Arbitration"). Ruiz Aff., ¶ 15. KWI and IWI entered into a contingency fee arrangement with the Yetter Coleman law firm to prosecute their claims in the Arbitration. *Id.* Initially in the Arbitration KWI and IWI jointly sought $400 million in damages against Hyundai, but this included long-term liabilities potentially owed to the Towns where the wind turbines were located, subcontractor claims, government claw-backs, and treble damages under G.L. c. 93A. *Id.*

17.    <u>Arrangements Giving the Arbitration Funder a 1st Lien.</u> KWI and IWI located an arbitration funding firm by the name of Parabellum Capital ("Parabellum") located in New York City which was willing to fund the cost of the Arbitration against Hyundai. Ruiz Aff., ¶ 16.  However, Parabellum was not willing to fund the legal fees and costs of such an Arbitration, which were projected to exceed $3.5 million, unless: (1) it received a ".65X profit multiple" on its funds spent on Arbitration fees and costs (to which KWI and IWI agreed); and (2) the Bank agreed to subordinate its 1st Lien to all funding provided by Parabellum. Id. The Yetter Coleman law firm, by law, had a priority attorney's lien on all of the litigation proceeds over the Bank's 1st Lien without any explicit subordination by the Bank to such attorneys' lien. Id. The Bank agreed to subordinate its 1st Lien to Parabellum. Id. This was accomplished by Parabellum forming a limited liability company by the name of IWKW 1703-547, LLC ("IWKW"), with KWI and IWI granting a first position lien on all "Collateral" consisting of

6

"Litigation Proceeds" to IWKW (except the "Litigation Proceeds that are owed to the Law Firm" which were already protected by Yetter Coleman's attorneys' lien). Ruiz Aff., ¶ 16, Ex. "9". The Bank then entered into an Intercreditor Agreement with IWKW and KWI, *id.* at Ex. "10", pursuant to which the Bank, defined in the Intercreditor Agreement as the "Creditor," consented to the grant to IWKW, defined as "Buyer," of a first position security interest in the Litigation Proceeds. Specifically, the Intercreditor Agreement provided, at ¶ 1, that "Creditor [the Bank] hereby consents ... to the Buyer's [IWKW's] first priority interest in the Litigation Proceeds and the Collateral, as defined in the Security Agreement ...." (Bracket added).[2]

18.    <u>KWI's Reduced Demand.</u>  By October, 2018 KWI and IWI had reduced their joint demand to about $57 million including treble damages under c. 93A. Ruiz Aff., ¶ 17.

19.    <u>2019 Town of Kingston Cease & Desist Order against KWI Turbine.</u>  On August 14, 2019 the Town of Kingston issued a Cease & Desist Order requiring the KWI Turbine to be permanently shut down, Ruiz Aff., Ex. "11", in part due to the unpaid taxes and rent which the Town was still charging after the Town had used the Noise Order to deprive the KWI Turbine of all net operating income with which to pay the rent and taxes. *Id.* This rendered the KWI Turbine a total loss and completely destroyed the investment-backed expectations in the KWI Turbine. *Id.* This also exacerbated an existing constitutional "taking" claim against the Town making that claim now worth in excess of at least $2.2 million in net present value not including tax and rent overcharges. *Id.* See report of Sustainable Energy Advantage, dated May 25, 2017, and revised on June 27, 2017,

---

[2] <u>Consequences of the Bank's Subordination.</u>  As a result of the Bank's complete subordination of its 1st Lien to IWKW, which was essentially Parabellum, the Bank had no right to any of the Litigation Proceeds under its prior 1st Lien unless and until: (1) Parabellum was paid 100% for all funds it had advanced to fund the Arbitration plus a contractual profit multiple of 65% of such funds; and (2) Yetter Coleman was paid 100% of the fees and costs owed to it.

commissioned by the Massachusetts CEC, *id.* at ¶ 19, and Ex. "12", documenting the loss due to the "taking" (see Table 10, lower right, for "Cumulative NPV" of negative $2,256,836). In addition, as result of the shut-down and "taking" KWI lost the value of its remaining RECs with the Massachusetts CEC worth approximately $1.5 million. Again, the Bank was kept aware of all of these developments. *Id.* Mr. Ruiz sent a February 7, 2019 email to Mr. Pattison of the Bank warning of a likely cease and desist order. *Id.* at Ex. "13".

20.     KWI Kept the Bank Informed. KWI kept the Bank informed of the filing and progress of the Arbitration. Ruiz Aff., ¶ 19. KWI also kept the Bank informed of the status of the problems with the operation of the KWI Turbine and its eventual complete shut-down. Mr. Ruiz sent the Bank status updates on a regular basis. *Id.*

21.     The Arbitration Hearing Took Place in London in October 2019. The Arbitration hearing took place in London before a three-person tribunal (the "Tribunal") in October 2019. Ruiz Aff., ¶ 20. After the hearing was completed the tribunal announced it would release its final decision sometime between June and September 2020.

22.     KWI Reduced Its Demand Again. On the advice of Arbitration counsel, at the time of the London arbitration hearing, KWI and IWI then reduced their demand to Hyundai, as part of a potential settlement, still further to $10 million. Ruiz Aff., ¶ 21.

23.     Hyundai Offered to Settle But For Much Less than KWI Demanded. Around the end of April 2020, Hyundai offered to settle for $███████ [redacted][3] subject to a final, signed agreement. Ruiz Aff., ¶ 22.

---

[3] The settlement agreement among KWI, IWI, the Guarantors and Hyundai requires that it be kept confidential. However, the Bank has stated the amount of the settlement in both its Memorandum in Support, at page 3, and in the Pattison Affidavit, at ¶ 12.

24.  Hyundai's Offer Was Not Enough to Cover Parabellum's 1st Lien.  As of the time of Hyundai's $████ [redacted] offer the arbitration funder, Parabellum alone was already entitled to at least $7 million under its contract with KWI and IWI. Ruiz Aff., ¶ 23.

25.  On May 7th - Attorney Cox for KWI Informed the Bank's Attorney.  On May 7th Attorney Cox from the Yetter Coleman law firm sent an email to Attorney Pezzoni, representing the Bank, telling him: "The overall settlement is $████ [redacted] (pending negotiation of the final terms and the document)…." Ruiz Aff., Ex. "14".

26.  May 19th – Bank Sent Payoff Balance with Inducements.  On May 19th at 11:49 am Mr. Pattison of the Bank sent an email to Mr. Ruiz and Attorney Pezzoni stating, "The payoff balance for KWI, as of today, is attached" along with a pay-off statement entitled Kington Wind Independence, LLC. Ruiz Aff., Ex. "15". The pay-off statement gave the "payoff balance" for what KWI owed to the Bank as $1,650,000, which included the inducement of "Waived" late charges of $37,256.91 out $40,625 and "Waived Prepayment Penalty" completely of $34,134.68. *Id.*

27.  May 19th - Deal Proposed to Bank. Later, on May 19th at 7:32 pm, Attorney Cox sent an email to Attorney Pezzoni explaining that KWI and the Guarantors had reached a $████ [redacted] settlement with Hyundai. Ruiz Aff., Ex. "16". Attorney Cox explained in his email that he was proposing a deal to the Bank whereby Parabellum would take only $2,319,356 of the proposed settlement funds, that is, only 33.1% of that to which it was entitled. *Id.* Parabellum's 1st Lien then amounted to "somewhere between $7-10M" including cash it invested in the Arbitration plus a .65X profit multiple on its investment. Attorney Cox further explained that Yetter Coleman would take only $2,000,000 of the proposed settlement funds, representing only its costs and no fees, which amount was no

9

better than 36% of the total to which it was entitled of up to $5,582,293. *Id.* He went on to say, "... this means no money for KWI, IWI, ..." Attorney Cox, in return, asked the Bank to agree to take only $1,332,222 out of $1,664,000 owed, that is, about 80%. *Id.* Seminole Bank would also receive the same 80%. *Id.* He further explained that Hyundai "would pay the money within *45 days of signature*." (Italics added). *Id.*

28. <u>May 19th – Attorney Pezzoni Seeks Back Up</u>. On May 19th Attorney Pezzoni sent an email to Attorney Cox in response to Attorney Cox's offer of a deal to the Bank. Ruiz Aff., Ex. "17". In that May 19th email Attorney Pezzoni says: "I still need the back up for what makes up the amounts owed to you, Parabellum, and Seminole. Please provide so my client can make an appropriate and timely decision. They cannot make a decision unless they know the full amounts (broken out by line item) of all charges being assessed to get to their global numbers." *Id.*

29. <u>May 19th - Deal Reiterated That Bank Must Release Guarantors to Get Any Funds</u>. Also, on May 19th Mr. Ruiz sent an email to Mr. Pattison reiterating the discounted payment offer Attorney Cox had proposed (referred to here as the "Deal"), Ruiz Aff., Ex. "18", asking (bolding in original):

> if it is OK to proceed ... we would accept the deal under the following conditions: A. Cathay and Seminole accept approximately 80 cents on the dollar principal amount owed and release the three owners completely of all personal guarantees on the loans and any other liabilities to the banks. B. Parabellum and Yetter Coleman take an equal and significant haircut ... **We would like to get your approval to proceed and sign the settlement offered with Hyundai**. They are waiting for our final word on finalizing the settlement.

On May 20th, Mr. Ruiz sent another email, Ex. "19", asking if it was "OK to proceed."

30. <u>May 24th Back-up Documentation Provided to Bank</u>. On May 24th Attorney Cox sent an email to Attorney Pezzoni, Ruiz Aff., ¶ 29, Ex. "20", in response to Attorney

Pezzoni's May 19th request for the back-up documentation by line item of every expense charged. The back-up provided to Attorney Pezzoni included: (1) "Cost Report" for all time expended by Yetter Coleman consisting of 81 pages showing total fees accrued; (2) the balance due to Seminole Bank; (3) a letter from Parabellum specifying the amount owed to IWKW; (4) invoices of Yetter Coleman's co-counsel; (5) and documents setting forth the rights of Parabellum, IWKW, and Yetter Coleman to 100% of the litigation proceeds. *Id.*

31.     Post May 24th - KWI and the Guarantors Were Waiting for a Response from the Bank. After the May 24th email, Attorney Cox, Parabellum, KWI and the Guarantors were waiting to hear back from the Bank about its response to the offer of the Deal. *Id.* Mr. Cleaves sent an email dated May 29th to Mr. Ruiz, Mr. Peterson, and Attorney Cox in which he said: "Just waiting on response from Bill Pezzoni – Cathay Lawyer." *Id.*

32.     The Bank made no Substantive Objection to the Deal and its Acceptance seemed a Foregone Conclusion. KWI and the Guarantors believed acceptance of the Deal by the Bank was very likely because: (1) the Bank had not signaled any disagreement with the Deal and had only wanted the back-up supporting the Deal (which it got, as noted above); (2) due to Parabellum's 1st Lien, and because it was entitled under its 1st Lien to an amount in excess of the pending settlement of $▮▮▮▮▮▮ [redacted], acceptance of the Deal was the only way for the Bank to get substantial immediate cash, let alone a penny of the settlement proceeds; and (3) if the Bank had signaled disagreement, KWI and the Guarantors would not have done the settlement (their signatures, as parties to the Arbitration were required), and they would have awaited a final arbitration award from the Tribunal (which may or may not have provided sufficient funds to pay off the Bank). *Id.*

11

33.     June 15th- KWI and Guarantors Signed the Settlement with Hyundai. On June 15, 2020 KWI and the Guarantors, for the reasons set forth above, and expecting the Bank to agree to the Deal proposed to it by both Attorney Cox and Mr. Ruiz, signed the settlement agreement with Hyundai. Ruiz Aff., ¶ 32. On June 16th, Attorney Cox for KWI/IWI and the Guarantors, sent an email to the Arbitration Tribunal announcing the settlement. *Id.* at Ex. "21". At that point, based on Hyundai's prior statements, Attorney Cox, KWI/IWI, and the Guarantors expected receipt of the settlement proceeds around July 30, 2020. *Id.*

34.     July 18th - Default Letter from the Bank. Attorney Pezzoni for the Bank, on July 8, 2020 sent a certified letter to KWI and the Guarantors giving notice of default and demanding payment in full (the "Default Letter"). Ruiz Aff., ¶ 33, Ex. "22".

35.     Bank Makes no Effort to Respond to the Offer of the Deal. The July 10th Default Letter was the *very first communication of any kind* KWI and the Guarantors had received from the Bank since Attorney Cox and Mr. Ruiz had offered the Deal to the Bank's counsel, Attorney Pezzoni, and the Bank's officer, Mr. Pattison, on May 19th. *Id.*

36.     July 16th – Mr. Ruiz sent an email to Attorney Pezzoni. Mr. Ruiz sent an email to Attorney Pezzoni but received the following reply: "I'll be out of the office for medical purposes until Tuesday, July 21st, with limited email, voicemail and cell phone access." Ruiz Aff., ¶ 35, Ex. "23". Thereafter, Mr. Pezzoni never responded to Mr. Ruiz. *Id.*

37.     July 24th – the Bank sues KWI and the Guarantors. On July 24th the Bank commenced this suit against KWI and the Guarantors. *Id.*

38.     August 5th – Attorney Cox wires the Bank Its Promised share of the Hyundai Proceeds. Hyundai sent the settlement proceeds in 45 days, at the end of July, as expected. On August 5, 2020, Attorney Cox wired from Yetter Coleman's IOLTA account for KWI to

Cathay Bank the amount of $1,225,000. Ruiz Aff., ¶ 37, Ex. "34". Seminole had received an identical amount a few days earlier. The distributions were made equally to KWI and IWI, and then to their bank creditors, pursuant to the terms of Intercreditor Agreement. Because the Bank was already holding $129,000 of KWI's funds (see Ruiz Aff., ¶ 37, Ex. "25") the Bank' August 14th set-off letter), upon the Bank's receipt of the $1,225,000 of wired funds it was more than paid in full pursuant to the terms of the Deal.

## Standard for Vacating an Ex Parte Attachment

The standard for obtaining and vacating an ex parte real estate attachment is governed by Massachusetts state law, specifically, Mass.R.Civ.P. 4.1(c) & (f). Under Rule 4.1 the moving party seeking ex parte attachment must demonstrate: (1) a reasonable likelihood of success on the merits; (2) in an amount equal to or greater than the amount sought to be attached; and (3) a "clear danger" that the party whose property is sought to be attached "if notified in advance ... will convey it, remove it from the state or will conceal it ..." Rule 4.1(h) states that proof must be provided by "affidavits" setting forth "specific facts" to warrant the findings.

A defendant whose property is attached on an ex parte attachment can move on two days' notice to vacate that attachment. Mass.R.Civ.P. 4.1(g). In such a motion to vacate the defendant "must first introduce evidence by affidavit sufficient to challenge any finding in the ex parte order." *Latorraca v. Centennial Techs., Inc.*, 583 F.Supp. 2d 208, 211 (D. Mass. 2008), affirmed sub nom, *Latorraca v. Taniki Financial Corp.*, 393 Fed. Appx. 730 (1st Cir. 2010).[4] "Once the defendant provides the required evidence, the burden reverts to the plaintiff

---

[4] "Every lawyer is an officer of the court [and] has a duty of candor to the tribunal." *Pearson v. First NH Mortgage Corp.*, 200 F.3d 30, 38 (1st Cir. 1999). Where a moving party in an ex parte proceeding has relied on material omissions and misrepresentations in order to obtain ex parte relief that ex parte relief should be vacated. *UBS Financial Services, Inc. v. Hergert*, 2013 WL 5775667, *1 (W.D. Wash. 2013) ("The court issued the TRO

to justify the attachment as if it had not been previous granted." *Id.* (citing, *Aetna Cas. and Sur. Co v. Rodco Autobody*, 138 F.R.D. 328, 332 (D. Mass. 1991).

Once the plaintiff's affidavit in support of its initial ex parte motion is sufficiently challenged by the defendant's motion to vacate, the plaintiff must again demonstrate a reasonable likelihood of success on the merits. The rules then applicable include: (1) "Courts have generally declined to approve attachments in the face of significant factual disputes." *Bergus v. Florian*, 2019 WL 7565458, *5 (D. Mass. 2019); *Hayes v. CRGE Foxborough, LLC*, 167 F. Supp.3d 229, 240 (D. Mass. 2016) ("factual disputes … preclude the Court from concluding that there is a reasonable likelihood of success…"); and (2) a motion for attachment should be denied "where defenses were at least facially meritorious." *Sheehan v. Netversant-New England, Inc.*, 435 F.Supp.2d 130, 132 (D. Mass. 2004).

**Argument**

1. **The Bank's Material Omissions And Misleading Statements To the Court Require That The Burden Shift To The Bank To Justify the Attachment.**

   a. The Bank hid the fact that counsel for KWI and the Guarantors had offered the Bank over $1.3 million from the settlement proceeds and that the Bank had not turned down the Deal backing this offer.

The Bank did not mention anywhere in its papers that counsel for KWI/Guarantors, Collin Cox, a highly respected attorney,[5] had offered the Bank $1.3 million from the settlement proceeds as part of an overall Deal. Facts listed above ("Facts"), ¶ 26. The Bank did not tell the Court that as part of the Deal KWI/Guarantors were not going to get anything from the settlement. Ruiz Aff., Ex. 16, p. 3. All proceeds were going to pay their Arbitration funder, their attorneys, and their banks. *Id.* at pp. 1-2. And the Bank did not tell the Court that

---

on October 10 because UBS misrepresented three critical facts. It did so by omitting some material facts entirely and offering half-truths (or worse) about other facts.").

[5] See Exhibit "1" to this Memorandum.

it had *not* turned down this offer.  Facts, ¶ 30, 31, 34.  The Bank had to have a reasonable

expectation it would get the money from the Deal, and it got the money.  Facts, ¶ 38.

> b. The Bank hid the fact that Mr. Peterson owned the Newton Property as a tenancy by the entirety with his wife so as to help create the false impression that he would sell it if notified in advance of a hearing on a motion to attach it.

The Bank had seen the Deed to Mr. Peterson's Newton Property before submitting its

Ex Parte Motion to the Court because its Writ of Attachment recorded in response to allowance

of its Motion references the exact book and page of the Deed of Mr. & Mrs. Peterson to the

Newton Property showing a tenancy by the entirety.  Compare Peterson Aff. Exs. "2" and "1".

Yet the Bank didn't tell the Court the Newton Property was held in a tenancy by the entirety.

Why not?  With the Property held by a tenancy by the entirety there was nothing the

Bank could do to sell or otherwise realize on it to pay the Loan. J. Shapiro, et al, 48 *Mass.*

*Practice Collection Law*, § 4:56 (4th ed. June 2020 update) (the "interest of a debtor spouse

[Mr. Peterson] in property held as a tenants by the entirety shall not be subject to execution or

seizure by a creditor [the Bank] of such debtor spouse as long as such property is the principal

residence of the nondebtor spouse [Mr. Peterson's wife]"; citing, G.L. c. 209, § 1) (Brackets

added).  And Mr. Peterson knew this.  Facts, ¶ 1.  He had absolutely no reason to try and sell

the Newton Property when it was already protected against the Bank's ability to seize or sell it.

But the Bank didn't tell the Court any of this, which was all entirely material.

As a result of this concealment the Court made the clearly mistaken finding, at Docket

#9, that : "(ii) there is a clear danger that the defendant if notified in advance of the attachment

of the property will convey it, remove it from the state or will conceal it." [6]

---

[6] As for finding no. (i) that Mr. Peterson "is not subject to the jurisdiction of the court", that is contradicted by the Bank's Verified Complaint, at ¶ 4, where the Bank states under oath that, "Defendant is a resident of Massachusetts."  As for finding no. (ii) that "there is an immediate danger that the defendant will damage or destroy the property to be attached," but where the Property to be damaged or destroyed was Mr. Peterson's

15

c. The Bank gave the misleading impression that it did not have the details of the Deal when, instead, it had the details as well as all exhaustive backup for the amount it was being offered.

Attorney Cox in his emails of May 19th and May 24th, Facts, ¶¶ 27 & 30, gave Attorney Pezzoni the exact details of the upcoming settlement, that is, the Deal, who was to get what from the Deal and why, and then followed up with exhaustive backup for the amounts to be paid. In spite of these communications, the Bank tries to mislead and create a false impression to the contrary by stating: (1) "the defendants have failed to provide a copy of the settlement agreement to Cathay Bank" – Pattison Aff., ¶ 13; and (2) "they have stopped responding to Cathay Bank's inquiries [regarding the settlement proceeds] – Pattison Aff., ¶ 15; and (3) "Cathay Bank has made numerous efforts to communicate with Kingston Wind and various representatives in an effort to find a solution; however, Kingston Wind has failed to respond in any material way – Pattison Aff., ¶ 18.

First, as for not supplying a copy of the draft settlement itself, the Bank knew it contained a standard confidentiality clause. 2nd Ruiz Aff., ¶ 2. The Bank had to conceal this too, lest the failure to provide the settlement agreement itself appear prosaic, as it was.

Second, as for claim that KWI stopped responding, this is most ironic because the truth is the other way around. Attorney Pezzoni did not get back to Attorney Cox about the offered Deal which paid 80% in return for a release of the Guarantors. Facts, ¶¶ 30, 31, 32, 35, 36.

Third, as for the Bank's claim that it made efforts to find a solution, instead, Attorney Cox's and Mr. Ruiz's offer of the Deal to the Bank makes clear that, instead, it was KWI and the Guarantors, at the conclusion of their 3-year Arbitration with Hyundai, who were the ones

_____

own house where he lived with this wife, in a protected tenancy by the entirety, this finding is completely unsupported and is even absurd on its face.

trying to find a solution. Facts, ¶¶ 27, 29. As for the claim that KWI and the Guarantors "failed to respond in any material way", again, instead, it was the Bank that did not respond to Attorney Cox's and Mr. Ruiz's offer of the Deal to the Bank. Facts, ¶¶ 27, 29, 31, 32. For the Bank to try to argue that the offer of the Deal to it, with its proposed 80% recovery, was somehow "not a response in a material way" can only be characterized as sheer falsehood.

In summary, due to the Bank's repeated material omissions and misstatements the Ex Parte Order should be vacated with the burden shifted to the Bank to justify any attachment.

**2. The Bank Cannot Meet Its Burden Because KWI And The Guarantors Have Set Out a Reasonable Case That The Bank, Whjch Made No Objection to the Deal From Which It Otherwise Would Have Received Nothing, Is Equitably Estopped From Claiming Any More Is Owed.**

The doctrine of equitable estoppel as recognized in Massachusetts courts holds the Bank to the Deal which it was offered, which compromised the rights of Parabellum and the Yetter Coleman law firm to more of the settlement proceeds, which gave up the right of KWI and the Guarantors to await a potentially much larger decision by the Arbitration panel, to which Deal the Bank made no substantive objection, it got all the backup in exhaustive detail, and it received and accepted the payment, to which it otherwise had no right whatsoever. All of this is set forth in the Facts, ¶¶ 17, 24, 27, 29, 30, 32, 38 . And the applicable law here is equitable estoppel as set forth in *In re Spenlihauer*, 572 B.R. 18, 43 (Bankr. D.Mass. 2017), citing, *Boylston Dev. Group, Inc.* v. *22 Boylston St. Corp.*, 412 Mass. 531, 542-543 (1992):

> [E]stoppel is employed to prevent the inequitable assertion of rights which would otherwise exist to the detriment of an opposing party who has been misled. .... Estoppel requires that the Court find existence of: 1) a representation or conduct amounting to a representation intended to induce a course of conduct on the part of the person to whom the representation is made; 2) an act or omission resulting from the representation, whether actual or by conduct, by the person to whom the representation is made; and 3) detriment to such person as a consequence of the act or omission. *In re Colarusso*, 295 B.R. 166, 177 (1st Cir. BAP 2003), citing to *Boylston Dev. Group, Inc.* v. *22 Boylston St. Corp.*, 412 Mass. 531, 591 N.E.2d 157 (1992) ... "Conduct" may include

17

spoken words, written words, positive acts, silence, and negative omissions to do something .... To find estoppel, there need not be an actual intent to defraud or mislead. The estopped party need only have intended or expected that another would act based upon his representations.

Here, KWI and the Guarantors have more than set forth at least a facially reasonable argument – and much more, supported by exhaustive detail - which under the applicable standard set forth above bars any claim by the Bank on the alleged deficiency it sought in the Ex Parte Motion.

### 3. Alternatively, The Bank Cannot Meet Its Burden Because It Owed KWI & The Guarantors A Duty to Act in A Commercially Reasonable Manner, Which Duty Cannot Be Waived And Which It Has Violated, Thus Barring Any Deficiency.

The Bank as a "secured party" at all times owed KWI, as "debtor", and the Guarantors, as "secondary obligors," a duty to "proceed in a commercially reasonable manner .... to collect or enforce an obligation of an account debtor or other person obligated on collateral" as long as the secured party is "entitled to ... full or limited recourse against debtor or secondary obligor." G.L. c. 106, § 9-607(c) ("UCC"). The elements requiring the Bank, as provided for under § 9-607(c), to have acted in a "commercially reasonable manner" all existed here: (1) the Guarantors are "secondary obligors" as defined at UCC, § 9-102, Com 2 ("secondary obligors" are defined as "those persons who have a stake in the proper enforcement of the security interest because of their obligation to pay the secured debt"); (2) "other person obligated on collateral" means "the right to enforce claims that the debtor may enjoy against others ... those claims typically would be proceeds of original collateral" as set forth at UCC, § 9-607, Com 3 (see UCC Lien, Ex. 2, the Kingston Contract and other contracts were the Bank's collateral);

and (3) the Bank is entitled to "full or limited recourse against ... a secondary obligor" because the terms of the Guaranty, Ruiz Ex. "3", at § 4(c), as the Bank itself argues, so provide.[7]

Once the secured party's compliance "is placed in issue, the secured party has the burden of establishing that the collection, enforcement, disposition, or acceptance was conducted in accordance with this part." UCC, § 9-626(a)(2). "[T]he secured party may not recover any deficiency unless it meets this burden." UCC, § 9-626, Com 3.

Moreover, the scope of the Bank's § 9-607(c) duty extends to "collection or enforcement" with the term "enforcement" not expressly defined in the UCC. The U.S. Congress has defined the phrase "enforce contracts" to mean "the performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship." 42 U.S.C. § 1981(b). Here, Attorney Pezzoni on behalf of the Bank sought to modify the Kingston Contract so as to enable KWI not to be financially crippled by the Noise Order and so it could pay its obligations to the Town and the Bank. Facts, ¶ 14. Attorney Pezzoni also intervened and sought to modify the CEC Contract again so that KWI could be adequately funded and pay its obligations. Facts, ¶ 14. And Attorney Pezzoni acting for the Bank had the leverage of a 1st Lien on KWI's assets except for the Arbitration proceeds. He and the Bank were also therefore in a position to take from the Town the funds of KWI it was wrongly withholding. Facts, ¶¶ 7, 14. They were also in a position to assert that the Town's actions amounted to a "force majeure" such that the Town had no right to taxes or rent. Ruiz Aff., Ex. "1," p. 4. The Bank was also in a position to assert a "taking"

---

[7] And the UCC expressly bars any waiver of the 9-607(c) duty no matter what the Guaranty or other loan document provide; the waiver terms in such documents are illegal. UCC, § 9-602(3) ("the debtor or obligor may not waive or vary the rules stated in the following listed sections: ... (3) Section 9-607(c), which deals with collection or enforcement of collateral."

claim against the Town and/or its BOH for the damages they caused.[8]  In summary, the Bank actively sought over a period of many months, while possessing tremendous leverage, to modify KWI's rights to its advantage and KWI's.  However, it eventually did nothing and abandoned KWI and its Guarantors to twist and eventually be sued by the Bank for a deficiency.  Such actions, given the harm caused by the BOH, the Town, and the CEC, and the value of the resulting claims against them, were not commercially reasonable.  More reasonable efforts would have resulted in no deficiency.  Now the burden rests with the Bank to prove otherwise at trial or be denied any deficiency.

With the burden on the Bank in an evidentiary setting to come forward with proof that its conduct was commercially reasonable, it cannot now prove a reasonable likelihood of success on its deficiency against Mr. Peterson and, accordingly, any further attachment against Mr. Peterson should be denied.

KINGSTON WIND INDEPENDENCE, LLP
BRADFORD CLEAVES, KIALLY RUIZ, and
DUNCAN PETERSON
By their attorneys,

*/s/ Michael C. Gilleran*
Michael C. Gilleran (BBO #192210)
michael.gilleran@fisherbroyles.com
Fisher Broyles LLP
470 Atlantic Avenue, 4th Floor
Boston, MA  02210
Tel: 339.237.1384

Dated:  September 9, 2020

---

[8] The elements of a valid "taking" claim were all present: (1) the BOH first rendered KWI's Turbine economically unviable and then shut it down completely – Facts, ¶¶ 13, 19; (2) the KWI Turbine was supported by extensive Investment-backed Expectations – Facts, ¶ 9; and (3) the BOH's actions were all post-acquisition and it had alternatives to abate the noise but still permit the KWI Turbine to operate – Facts, ¶ 13. *Penn Central Trans. Co. v. New York City*, 438 U.S. 104, 124 (1978) (setting forth the three elements).

## Certificate of Service

I, Michael C. Gilleran, hereby certify that I have today served the foregoing document on all other counsel of record through the ECF filing system, with which all plaintiff's counsel have registered.

/s/ Michael C. Gilleran_____
Michael C. Gilleran

Dated: September 9, 2020

Exhibit "1"

# YetterColeman LLP
TRIALS | APPEALS

Lawyers
Practices & Experience
The Newsroom
Careers
About Us
Contact Us

## Lawyers



### Collin J. Cox
Partner

**Contact**
ccox@yettercoleman.com
O: 713.632.8069 | M: 832.722.2166 | Houston, Texas
vCard PDF

#### Professional Summary

Collin is a business trial lawyer who represents plaintiffs and defendants in high-stakes commercial cases. He has been a lead trial lawyer in computer software trade secrets cases, several actions related to the Bernard L. Madoff fraud, royalty disputes, patent litigation, and other business crisis situations. In each of his representations, Collin prides himself on his ability to get to the heart of a complex matter, making everything as simple as possible, but not simpler (to quote Einstein), to tell a winning story to a jury or judge.

Collin continues to be the youngest trial lawyer in Texas to receive band ranking recognition from *Chambers USA* in General Commercial Litigation, which reports in its *2020 Guide* that he is considered "a go-to trial lawyer" who is "commercially very savvy and a strategic thinker." Collin's strong reputation also is reflected in his national role serving a second consecutive year on *Law360*'s Trials Editorial Advisory Board.

In 2018, Collin was one of 59 Americans selected as a Presidential Leadership Scholar, completing a year-long leadership curriculum centered around four presidential administrations. He currently serves on the board of directors for the Houston Bar Association, UTHealth Development, Houston Wilderness, and Da Camera of Houston. He chaired three major nonprofit boards before turning 40, including the Buffalo Bayou Partnership and the Texas Lyceum, the pre-eminent leadership organization for Texans younger than 45. He also is on the Board of the Texas General Counsel Forum's Houston Chapter, which focuses on best legal practices for in-house counsel.

Collin maintains a close connection to Duke Law School, serving on its Board of Visitors and on its Adjunct Faculty, teaching a class on Hearings Practice each of the last three years. Collin is named in *Best Lawyers in America®* for commercial and intellectual property litigation and is noted as a "Texas Super Lawyer" by *Thomson Reuters* and a "Houston Top Lawyer" by *H Magazine*. In 2012, he was recognized as the Woodrow B. Seals Outstanding Young Lawyer in Houston.

Prior to joining the firm, Collin practiced with Williams & Connolly LLP in Washington, D.C., and was a law clerk for the Honorable Anthony J. Scirica, Chief Judge of the United States Court of Appeals for the Third Circuit, in Philadelphia.

Collin and his wife, Jacquelyn, have three children.

#### Representative Experience

SHOW ALL | HIDE ALL

- *GHP Nail Systems, LLC v. Benelux Cosmetics B.V.* Obtained a $2.7 million jury verdict on counterclaims while defending Benelux, a Netherlands-based cosmetic distributor in a trial involving poor-quality gel nail polish manufactured by the plaintiff. We were hired four months

*"A go-to trial lawyer for businesses from a wide range of industries, including oil and gas, financial services and technology companies" who is praised for his "ferocious work ethic and very good tactical sense."*

— CHAMBERS USA:
AMERICA'S LEADING
LAWYERS FOR BUSINESS

Collin is recognized by his peers in Commercial and Intellectual Property Litigation.

— THE BEST LAWYERS IN
AMERICA®

Named a "Texas Super Lawyer" in Business Litigation.

— THOMSONREUTERS

before a three-week trial, after discovery and expert selection. We prevailed on all counterclaims and successfully defeated seven claims by GHP. The final award for our client included actual damages, penalty damages, and attorney fees.

- *Ruben Rodriguez v. Encana Oil & Gas (USA) Inc.* Secured a complete dismissal of a breach of contract claim brought against client Helmerich & Payne by a subcontract employee who allegedly was injured on an H&P rig located on Encana's property. Granting our motion to dismiss, the Court held that the plaintiff could not establish he was a third-party beneficiary of his daywork drilling contract where he only pleaded that he received incidental benefits from H&P's obligations under the contract.

- *Sanchez v. Noble Energy.* Secured dismissal of a nuisance and personal injury lawsuit brought against Noble Energy in Texas state court involving an alleged accident that occurred in Colorado. After briefing and argument, the court granted our motion to dismiss for forum non conveniens, dismissing the lawsuit with prejudice.

- *Joseph Hardesty, et al. v. County of Sacramento* Helped secure a unanimous $107 million federal jury trial win (after five weeks of testimony) for two mining families in California. Plaintiffs alleged that the County of Sacramento violated their procedural and substantive due process rights by improperly shutting down a sand-gravel mine at the urging of a large competitor (Top 100 U.S. verdict of 2017).

- *Business Logic Holding Corporation v. Morningstar et al.* In a complex case involving financial software in the retirement sector, first-chaired a trial team that secured a $61 million cash recovery that represented 95% maximum claimed damages by our client, Business Logic. Reached the last business day before jury selection, the agreement is the 9th largest disclosed trade-secrets settlement in the U.S. Also argued summary judgment, which preserved our misappropriation and breach-of-contract claims and disposed of Morningstar's counterclaim against our client.

- *Polyzen, Inc. v. RadiaDyne, L.L.C.* First-chaired a defense victory in a four-day jury trial in Raleigh representing defendant RadiaDyne, the designer of balloons used in prostate cancer therapy. Before trial, the court dismissed all patent claims brought by the plaintiff, a manufacturer of medical balloons. At trial, the jury unanimously found for our client on plaintiff's trade secret claim and its claim for unpurchased inventory. The jury also found that plaintiff breached the relevant contract, competed unfairly with our client, and failed to return tooling paid for by RadiaDyne. After a seven-year journey, the case resulted in a judgment for monetary damages for RadiaDyne, which has since been affirmed by the Federal Circuit.

## Professional Honors & Affiliations

SHOW ALL | HIDE ALL

- *Best Lawyers in America*® in Commercial and Intellectual Property Litigation, 2016-2021
- *Chambers USA: America's Leading Business Lawyers* in Texas Commercial Litigation, 2015-2020
- "Texas Super Lawyer" in Business Litigation, *Thomson Reuters*, 2013-2019
- "Houston Top Lawyer" in Business Litigation, *H Magazine*
- "Texas Rising Star," by *Thomson Reuters*, 2008-2013
- 2012 Woodrow B. Seals Outstanding Young Lawyer Award, Houston Young Lawyers Association
- Outstanding Young Alumnus of Baylor University, 2008

## Presentations & Publications

SHOW ALL | HIDE ALL

- "Helping Clients Overcome Financial Hurdles Mid-Litigation," *Law360*, July 16, 2020 (co-author)

- "Nuisance - Trespass and Limitations Issues," 42nd Annual Advanced Civil Trial Course, 2019 (presenter)
- "Discovery of Damages in TCPA Cases," 32nd Annual Advanced Evidence and Discovery Course, 2019 (presenter and co-author)
- "Business Development, Marketing and Networking Strategies," Practice Skills for Young Lawyers, Texas Young Lawyers Association of State Bar of Texas, March 2017 (panelist)
- Adjunct Professor (Wintersession), Hearings Practice, Duke Law School, 2017-2020
- "Commercial Litigation Trends in Texas," *Financier Worldwide*, November 2016
- "Trends in Commercial Litigation," State Bar 8th Annual Business Disputes Conference, September 2016 (presenter and co-author)

Education & Professional Background

- Duke University, J.D., *summa cum laude*, 2001 (Order of the Coif, Editor-in-Chief, 2000-2001, Duke Law Journal)
- University of Cambridge, M.Phil., *First Class Honors,* 1999
- Baylor University, B.A., *magna cum laude*, 1997 (Phi Beta Kappa, Outstanding Graduate, College of Arts & Sciences, Student Body President, Permanent Class President)
- Law Clerk to The Hon. Anthony J. Scirica, U.S. Court of Appeals for the Third Circuit, 2001-2002
- Temple Bar Scholar
- Admitted to Practice: Texas, 2001, District of Columbia, 2003, New York, 2015

Contact | Disclaimer | Sitemap
Copyright © 2020 YetterColeman LLP. Site by i2i Group